# Exhibit A

CSC

**null / ALL**
**Transmittal Number: 34880449**
**Date Processed: 08/25/2026**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Laurie Holm<br>Invitation Homes<br>5420 Lyndon B Johnson Fwy<br>Ste 600<br>Dallas, TX 75240-6230 |
| **Electronic copy provided to:** | Jack Delorimier<br>Kristy McPherson<br>Libby Mazur<br>Kimberly Reynolds |

| | |
|---|---|
| **Entity:** | 2018-4 IH Borrower LP<br>Entity ID Number 3855823 |
| **Entity Served:** | 2018-4 Ih Borrower LP |
| **Title of Action:** | Jennifer Anderson vs. 2018-4 Ih Borrower LP |
| **Matter Name/ID:** | Jennifer Anderson vs. 2018-4 Ih Borrower LP (19810753) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Discrimination |
| **Court/Agency:** | Riverside County Superior Court, CA |
| **Case/Reference No:** | CVME2611301 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 08/24/2026 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Consumer Protection Network<br>213-285-4321 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674 (888) 690-2882 | sop@cscglobal.com

Electronically FILED by Superior Court of California, County of Riverside on 08/19/2026 02:40 PM
Case Number CVME2611301 0000178871661 - Jason B. Galkin, Executive Officer/Clerk of the Court By Judith Soriano, Clerk

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***

2018-4 IH BORROWER LP, a limited partnership; THR PROPERTY MANAGEMENT L.P., a limited partnership; INVITATION HOMES REALTY CALIFORNIA, INC., a California corporation; CONSERVICE, LLC, a limited liability company; MATTHEW HICKS, an individual; FELICIA HOUSTON, an individual; and DOES 1 through 50, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

JENNIFER ANDERSON, AN INDIVIDUAL,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Southwest Justice Center
30755-D Auld Road, Murrieta, CA 92563

CASE NUMBER:
*(Número del Caso):*
CVME2611301

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Onica Cole (SBN198383); Consumer Protection Network-LA; 205 S. Broadway, Suite802, Los Angeles, CA 90012; (213) 285-4321.

DATE: *(Fecha)* 08/19/2026 Clerk, by *(Secretario)* J. Soriano [signature], Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]
SUPERIOR COURT OF CALIFORNIA COUNTY OF RIVERSIDE
GC68150(g)

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: **2018-4 IH BORROWER LP, a limited partnership**

   under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☒ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*: AUG 2 4 2026

Electronically FILED by Superior Court of California, County of Riverside on 08/19/2026 02:40 PM
Case Number CVME2611301 0000178871660 - Jason B. Galkin, Executive Officer/Clerk of the Court By Judith Soriano, Clerk

Onica V. Cole [SBN 198383]
CONSUMER PROTECTION NETWORK-LA
205 S Broadway, Suite 802
Los Angeles, CA 90012
(213) 285-4321
Onica.Cole@ConsumerProtectionNetworkLA.com
*Attorney for Plaintiff Jennifer Anderson,*

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF RIVERSIDE**

JENNIFER ANDERSON, AN INDIVIDUAL,

Plaintiff,

vs.,

2018-4 IH BORROWER LP, a limited partnership; THR PROPERTY MANAGEMENT L.P., a limited partnership; INVITATION HOMES REALTY CALIFORNIA, INC., a California corporation; CONSERVICE, LLC, a limited liability company; MATTHEW HICKS, an individual; FELICIA HOUSTON, an individual; and DOES 1 through 50, inclusive,

Defendants

Case No.: CVME2611301
Assigned to Hon. Judge:

**COMPLAINT**

1. **FAILURE TO PROVIDE REASONABLE ACCOMMODATION** — *Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B)*
2. **FAILURE TO PROVIDE REASONABLE ACCOMMODATION** — *FEHA, Gov. Code § 12955 et seq.*
3. **DISABILITY-BASED HARASSMENT AND RETALIATION** — *FHA and FEHA*
4. **UNLAWFUL ENTRY** — *California Civil Code § 1954*
5. **VIOLATION OF CALIFORNIA TENANT PROTECTION ACT / AB 1482 RENT CAP** — *California Civil Code § 1947.12*
6. **BREACH OF QUIET ENJOYMENT / NUISANCE** — *California Civil Code §§ 1927 and 3479*
7. **NEGLIGENT SUPERVISION / RETENTION**
8. **FAILURE TO ENGAGE IN A GOOD FAITH INTERACTIVE PROCESS** — *FEHA*
9. **TRESPASS**
10. **INVASION OF PRIVACY / INTRUSION UPON SECLUSION**
11. **UNFAIR BUSINESS PRACTICES** — *Business and Professions Code § 17200 et seq.*
12. **DECLARATORY AND INJUNCTIVE RELIEF**

**PARTIES**

1. Plaintiff, **JENNIFER ANDERSON** hereinafter "Plaintiff Jennifer" or "Plaintiff," is, and at all relevant times mentioned herein was, an individual residing in the State of California. Plaintiff Jennifer is the lawful tenant of the residential premises located at 40169 Medford Road, Temecula, California 92591 the "Subject Property". Plaintiff Jennifer has resided at the Subject Property since on or about August 8, 2014, has fulfilled her obligations under the tenancy, and has a direct and legally protectable interest in the claims asserted herein.

2. Defendant, **2018-4 IH BORROWER LP** hereinafter "Defendant 2018-4 IH Borrower," is, and at all relevant times mentioned herein was, the landlord of the Subject Property as identified in Plaintiff Jennifer's lease and lease renewal documents. Plaintiff is informed and believes, and thereon alleges, that Defendant 2018-4 IH Borrower entered into lease and renewal agreements with Plaintiff Jennifer, collected rent and other charges from Plaintiff Jennifer, and was responsible for compliance with all applicable federal, state, and local housing laws, including laws governing disability accommodations, tenant protections, rent charges, utility charges, and lawful entry.

3. Defendant, **THR PROPERTY MANAGEMENT L.P.** hereinafter "Defendant THR Property Management," is, and at all relevant times mentioned herein was, the property manager for the Subject Property as identified in Plaintiff Jennifer's lease and lease renewal documents. The lease documents identified THR Property Management L.P. as authorized to manage the residence and act on behalf of the landlord for purposes including service of process, eviction actions, and receiving notices and demands. Plaintiff is informed and believes, and thereon alleges, that Defendant THR Property Management was responsible for management, maintenance coordination, tenant communications, inspection scheduling, entry practices, and enforcement of policies and procedures at the Subject Property.

4. Defendant, **INVITATION HOMES REALTY CALIFORNIA, INC.** hereinafter "Defendant Invitation Homes Realty California," is, and at all relevant times mentioned herein was, an entity identified in lease-related communications and documents as a broker, leasing entity, and/or affiliated entity connected to the Subject Property. Plaintiff is informed and believes, and thereon alleges, that Defendant Invitation Homes Realty California, Inc., including through its employees, agents, and representatives, participated in leasing, renewal communications, tenant communications, fee-related communications, and related conduct alleged herein.

5. Defendant, **CONSERVICE**, hereinafter "Defendant Conservice," is, and at all relevant times mentioned herein was, a third-party utility billing and/or utility management company that billed or attempted to collect utility-related charges from Plaintiff Jennifer in connection with the Subject Property. Plaintiff is informed and believes, and thereon alleges, that Defendant Conservice acted on behalf of and/or in coordination with the landlord and property management Defendants by issuing utility statements, demanding payment for water, sewer, and service fees, and participating in the utility billing practices challenged herein.

6. Defendant, **MATTHEW HICKS**, hereinafter "Defendant Hicks," is, and at all relevant times mentioned herein was, an individual employed by, contracted with, or acting on behalf of Defendants in connection with ProCare inspections, maintenance visits, and/or attempted entries at the Subject Property. Plaintiff is informed and believes, and thereon alleges, that Defendant Hicks was identified in Defendants' maintenance portal and/or communications as the individual sent to Plaintiff Jennifer's residence in connection with ProCare visits, including on or about October 17, 2025 and May 18, 2026. Plaintiff further alleges that despite her prior counsel's request that the individual connected to Plaintiff Jennifer's sexual harassment and safety concerns not be sent to her home, Defendant Hicks was again sent to the Subject Property.

7. Defendant, **FELICIA HOUSTON**, hereinafter "Defendant Houston," is, and at all relevant times mentioned herein was, an individual employed by or acting on behalf of Defendants as a leasing agent, renewal specialist, DRE-licensed representative, and/or agent involved in Plaintiff Jennifer's lease renewal and tenant communications. Plaintiff is informed and believes, and thereon alleges, that Defendant Houston received and acknowledged Plaintiff Jennifer's accommodation-related communications, including Plaintiff Jennifer's request for email-only communication due to disability and her objection to the disputed administrative fee.

8. The true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each DOE Defendant is legally responsible in some manner for the occurrences herein alleged, including but not limited to any related Invitation Homes entity, parent company, affiliate, employee, contractor, utility billing agent, property management entity, ProCare representative, maintenance worker, leasing representative, or other person or entity involved in the conduct alleged herein. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

9. Plaintiff is informed and believes, and thereon alleges, that at all relevant times each Defendant was the agent, employee, representative, contractor, partner, joint venturer, alter ego, and/or authorized actor of each other Defendant, and in doing the acts alleged herein was acting within the course and scope of such agency, employment, representation, contractual authority, partnership, joint venture, or other relationship. Plaintiff is further informed and believes, and thereon alleges, that each Defendant ratified, authorized, approved, directed, participated in, or failed to prevent the acts and omissions alleged herein.

**VENUE**

10. Venue is proper in the Superior Court of California, County of Riverside, pursuant to Code of Civil Procedure section 395(a), because the Subject Property is located in Riverside County, California, and the acts and omissions giving rise to this action occurred in Riverside County.

11. Accordingly, the Superior Court of California, County of Riverside has proper jurisdiction and venue over this action.

**PROPERTY**

12. This action concerns the residential premises located at 40169 Medford Road, Temecula, California 92591 the "Subject Property". The Subject Property consists of a single-family residence intended for residential tenancy purposes. The Subject Property is located within the City of Temecula, County of Riverside, State of California.

13. Upon information and belief, the Subject Property is owned, operated, managed, and/or controlled by Defendant 2018-4 IH Borrower LP, Defendant THR Property Management L.P., Defendant Invitation Homes Realty California, Inc., and/or their related entities, agents, employees, contractors, and representatives. At all relevant times, Defendants acted as the landlord, property manager, leasing agent, and/or agents responsible for the management, maintenance, lease renewals, utility billing, tenant communications, inspection scheduling, and control of the Subject Property.

14. At all relevant times, Defendants and/or their agents operated and communicated with Plaintiff under the name "Invitation Homes" in tenant-facing communications, including lease renewal communications, emails, maintenance portal records, ProCare notices, billing communications, and other materials concerning the Subject Property.

**BACKGROUND**

15. Plaintiff Jennifer originally moved into the Subject Property, on or about August 8, 2014. At the commencement of Plaintiff Jennifer's tenancy, Plaintiff's original monthly rental amount was approximately $2,200.00, plus $20.00 per month in pet rent. Plaintiff Jennifer paid a security deposit in the amount of approximately $2,200.00, together with a pet deposit in the amount of approximately $150.00. Plaintiff Jennifer alleges that, at the beginning of her tenancy, there were no other recurring monthly fees charged in addition to rent and pet rent.

16. In or about 2015, Plaintiff Jennifer paid a monthly "Resident Rent" in the amount of approximately $2,200.00 and a separate $20.00 monthly "Pet Rent" charge.

17. In or about 2016, Plaintiff Jennifer paid a monthly "Resident Rent" in the amount of approximately $2,250.00 and a separate $20.00 monthly "Pet Rent" charge.

18. In or about 2019, Plaintiff Jennifer paid a monthly "Resident Rent" and, while applicable, a separate $20.00 monthly "Pet Rent" charge. Plaintiff Jennifer was still being charged pet rent during portions of 2019, but Plaintiff Jennifer states that the pet rent was later removed after her cat passed away in the home.

19. In or about 2020, Plaintiff Jennifer paid a monthly "Resident Rent" only, in the amount of approximately $2,530.00 and later approximately $2,606.00.

20. In or about October 2021, Defendants began charging Plaintiff Jennifer a $9.95 HVAC filter fee, which Plaintiff Jennifer states was added through a lease addendum and properly disclosed in her lease.

21. In or about 2022, Plaintiff Jennifer paid a monthly "Resident Rent" in the amount of approximately $2,789.00 and a separate $9.95 "HVAC Filter" fee.

22. On or about August 25, 2024, Plaintiff Jennifer entered into a Renewal Rental Agreement with Defendant 2018-4 IH Borrower LP for the residential property located at 40169 Medford Road, Temecula, California 92591. The lease term commenced on September 17, 2024 and ended on September 16, 2025. The lease documents identified Plaintiff Jennifer as the resident and Defendant 2018-4 IH Borrower LP as the landlord. The lease documents further identified THR Property Management L.P. as the property manager authorized to manage the residence and act on behalf of the landlord for purposes including service of process, eviction actions, and receiving notices and demands. The lease documents were executed on behalf of the landlord by Charles Young, identified as Chief Operating Officer. **(Exhibit 1)**

23. On or about the same date, the lease renewal included a "Summary of Lease Charges," which listed Plaintiff Jennifer's monthly base rent as $3,251.00. The Summary of Lease Charges also listed an Air Filter Service Fee of $9.95 and an Internet Package Fee of $85.00, resulting in a stated total monthly rent of $3,345.95. The same Summary of Lease Charges reflected previously paid deposits, including a refundable security deposit of $2,200.00 and an additional refundable security deposit under the Animal Addendum of $150.00, for total deposits paid of $2,350.00. Notably, the 2024–2025 Summary of Lease Charges.did not list a separate Utility Admin Fee as part of the monthly rental charges. **(Exhibit 1)**

24. In or about October 2024, Defendants added an Internet Package fee, which Plaintiff Jennifer likewise states was added through an addendum and properly disclosed in her lease. Plaintiff Jennifer alleges that, unlike those prior disclosed addendum-based charges, the disputed utility-related charges imposed beginning January 1, 2026, including "Utility - Water Chargeback," "Utility - Sewer Chargeback," and "Utility Set-Up & Service Fee," were not clearly disclosed in the renewal communications before she requested disability accommodations, had not been charged during her prior eleven-year tenancy, and were later imposed, collected, and treated as rent or additional rent despite Plaintiff Jennifer's written objections.

25. Plaintiff Jennifer later reviewed the renewal link provided by Defendants' Renewal Specialist, Alia. The renewal page displayed available renewal options and monthly rental amounts, including a twelve-month renewal option at approximately $3,460.00 per month, but did not identify or explain the disputed utility-related fees that were later included in the lease renewal documents. Plaintiff Jennifer alleges that Defendants did not disclose any new utility-related charges or fees in the renewal communications sent before she requested disability accommodations.

26. On or about June 25, 2025, Defendants Invitation Homes internally created a ProCare inspection appointment for Plaintiff Jennifer through a maintenance portal system that Plaintiff Jennifer had not used in several years. Defendants failed to provide any notice to Plaintiff Jennifer that such an appointment had been created. Plaintiff Jennifer did not become aware of this appointment until on or about July 14, 2025, when Defendants' employee arrived at the Subject Property.

27. On or about June 27, 2025, Plaintiff Jennifer received the first of approximately eight emails from Defendants' Renewal Specialist, identified as Alia, inquiring whether Plaintiff Jennifer intended to renew her lease and stating that a renewal letter should have already been received.

28. Plaintiff Jennifer responded that no such renewal letter had been received. In reply, Defendants' agent instructed Plaintiff Jennifer to follow a renewal link provided in the email to view renewal rates. At no time during this communication did Defendants disclose any changes to the lease terms or the addition of any new fees.

29. On or about July 14, 2025, Defendants Invitation Homes scheduled a "ProCare - Post Move-In Visit" for Plaintiff Jennifer despite the fact that Plaintiff Jennifer was not a new tenant and had resided at the property for approximately eleven years.

30. On that same date, an employee of Defendants arrived at Plaintiff Jennifer's residence without prior notice and pounded on her door for approximately ten minutes. Plaintiff Jennifer, unaware of the individual's identity or purpose, experienced fear and distress.

31. The employee ultimately left a notice on the door, which was the only means by which Plaintiff Jennifer learned the individual was affiliated with Defendants.

32. Plaintiff Jennifer subsequently contacted Defendants' maintenance line to inquire about the unauthorized visit and was informed that it was a "ProCare" appointment typically conducted as a courtesy for new tenants.

33. Upon learning that Plaintiff Jennifer was a long-term tenant, Defendants' representative apologized, acknowledged that the visit was a mistake, stated that such appointments are not conducted for long-term tenants, and cancelled the appointment.

34. On or about August 6, 2025, Plaintiff Jennifer contacted her leasing agent, identified as Felicia Houston, informing her that Plaintiff Jennifer's mother had just undergone heart surgery and requesting additional time.

35. Defendants' agent responded within approximately three minutes, expressing sympathy and acknowledging Plaintiff Jennifer's request, thereby demonstrating Defendants' ability to respond promptly to communications when they chose to do so.

36. On or about August 7, 2025, despite being aware of Plaintiff Jennifer's family medical circumstances, Defendants Invitation Homes attempted to schedule another ProCare inspection at Plaintiff Jennifer's residence rather than providing the requested time for her to care for her mother. Defendants failed to provide proper notice

of the appointment, instead sending an email notification at approximately 4:08 p.m. on the evening prior to the scheduled visit.

37. Upon receiving the notice, Plaintiff Jennifer contacted Defendants' maintenance line, requested that the appointment be canceled, and specifically asked that all further communications be conducted via email. Plaintiff Jennifer was informed that her request would be forwarded to Defendants' local office.

38. On or about the same day, Plaintiff Jennifer submitted a written communication to Defendants through the maintenance portal, accessed via the appointment reminder email. In this communication, Plaintiff Jennifer stated that the scheduled ProCare visit was a mistake and requested that it be canceled.

39. Plaintiff Jennifer further stated that, if Defendants did not consider the appointment a mistake, she requested cancellation as a reasonable accommodation for her disability. Defendants did not respond to this communication. Instead, without notifying Plaintiff Jennifer, Defendants rescheduled the appointment approximately two weeks later rather than canceling it.

40. On or about August 15, 2025, Plaintiff Jennifer learned for the first time that the previously scheduled ProCare appointment had not been canceled, but instead had been rescheduled without her knowledge.

41. Plaintiff Jennifer contacted Defendants' maintenance line and again requested a disability accommodation. Plaintiff Jennifer was transferred to Defendants' ProCare department, where she spoke with an employee and reiterated her request for accommodation.

42. During this conversation, Defendants' employee stated that the ProCare program began in 2019, was paused during the COVID-19 pandemic, and had since resumed as an inspection program conducted every six months for select tenants, which is inconsistent with Defendants' public representations.

43. Despite Plaintiff Jennifer's repeated requests, Defendants did not cancel the appointment, but instead rescheduled it again. Plaintiff Jennifer also reasserted her need for email-only communication, and Defendants' employee stated that this request would be passed along to the local office. No follow-up communication was received.

44. Later the same day, Plaintiff Jennifer sent an email to her leasing agent, Felicia Houston, confirming her willingness to renew her lease. However, Defendants failed to respond to this communication.

45. On or about August 20, 2025, after receiving no response from her leasing agent, Plaintiff Jennifer used a previously provided renewal link, originally sent in June 2025, to indicate her intent to renew her lease. Within that submission, Plaintiff Jennifer expressly stated that, due to her disability, she required all correspondence to be conducted via email.

46. Later the same day, Plaintiff Jennifer sent an email to her leasing agent stating, "I was told only the monthly price would be changing." In that same communication, Plaintiff Jennifer reiterated her long-standing disability accommodation requiring email-only communication and noted that certain employees of Defendants were not honoring that accommodation. Defendants failed to respond to this communication.

47. After Plaintiff Jennifer reaffirmed her disability accommodation, Defendants Invitation Homes added an $8.35 administrative fee to Plaintiff Jennifer's lease without proper notice and transmitted the lease for her signature. This fee had never been charged during Plaintiff Jennifer's approximately eleven-year tenancy.

48. Plaintiff Jennifer objected to the addition of this fee in writing to Defendants' employee, identified as Edralyn Boongaling. Defendants failed to respond. Although Defendant Conservice initially represented that it would directly handle and collect utility-related charges, as of January 1, 2026, Defendants began collecting such charges, including the administrative fee, directly through Plaintiff Jennifer's monthly rent payments.

49. On or about August 21, 2025, after receiving no response from Defendants, Plaintiff Jennifer emailed Defendants' leasing agents, including Felicia Houston, the DRE-licensed agent of record, and Edralyn Boongaling, explaining why the $8.35 administrative fee was unlawful and requesting its removal. Plaintiff Jennifer also reiterated her need for email-only communication as a disability accommodation.

50. On or about August 22, 2025, Plaintiff Jennifer again contacted Felicia Houston regarding both of her disability accommodation requests, renewed her request for removal of the improper lease fee, and further requested that the upcoming ProCare visit be canceled until her accommodations were properly addressed. Defendants failed to respond to any of these communications.

51. On or about August 26, 2025, Plaintiff Jennifer sent a formal written request for reasonable accommodation to Defendants Invitation Homes via FedEx Express. In this letter, Plaintiff Jennifer expressly requested disability accommodations under the Fair Housing Act and California FEHA, including removal from

all ProCare inspections, the ability to self-report any needed repairs, and reaffirmation of her long-standing email-only communication accommodation.

52. Plaintiff Jennifer further requested flexibility in scheduling due to her disabilities, including the ability to cancel or reschedule appointments without penalty. The letter also objected to an unlawfully added administrative fee and asserted that ProCare inspections constituted unlawful entry under California Civil Code. Defendants did not provide a substantive response to this letter.

53. Later the same day, Plaintiff Jennifer contacted Defendants' maintenance line to reschedule the existing ProCare appointment that had been scheduled for August 29, 2025, understanding that maintenance personnel could not cancel such appointments. Plaintiff Jennifer was transferred to Defendants' ProCare department, where the appointment was rescheduled to September 19, 2025, between approximately 10:00 a.m. and 2:00 p.m.

54. On or about August 29, 2025, Plaintiff Jennifer mailed a written letter to Defendants Invitation Homes at their Glendale address, as listed in the lease agreement, via FedEx Express. The letter was signed for and confirmed delivered on that same date. Plaintiff Jennifer also sent a copy of the letter via email to her leasing agent, identified as Felicia Houston.

55. On or about August 29, 2025, Plaintiff Jennifer's treating physician, Kristin Olah, M.D., issued a written statement confirming that Plaintiff Jennifer has disabling medical conditions requiring reasonable housing accommodations.

56. In that letter, Dr. Olah stated that Plaintiff Jennifer requires: (1) exemption from home inspection programs such as ProCare; (2) the ability to cancel or reschedule home maintenance or inspection appointments as needed due to her medical conditions; and (3) email-only communication. The accommodations confirmed by Dr. Olah were the same accommodations Plaintiff Jennifer had previously requested from Defendants in her August 26, 2025 accommodation request letter. Although Defendants had not requested medical documentation, Plaintiff Jennifer, through her counsel at the time, Madeline Liebreich, voluntarily provided Defendants with Dr. Olah's letter on or about October 15, 2025.

57. On or about September 2, 2025, in an internal email communication, Defendant Felicia Houston sent a message to Defendant Gilbert Avalos acknowledging receipt of Plaintiff Jennifer's mailed accommodation letter and further acknowledging that Plaintiff Jennifer had requested removal of the administrative fee. In that same

communication, Defendant Felicia Houston explicitly stated that Plaintiff Jennifer was requesting email-only communication due to her disability.

58. On or about September 4, 2025, Defendants prepared and executed lease renewal documents on behalf of Defendant 2018-4 IH Borrower LP for the residential property located at 40169 Medford Road, Temecula, California 92591, for a lease term commencing on September 17, 2025 and ending on September 16, 2026. Although Plaintiff Jennifer signed the lease renewal on or about September 15, 2025, the lease documents themselves reflect a September 4, 2025 execution date on behalf of Defendants.

59. The lease renewal identified THR Property Management L.P. as the property manager authorized to manage the residence and act on behalf of the landlord and the lease renewal documents were executed on behalf of Defendants by Charles Young, identified in the agreement as Chief Operating Officer. The lease renewal further identified a stated base rent of $3,460.00 per month together with additional recurring charges including an Air Filter Service Fee of $9.95, an Internet Package Fee of $85.00, and a Utility Administration Fee of $8.35, resulting in a stated total monthly payment obligation of $3,563.30.

60. On or about the same day, Plaintiff Jennifer and Defendants executed a Utilities Addendum as part of the lease renewal transaction. Pursuant to the Utilities Addendum, Plaintiff Jennifer was responsible for the payment of utility charges incurred during the lease term, including electricity, gas, water, sewer, stormwater, and trash services.

61. The Utilities Addendum further provided that Defendants and their designated "Utility Billing Agent" could assess recurring "Utility Fees," including administrative fees, service fees, and charges associated with utility billing and account management. The Utilities Addendum specifically stated that water, sewer, stormwater, and trash-related charges could be invoiced together with an additional "Utility Admin Fee," and further provided that Defendants reserved the right to modify utility-related charges upon thirty (30) days' written notice. The Utilities Addendum additionally stated that unpaid utility-related charges and fees would be deemed additional "Rent" under the lease agreement and could constitute a default under the lease.

62. Plaintiff Jennifer and Defendants also executed numerous additional addendums and disclosures as part of the lease renewal transaction, including but not limited to: the PRE-1978 Housing Rental and Leases Disclosure of Information Lead-Based Paint and/or Lead-Based Paint Hazards; Bed Bug Addendum; Mold Prevention and

Information Addendum; Insurance Addendum (Insurance Required by Resident); Landscaping Addendum; Lease Buy-Out Addendum; Disclosure Regarding Real Estate Agency Relationship; Confirmation of Real Estate Agency Relationships (as required by the California Civil Code); Air Filter Service Addendum; Animal Addendum; Credit Reporting Addendum; and Internet Package Addendum.

63. On or about September 5, 2025, as a result of the ongoing stress and anxiety caused by Defendants' actions, including the impending ProCare appointment, Plaintiff Jennifer experienced a severe panic attack. Later that same evening, Plaintiff Jennifer experienced persistent and alarming physical symptoms, including chest pain, which led her to believe she was suffering a heart attack. These symptoms did not subside and ultimately required follow-up medical care, which Plaintiff Jennifer received on or about September 16, 2025.

64. On or about September 12, 2025, Defendant David Castaneda sent an email to Plaintiff Jennifer, copying Defendants Felicia Houston, Gilbert Avalos, and Liz Arreguin, acknowledging receipt of Plaintiff Jennifer's written request for reasonable accommodations.

65. In that communication, Defendant Castaneda stated that Defendants' Portfolio Director, Liz Arreguin, would be addressing Plaintiff Jennifer's accommodation requests directly and that someone would contact her shortly.

66. Despite Defendant David Castaneda's September 12, 2025 representation that Liz Arreguin would contact Plaintiff Jennifer regarding her accommodation requests, no such contact was made for over five weeks. Other than the September 12, 2025 email, Defendants did not directly respond to Plaintiff Jennifer regarding her accommodation requests until after counsel became involved, including communications on or about October 20, 2025, and October 22, 2025. This delay contradicts Defendants' later assertion that they responded promptly to Plaintiff Jennifer's accommodation requests.

67. In that same September 12, 2025 communication, Defendant Castaneda stated that the $8.35 administrative fee was permissible because it had allegedly been charged in prior leases. This statement was inaccurate, as Plaintiff Jennifer had not been charged this fee during her tenancy, and the fee was only imposed after she requested disability accommodations. Plaintiff Jennifer was not provided sufficient time to respond before executing the lease containing the disputed fee.

68. On or about September 15, 2025, Plaintiff Jennifer executed her lease renewal.

69. On or about September 16, 2025, Plaintiff Jennifer received medical care related to persistent chest pain that began on or about September 5, 2025. Plaintiff Jennifer's treating physician attributed these symptoms to stress and noted that the stress was causing physical manifestations, including chest pain.

70. The physician further indicated that Plaintiff Jennifer's daily panic attacks, which began in early August 2025, were a likely contributing factor. Plaintiff Jennifer discussed with her physician the stress arising from Defendants' conduct, and the physician noted that Plaintiff Jennifer's existing physical disabilities were likely being exacerbated by the ongoing stress caused by Defendants.

71. Plaintiff Jennifer has lived with a permanent mental disability since childhood and alleges that, because of her disabilities, she relies on strict routines, control over her environment, and specific coping mechanisms in order to function and use her home safely. Plaintiff Jennifer alleges that unwanted intrusions into her home, including repeated ProCare inspections and attempted entries, severely disrupt the stability and control she requires as a result of her disabilities.

72. Plaintiff Jennifer also has permanent physical disabilities, which began in or about 2014, and has been issued a permanent disability placard by the State of California due to her physical limitations. Plaintiff Jennifer alleges that the stress, shaking, panic attacks, and PTSD responses triggered by Defendants' repeated ProCare scheduling and attempted entries aggravate her physical disabilities and cause severe physical pain that can take weeks to recover from.

73. Plaintiff Jennifer alleges that her disability-related need was not merely for reduced or less frequent inspections, but for an exemption from ProCare because participation in the program was not possible for her given her disabilities. Plaintiff Jennifer alleges that Defendants' proposal to reduce ProCare inspections or require continued participation failed to accommodate the disability-related limitations identified by Plaintiff Jennifer and confirmed by her treating physician.

74. Plaintiff Jennifer further alleges that Defendants' repeated ProCare scheduling, attempted entries, and failure to engage in the interactive process interfered with her ability to timely pursue urgent medical care related to breast health concerns, including follow-up care after BI-RADS 4 findings. Plaintiff Jennifer alleges that Defendants' conduct forced her to divert limited financial and emotional resources toward obtaining legal assistance to stop Defendants' conduct, causing additional fear, stress, and harm.

75. Plaintiff Jennifer also alleges that ProCare was especially harmful because it involved nonconsensual attempted entry into her home and triggered trauma related to a prior incident in which one of Defendants' employees sexually harassed her inside the residence. Plaintiff Jennifer alleges that Defendants' repeated disregard of her consent caused her to fear that the same employee, or another employee, could return to her home and harm her again, depriving her of feeling safe in her own home.

76. On or about September 18, 2025, after observing that the previously scheduled ProCare appointment had not been canceled as requested, Plaintiff Jennifer contacted Defendants through their maintenance portal and reiterated that the appointment was canceled.

77. In that communication, Plaintiff Jennifer stated that scheduling or attempting entry under false pretenses, including fabricated repairs, constitutes unlawful entry, and further noted that proper notice had not been provided.

78. Plaintiff Jennifer also referenced Defendants' maintenance portal representations indicating that cancellations are permitted and easily processed. Plaintiff Jennifer received no response. On that same date, Plaintiff Jennifer also replied to the "notice" email sent at approximately 4:05 p.m., reiterating the same information she had submitted through the portal. The email contained no indication that the address was unmonitored.

79. On or about September 19, 2025, at approximately 9:30 a.m., Plaintiff Jennifer posted a written notice on her door stating that the scheduled ProCare appointment had been canceled and that any attempt to proceed would constitute harassment, discrimination, and trespass.

80. Despite this notice, Defendants proceeded with the visit. At approximately 10:20 a.m., an employee of Defendants rang Plaintiff Jennifer's doorbell, followed by knocking at approximately 10:23 a.m. and again at approximately 10:33 a.m.

81. These events were witnessed by Plaintiff Jennifer and her mother, who was present inside the home at the time. At some point within the following hour, Defendants left a notice on Plaintiff Jennifer's door stating "sorry we missed you" regarding the appointment, despite the clearly posted written notice that the appointment had been canceled.

82. Shortly after Defendants left the "Sorry We Missed You" notice on Plaintiff Jennifer's door, Defendants sent Plaintiff Jennifer an email at approximately 10:38 a.m. regarding a "ProCare (Post Move-in) issue" and maintenance request number B14207621. In that email, Defendants stated that they were "sorry" they could not complete Plaintiff Jennifer's "maintenance request" on the initial visit and further stated that "additional repairs are required to fully address the service request" and that Defendants would contact Plaintiff Jennifer to schedule a return visit.

83. These statements were false and misleading. Plaintiff Jennifer had lived at the property for approximately eleven years, did not have any post move-in issue, had not submitted or authorized the alleged maintenance request, and no repairs had been initiated or performed. Plaintiff Jennifer alleges that Defendants used false or misleading maintenance records to justify repeated attempted entries into her home despite her cancellation, posted notice, and pending disability accommodation requests.

84. Later that day, Plaintiff Jennifer discovered that Defendants had sent an email earlier that morning, at approximately 9:30 a.m., stating that an individual identified as "Matthew Hicks" was on the way to her residence. In that communication, Defendants indicated that their portal was a valid method of communication. Despite Plaintiff Jennifer's prior written communications through that portal, Defendants failed to acknowledge or respond to her cancellation and accommodation requests and instead proceeded with the visit.

85. On or about October 1, 2025, Plaintiff Jennifer reviewed Defendants' online payment portal, which reflected monthly charges consisting of "Resident Rent," "Internet Package," and "HVAC Filter," consistent with the lease renewal terms. The contested $8.35 administrative fee was not listed as a charge on the portal at that time. Plaintiff Jennifer alleges that this contradicted Defendants' later assertion that the fee had always been charged as part of her tenancy.

86. On or about October 15, 2025, Plaintiff Jennifer, through her counsel, Madeline B. Liebreich, Esq., sent Defendants a formal cease-and-desist and demand letter regarding unlawful entry, harassment, and failure to provide reasonable accommodations.

87. In that letter, Plaintiff Jennifer, through counsel, stated that she is an individual with disabilities and submitted that her treating physician had confirmed, in a letter dated August 29, 2025, that she requires specific housing accommodations due to her medical conditions.

88. The letter formally requested multiple reasonable accommodations under the Fair Housing Act and California FEHA, including: complete exemption from the ProCare home inspection program; the right to cancel or reschedule inspections or maintenance appointments at any time due to medical necessity without penalty or adverse consequences; and strict email-only communication for all tenancy-related matters.

89. The letter further explained that these accommodations were medically necessary to prevent substantial harm to Plaintiff Jennifer's health and to ensure her full use and enjoyment of her home.

90. The letter also asserted that Defendants' ProCare inspections constituted unlawful entry and demanded that any lawful entry be preceded by no less than seventy-two (72) hours' written notice specifying the date, time, and purpose. Additionally, the letter demanded written confirmation by October 17, 2025, that all pending and future ProCare inspections would be canceled, that the requested accommodations would be granted, and that Defendants would comply with applicable notice requirements.

91. The letter further requested reimbursement in the amount of $1,000 for attorney's fees incurred as a result of Defendants' failure to engage in the interactive process and comply with fair housing laws. The letter concluded by reiterating that all future communications must be conducted by email only, consistent with Plaintiff Jennifer's disability-related accommodation.

92. On or about October 17, 2025, at approximately 10:30 a.m., an individual driving a vehicle labeled "Invitation Homes" arrived and parked across the street from Plaintiff Jennifer's residence and attempted to conduct a ProCare visit.

93. The individual approached Plaintiff Jennifer's door but paused to look at a posted notice, which stated: "Notice. My attorney has sent a legal notice to Invitation Homes regarding entry to this property. You are not authorized to enter." Plaintiff Jennifer recognized this individual as either the same employee, or someone bearing a strong resemblance and similar demeanor to an individual who had sexually harassed her several years prior.

94. After observing the posted notice, the individual returned to his vehicle, made a phone call, and approximately five minutes later returned and rang Plaintiff Jennifer's doorbell, disregarding the posted notice. Plaintiff Jennifer did not answer.

95. For approximately twenty minutes thereafter, the individual appeared agitated, pacing around his vehicle, walking to and from Plaintiff Jennifer's yard, and repeatedly slamming his car door. The individual then

approached the residence, placed a "Sorry We Missed You" notice on the door, took a photograph of the door, and departed. These events were witnessed by Plaintiff Jennifer and her mother.

96. Following this incident, Plaintiff Jennifer received an email from Defendants stating that repairs initiated at the property were incomplete and that Defendants would need to return to complete them. Plaintiff Jennifer alleges that no repairs had been authorized or performed, and that this communication was used to justify further entry.

97. On or about October 20, 2025, Plaintiff Jennifer, through her counsel, Madeline B. Liebreich, Esq., communicated directly with Defendants and provided a detailed account of a prior incident of sexual harassment by an employee of Defendants. In that communication, Plaintiff Jennifer described that during a prior maintenance visit, the employee acted in a sexually inappropriate and intimidating manner, including entering her personal space, making suggestive remarks, and engaging in unwanted physical contact, causing Plaintiff Jennifer fear and distress.

98. Plaintiff Jennifer further explained that she believed the same individual was attempting to return to her residence under the ProCare program and expressed concern for her safety. Plaintiff Jennifer also stated that, following the incident, she took steps to avoid being alone during maintenance visits due to fear of further harm. This communication placed Defendants on notice of the identity of the individual and the risk posed by continued contact, yet Defendants failed to take appropriate action to prevent further encounters.

99. Plaintiff Jennifer alleges that the individual repeatedly sent to her residence in connection with the ProCare inspection attempts was identified in Defendants' communications as Matthew Hicks. Plaintiff Jennifer further alleges that Matthew Hicks was the individual, or the individual she believed to be the same individual or bearing a strong resemblance to the employee, whom her prior counsel requested Defendants not send to Plaintiff Jennifer's residence again due to Plaintiff Jennifer's prior sexual harassment claim and safety concerns.

100. On or about October 22, 2025, Defendants, through their representative Brenda Vargas, sent a written response to Plaintiff Jennifer's counsel regarding her requests for reasonable accommodation. In that response, Defendants confirmed that they were denying Plaintiff Jennifer's request to be exempt from ProCare inspections, stating that such inspections are "beneficial" and part of their standard policy, and offering instead a limited alternative of reducing inspections to once per year.

101. Defendants further stated that Plaintiff Jennifer could cancel or stop inspections within twenty-four (24) hours of a scheduled visit, but required that she continue to participate in the inspection program. Plaintiff Jennifer alleges, and her treating physician confirmed, that continued participation in the ProCare inspection program does not accommodate Plaintiff Jennifer's disability-related needs.

102. Defendants stated that they would permit email communication but attempted to condition that accommodation by requesting the addition of text messaging. Defendants also denied Plaintiff Jennifer's request for reimbursement of $1,000 in attorney's fees, asserting that they had not failed to engage in the interactive process.

103. In the same communication, Defendants acknowledged Plaintiff Jennifer's concerns regarding a prior sexual harassment incident involving one of their employees but stated that they were unable to identify the individual and denied that the employee involved in recent inspection attempts was the same person.

104. Defendants further acknowledged that Plaintiff Jennifer had expressed fear regarding the employee being sent to her residence and stated that if Plaintiff Jennifer "feel [sic] unsafe at the property," she could "contact the local police department."

105. Plaintiff Jennifer alleges that Defendants' response failed to provide a legally sufficient basis for denying her requested accommodations under the Fair Housing Act and California FEHA, improperly conditioned or diluted medically necessary accommodations, and acknowledged a risk of harm while failing to take reasonable steps to prevent further contact or entry attempts by the employee in question.

106. On or about October 31, 2025, Defendants began utilizing a third-party company, Conservice, to meter, bill, and/or collect utility-related charges for Plaintiff Jennifer's residence, despite Plaintiff Jennifer having no prior billing relationship with Conservice and despite certain utility-related charges, including sewer and administrative utility fees, not having been separately charged to Plaintiff Jennifer during her prior eleven-year tenancy.

107. Plaintiff Jennifer had no prior relationship with Conservice and did not consent to Defendants sharing her personal information, opening an account in her name, or authorizing Conservice to bill or contact her.

108. In or about October 2025, Plaintiff Jennifer discovered that her water utility account with Rancho California Water District had been closed without her knowledge or consent. Plaintiff Jennifer had maintained that

account in her own name since approximately 2014 and had paid the water utility provider directly throughout her tenancy. Plaintiff Jennifer alleges that the account closure occurred without her authorization and coincided with Defendants' transition of utility billing to Conservice.

109. On or about November 1, 2025, Plaintiff Jennifer again reviewed Defendants' online payment portal and observed that the contested $8.35 administrative fee still had not been added as a charge. The monthly charges continued to reflect only "Resident Rent," "Internet Package," and "HVAC Filter," consistent with the lease terms.

110. On or about November 5, 2025, Defendants, through their counsel, Greg Hurley, provided a written response to Plaintiff Jennifer's counsel regarding her requests for reasonable accommodation. In that response, Defendants reiterated their denial of Plaintiff Jennifer's request to be exempt from the ProCare home inspection program, again asserting that such inspections are "beneficial" to residents and offering only a limited alternative of reducing the frequency of inspections to once per year. Defendants further stated that Plaintiff Jennifer could cancel a scheduled inspection within twenty-four (24) hours but maintained that it was not reasonable for her to cancel during an active visit.

111. Defendants stated that they would permit email-only communication but attempted to expand that accommodation by requesting the inclusion of text message communication. Defendants also denied Plaintiff Jennifer's request for reimbursement of $1,000 in attorney's fees, asserting that they had not failed to engage in the interactive process and that they had previously responded to portions of her accommodation requests.

112. On or about November 14, 2025, Plaintiff Jennifer, through her counsel, Madeline B. Liebreich, Esq., responded to Defendants' counsel, Greg Hurley, stating that she would seek a protective order on Plaintiff Jennifer's behalf to prevent further violations of her rights if Defendants did not immediately agree to comply with her reasonable disability-related accommodation.

113. The communication further demanded that the individual identified by Plaintiff Jennifer as having engaged in prior sexual harassment not be permitted to come to her residence, noting that this issue should not require further discussion.

114. On or about November 17, 2025, Defendants, through their counsel, Greg Hurley, responded and stated that refraining from sending the individual identified by Plaintiff Jennifer as having engaged in prior sexual

harassment would result in delays to any repairs at her residence. Defendants did not address or respond to Plaintiff Jennifer's request for reasonable accommodation.

115. On or about December 13, 2025, Plaintiff Jennifer received, for the first time, an email from Defendant Conservice providing a utility statement for her residence, with charges due January 1, 2026. The statement reflected charges for sewer in the amount of $5.60, water in the amount of $3.42, and a service fee of $8.35, for a total of $17.37, with a service period beginning October 31, 2025.

116. The communication further stated that Plaintiff Jennifer had not logged into Conservice's system and was required to register an account to access billing information. Plaintiff Jennifer had no prior relationship with Conservice, did not open an account, and did not consent to such charges. The inclusion of the $8.35 service fee reflects the same administrative fee previously contested by Plaintiff Jennifer for lack of proper notice.

117. On or about January 1, 2026, Defendants added charges for water, sewer, and a Conservice administrative fee to Plaintiff Jennifer's monthly rent for the first time in her more than eleven-year tenancy. Plaintiff Jennifer was not provided an option to dispute or selectively pay these charges, and instead was required to either pay the full amount demanded or risk nonpayment. This also marked the first time Plaintiff Jennifer was required to pay for sewer services during her tenancy.

118. On or about February 1, 2026, Plaintiff Jennifer alleges that, as a result of the addition of Conservice fees and newly imposed utility charges treated as rent or additional rent, her total monthly payment obligation exceeded the limits set forth under California's Tenant Protection Act (AB 1482).

119. On or about March 1, 2026, Plaintiff Jennifer alleges that her total monthly payment obligation continued to exceed the allowable rent increase limits under AB 1482 as a result of Defendants' inclusion of disputed utility-related charges as part of the rental payment obligation.

120. On or about May 11, 2026, Defendants scheduled another "ProCare" visit for May 18, 2026, between approximately 8:00 a.m. and 12:00 p.m., without Plaintiff Jennifer's consent, despite Plaintiff Jennifer's prior requests for exemption from the ProCare inspection program as a reasonable accommodation for her disability-related needs and despite prior demands that Defendants cease such conduct. Defendants sent the notice directly to Plaintiff Jennifer rather than to her counsel.

121. The May 11, 2026 notice stated that Defendants were "looking forward" to seeing Plaintiff Jennifer for the upcoming ProCare Maintenance Visit, that Defendants would contact her by telephone before arriving, and that the visit would last approximately one to two hours depending on "the number of minor maintenance repairs you need completed."

122. Plaintiff Jennifer did not have any pending minor maintenance repair requests. Plaintiff Jennifer alleges that this scheduled visit conflicted with her documented accommodation needs, contradicted Defendants' prior acknowledgment of her email-only communication accommodation, and continued the same disputed conduct Defendants had previously been instructed to cease.

123. On or about May 17, 2026, Plaintiff Jennifer canceled the May 18, 2026 ProCare appointment in writing through Defendants' maintenance portal pursuant to her disability-related accommodation permitting her to cancel appointments due to her disabilities. In the portal communication, Plaintiff Jennifer again stated that she required email-only communication due to her disabilities and that the appointment was canceled.

124. On or about May 18, 2026, before 8:00 a.m., Plaintiff Jennifer placed a written notice on her front door stating that the scheduled visit had been officially canceled pursuant to a granted disability accommodation, that the cancellation was due to her disabilities, and that consent to be on the property was expressly revoked. The notice further stated that any continued presence or attempt to enter would be treated as trespassing.

125. At approximately 9:41 a.m. on May 18, 2026, Matthew Hicks approached Plaintiff Jennifer's residence, read the posted notice, and took a photograph of it. Plaintiff Jennifer alleges that Matthew Hicks had parked a white van labeled "Invitation Homes" in front of her residence, and that after reading the notice, he left Plaintiff Jennifer's property but remained parked in front of the home. These events were captured by security cameras.

126. At approximately 10:00 a.m., Matthew Hicks reentered Plaintiff Jennifer's property despite the posted notice and placed a "Sorry We Missed You" door tag on Plaintiff Jennifer's door. Plaintiff Jennifer's mother was inside the residence with Plaintiff Jennifer while these events occurred, and the incident was recorded on two security cameras.

127. At approximately 10:02 a.m., Defendants sent Plaintiff Jennifer an email stating that her "ProCare (Post Move-in) issue" could not be completed and falsely stating that "additional repairs" were needed. Plaintiff

Jennifer alleges that no repairs were needed and that Defendants used the same false "Post Move-in" and "additional repairs" language as a pretext to schedule or justify another appointment.

128. At approximately 10:05 a.m., Matthew Hicks drove away from in front of Plaintiff Jennifer's home. Plaintiff Jennifer alleges that Defendants' maintenance portal identified Matthew Hicks as the individual sent to her residence on both October 17, 2025 and May 18, 2026, and that video evidence confirms Plaintiff Jennifer's prior description of the individual. Plaintiff Jennifer further alleges that her prior counsel had requested that Matthew Hicks not be sent to her home due to Plaintiff Jennifer's sexual harassment claim and safety concerns, but Defendants failed to honor that request.

**FIRST CAUSE OF ACTION**

Failure to Provide Reasonable Accommodation – Violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B)

*(Against All Defendants)*

129. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

130. At all relevant times, Plaintiff Jennifer was a person with disabilities within the meaning of the Fair Housing Act.

131. At all relevant times, Defendants were housing providers, landlords, property managers, agents, employees, contractors, representatives, and/or persons acting on behalf of housing providers in connection with the Subject Property.

132. Pursuant to the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B), discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with disabilities an equal opportunity to use and enjoy a dwelling.

133. Plaintiff Jennifer requested reasonable accommodations from Defendants, including exemption from the ProCare inspection program, the ability to cancel or reschedule maintenance or inspection appointments due to her disabilities, and email-only communication.

134. Plaintiff Jennifer's requested accommodations were reasonable and necessary because Defendants' ProCare inspection program, repeated attempted entries, and non-email communications interfered with Plaintiff Jennifer's disability-related ability to safely use and enjoy the Subject Property.

135. Defendants were placed on notice of Plaintiff Jennifer's disability-related accommodation needs, including but not limited to Plaintiff Jennifer's written accommodation requests on or about August 8, 2025, August 20, 2025, August 22, 2025, and August 26, 2025.

136. Plaintiff Jennifer's requested accommodations were further supported by her treating physician's written statement dated on or about August 29, 2025, which confirmed that Plaintiff Jennifer required exemption from home inspection programs such as ProCare, the ability to cancel or reschedule maintenance or inspection appointments, and email-only communication due to her disabling medical conditions.

137. Defendants had actual knowledge of Plaintiff Jennifer's requested accommodations, including through the internal acknowledgment on or about September 2, 2025, and Defendant David Castaneda's acknowledgment on or about September 12, 2025.

138. Despite such notice and knowledge, Defendants failed and refused to provide Plaintiff Jennifer's requested reasonable accommodations.

139. Defendants' failure and refusal to accommodate Plaintiff Jennifer is supported by, among other things, the events of September 19, 2025, when Defendants proceeded with a ProCare visit after Plaintiff Jennifer had canceled the appointment and posted notice; October 22, 2025, when Defendants denied exemption from ProCare because they considered the program "beneficial"; November 5, 2025, when Defendants reaffirmed that refusal through counsel; and May 18, 2026, when Defendants again proceeded with a ProCare visit after Plaintiff Jennifer had canceled the appointment and revoked consent to be on the property.

140. Defendants' proposed alternatives, including reducing the frequency of ProCare inspections while still requiring Plaintiff Jennifer to participate, failed to provide the accommodation medically required by Plaintiff Jennifer and confirmed by her treating physician.

141. As a direct and proximate result of Defendants' failure to provide reasonable accommodations, Plaintiff Jennifer was denied equal opportunity to use and enjoy the Subject Property and suffered damages, including emotional distress, physical symptoms, exacerbation of disabilities, fear, loss of safety, and other harm according to proof.

142. Plaintiff Jennifer is entitled to all remedies available under the Fair Housing Act, including actual damages, emotional distress damages, punitive damages where applicable, attorneys' fees and costs, and injunctive and declaratory relief.

**SECOND CAUSE OF ACTION**

Failure to Provide Reasonable Accommodation – Violation of the Fair Employment and Housing Act Gov. Code § 12955 et seq.

*(Against All Defendants)*

143. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

144. At all relevant times, Plaintiff Jennifer was a person with disabilities within the meaning of the California Fair Employment and Housing Act.

145. At all relevant times, Defendants were housing providers, landlords, property managers, agents, employees, contractors, representatives, and/or persons acting on behalf of housing providers in connection with the Subject Property.

146. Pursuant to California Government Code section 12955 et seq., it is unlawful for a housing provider to discriminate against a person because of disability, including by refusing to provide reasonable accommodations in rules, policies, practices, or services when such accommodations are necessary to afford a person with disabilities equal opportunity to use and enjoy a dwelling.

147. Plaintiff Jennifer requested reasonable accommodations from Defendants, including exemption from the ProCare inspection program, the ability to cancel or reschedule maintenance or inspection appointments due to her disabilities, and email-only communication.

148. Plaintiff Jennifer's requested accommodations were reasonable and necessary because Defendants' ProCare inspection program, repeated attempted entries, in-person contacts, and non-email communications interfered with Plaintiff Jennifer's disability-related ability to safely use and enjoy the Subject Property.

149. Defendants were placed on notice of Plaintiff Jennifer's disability-related accommodation needs, including but not limited to Plaintiff Jennifer's written accommodation requests on or about August 8, 2025, August 20, 2025, August 22, 2025, and August 26, 2025.

150. Plaintiff Jennifer's requested accommodations were further supported by her treating physician's written statement dated on or about August 29, 2025, which confirmed that Plaintiff Jennifer required exemption from home inspection programs such as ProCare, the ability to cancel or reschedule maintenance or inspection appointments, and email-only communication due to her disabling medical conditions.

151. Defendants had actual knowledge of Plaintiff Jennifer's requested accommodations, including through the internal acknowledgment on or about September 2, 2025, and Defendant David Castaneda's acknowledgment on or about September 12, 2025.

152. Despite such notice and knowledge, Defendants failed and refused to provide Plaintiff Jennifer's requested reasonable accommodations.

153. Defendants' failure and refusal to accommodate Plaintiff Jennifer is supported by, among other things, the events of September 19, 2025, when Defendants proceeded with a ProCare visit after Plaintiff Jennifer had canceled the appointment and posted notice; October 22, 2025, when Defendants denied exemption from ProCare because they considered the program "beneficial"; November 5, 2025, when Defendants reaffirmed that refusal through counsel; and May 18, 2026, when Defendants again proceeded with a ProCare visit after Plaintiff Jennifer had canceled the appointment and revoked consent to be on the property.

154. Defendants' proposed alternatives, including reducing the frequency of ProCare inspections while still requiring Plaintiff Jennifer to participate, failed to provide the accommodation medically required by Plaintiff Jennifer and confirmed by her treating physician.

155. Defendants' conduct denied Plaintiff Jennifer equal opportunity to use and enjoy the Subject Property and constituted disability discrimination in violation of California Government Code section 12955 et seq.

156. As a direct and proximate result of Defendants' failure to provide reasonable accommodations, Plaintiff Jennifer suffered damages, including emotional distress, physical symptoms, exacerbation of disabilities, fear, loss of safety, interference with her use and enjoyment of the Subject Property, and other harm according to proof.

157. Plaintiff Jennifer is entitled to all remedies available under California law, including actual damages, emotional distress damages, statutory damages where applicable, punitive damages where appropriate, attorneys' fees and costs, and injunctive and declaratory relief.

**THIRD CAUSE OF ACTION**

Disability-Based Harassment and Retaliation - Violation of the Fair Housing Act and California Fair Employment and Housing Act

42 U.S.C. § 3617; Gov. Code § 12955 et seq.

*(Against All Defendants)*

158. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

159. At all relevant times, Plaintiff Jennifer was a person with disabilities within the meaning of the Fair Housing Act and California Fair Employment and Housing Act.

160. At all relevant times, Defendants were housing providers, landlords, property managers, agents, employees, contractors, representatives, and/or persons acting on behalf of housing providers in connection with the Subject Property.

161. Plaintiff Jennifer engaged in protected activity by requesting disability-related reasonable accommodations, opposing Defendants' refusal to provide such accommodations, objecting to ProCare inspection attempts, objecting to unlawful or improper entry, objecting to disputed charges, and obtaining counsel to protect her housing rights.

162. Pursuant to 42 U.S.C. § 3617, it is unlawful to coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of rights protected by the Fair Housing Act, including the right to request and receive reasonable accommodations related to disability.

163. Pursuant to Government Code section 12955 et seq., it is unlawful for a housing provider to discriminate against, harass, or retaliate against a person because of disability or because the person opposed housing practices made unlawful by California fair housing law.

164. Defendants' harassment and retaliation are supported by the events beginning on or about August 8, 2025, when Plaintiff Jennifer first requested cancellation of ProCare as a disability accommodation, and Defendants responded by continuing to reschedule ProCare rather than resolving or honoring the accommodation request.

165. Defendants' harassment and retaliation are further supported by the events of August 20 through August 22, 2025, when Plaintiff Jennifer reiterated her disability-related need for email-only communication and requested removal of the disputed administrative fee, after which Defendants failed to respond and continued pursuing the disputed fee and ProCare appointment.

166. Defendants' harassment and retaliation are further supported by the events of September 12, 2025, when Defendant David Castaneda acknowledged Plaintiff Jennifer's accommodation request but allegedly called Plaintiff Jennifer multiple times despite Defendants' internal knowledge of her email-only accommodation.

167. Defendants' harassment and retaliation are further supported by the events of September 19, 2025, when Defendants proceeded with a ProCare visit after Plaintiff Jennifer canceled the appointment and posted notice that proceeding would constitute harassment, discrimination, and trespass.

168. Defendants' harassment and retaliation are further supported by the September 19, 2025 email falsely referring to a "ProCare (Post Move-in) issue" and "additional repairs," because Plaintiff Jennifer had lived at the Subject Property for approximately eleven years, had no post move-in issue, and had not authorized or requested such repairs.

169. Defendants' harassment and retaliation are further supported by the events of October 17, 2025, when Defendants again attempted a ProCare visit shortly after Plaintiff Jennifer's counsel sent a cease-and-desist and demand letter, despite a posted notice stating that Defendants were not authorized to enter.

170. Defendants' harassment and retaliation are further supported by the events of October 20 through October 22, 2025, when Plaintiff Jennifer, through counsel, placed Defendants on notice of her prior sexual harassment concern and safety fears, and Defendants nevertheless denied her ProCare exemption while dismissing or minimizing those safety concerns.

171. Defendants' harassment and retaliation are further supported by the events of November 5 through November 17, 2025, when Defendants, through counsel, reaffirmed their refusal to exempt Plaintiff Jennifer from ProCare and indicated that refraining from sending the individual connected to Plaintiff Jennifer's safety concerns could delay repairs, without addressing her reasonable accommodation request.

172. Defendants' harassment and retaliation are further supported by the events of May 11 through May 18, 2026, when Defendants scheduled another ProCare visit, Plaintiff Jennifer canceled the appointment and revoked consent to be on the property, yet Matthew Hicks appeared, read and photographed the notice, called Plaintiff Jennifer despite her email-only accommodation, reentered the property, and left a "Sorry We Missed You" tag.

173. Defendants' conduct was severe, persistent, and directly connected to Plaintiff Jennifer's disability-related accommodation requests, her opposition to Defendants' ProCare practices, and her efforts to protect her housing rights.

174. Defendants' conduct interfered with Plaintiff Jennifer's exercise and enjoyment of rights protected by the Fair Housing Act and California fair housing law, including her right to request reasonable accommodations, oppose discriminatory housing practices, and safely use and enjoy the Subject Property without disability-based harassment or retaliation.

175. As a direct and proximate result of Defendants' disability-based harassment and retaliation, Plaintiff Jennifer suffered damages, including emotional distress, fear, anxiety, panic attacks, physical symptoms, exacerbation of disabilities, loss of safety, interference with medical care, and loss of use and enjoyment of the Subject Property.

176. Plaintiff Jennifer is entitled to all remedies available under the Fair Housing Act and California law, including actual damages, emotional distress damages, punitive damages where applicable, attorneys' fees and costs, and injunctive and declaratory relief.

**FOURTH CAUSE OF ACTION**

Unlawful Entry - Violation of California Civil Code § 1954

*(Against All Defendants)*

177. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

178. At all relevant times, Plaintiff Jennifer was the lawful tenant and occupant of the Subject Property.

179. At all relevant times, Defendants were landlords, property managers, agents, employees, contractors, representatives, and/or persons acting on behalf of the landlord or property manager in connection with the Subject Property.

180. California Civil Code § 1954 limits the circumstances under which a landlord may enter a tenant's dwelling and requires lawful purpose, proper notice, and reasonable entry practices.

181. Defendants violated California Civil Code § 1954 by attempting to enter, causing others to attempt to enter, or using alleged maintenance and ProCare inspections as a pretext to access Plaintiff Jennifer's home without lawful basis, proper notice, consent, or a legitimate repair-related purpose.

182. Defendants' unlawful entry practices are supported by the events of July 14, 2025, when Defendants appeared at Plaintiff Jennifer's home for a "ProCare - Post Move-In Visit" without prior notice, despite Plaintiff Jennifer being a long-term tenant and not a new move-in resident.

183. Defendants' unlawful entry practices are further supported by the events of August 7 and August 8, 2025, when Defendants scheduled another ProCare visit with less than twenty-four hours' notice and failed to state a valid, specific repair-related purpose for entry.

184. Defendants' unlawful entry practices are further supported by the events of September 18 and September 19, 2025, when Plaintiff Jennifer canceled the ProCare appointment in writing, advised Defendants that attempting entry based on fabricated repairs would be unlawful, posted notice on her door that the appointment was canceled, and Defendants nevertheless proceeded with the visit.

185. Defendants' unlawful entry practices are further supported by the events of September 19, 2025, when Defendants rang and knocked at Plaintiff Jennifer's door after cancellation and posted notice, then left a "Sorry We Missed You" tag and sent an email referring to a "ProCare (Post Move-in) issue" and alleged "additional repairs," even though Plaintiff Jennifer had no post move-in issue and had not requested or authorized repairs.

186. Defendants' unlawful entry practices are further supported by the events of October 17, 2025, when Defendants again attempted a ProCare visit shortly after Plaintiff Jennifer's counsel sent a cease-and-desist letter and despite a posted notice stating that Defendants were not authorized to enter the property.

187. Defendants' unlawful entry practices are further supported by the events of May 17 and May 18, 2026, when Plaintiff Jennifer canceled the scheduled ProCare appointment through Defendants' maintenance portal, posted notice revoking consent to be on the property, and Defendant Matthew Hicks nevertheless appeared at the Subject Property, read and photographed the notice, reentered the property, and placed a "Sorry We Missed You" tag on Plaintiff Jennifer's door.

188. Defendants' repeated use of "Post Move-in," "maintenance request," and "additional repairs" language to justify ProCare visits was false, misleading, and pretextual because Plaintiff Jennifer had lived at the Subject

Property for approximately eleven to twelve years, had no pending minor maintenance repairs, and had not requested or authorized such repair visits.

189. Defendants' conduct constituted unlawful entry and attempted unlawful entry, interfered with Plaintiff Jennifer's possessory rights, privacy, safety, and quiet enjoyment of the Subject Property, and violated California Civil Code § 1954.

190. As a direct and proximate result of Defendants' unlawful entry practices, Plaintiff Jennifer suffered damages, including emotional distress, fear, anxiety, panic attacks, physical symptoms, exacerbation of disabilities, loss of safety, and interference with her use and enjoyment of the Subject Property.

191. Plaintiff Jennifer is entitled to all remedies available under California law, including actual damages, statutory damages where applicable, punitive damages where appropriate, attorneys' fees and costs where authorized, and injunctive and declaratory relief prohibiting Defendants from further unlawful entry or attempted entry.

**FIFTH CAUSE OF ACTION**

Violation of California Tenant Protection Act / AB 1482 Rent Cap - California Civil Code § 1947.12

*(Against Defendants 2018-4 IH Borrower LP, THR Property Management L.P., Invitation Homes Realty California, Inc., Conservice, and DOES 1 through 50)*

192. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

193. Plaintiff Jennifer was, at all relevant times, a residential tenant of the Subject Property. Defendants were landlords, property managers, agents, representatives, and/or persons acting on behalf of the landlord in connection with the Subject Property.

194. California Civil Code section 1947.12 prohibits an owner of residential real property, unless exempt, from increasing the gross rental rate for a dwelling over any twelve-month period by more than five percent plus the percentage change in the cost of living, or ten percent, whichever is lower.

195. Plaintiff is informed and believes, and thereon alleges, that the Subject Property was subject to the rent increase limitations set forth in Civil Code section 1947.12 at all relevant times.

196. Defendants violated Civil Code section 1947.12 by imposing, demanding, collecting, and/or attempting to collect charges that increased Plaintiff Jennifer's gross rental rate beyond the maximum amount permitted by law.

197. This cause of action is supported by, among other things, the charges imposed beginning on or about January 1, 2026, when Defendants added water, sewer, and Conservice-related administrative or service charges to Plaintiff Jennifer's monthly rent after the lease term had already commenced.

198. This cause of action is further supported by charges imposed on or about February 1, 2026, March 1, 2026, April 1, 2026, and May 1, 2026, when Plaintiff Jennifer alleges, and is informed and believes, that her total monthly payment obligation exceeded the allowable rent increase limits under Civil Code section 1947.12 because Defendants included disputed utility-related charges as rent or additional rent.

199. Defendants treated the disputed utility-related charges as rent or additional rent by requiring Plaintiff Jennifer to pay the total amount demanded through the rental payment process and by failing to provide a meaningful option to dispute or separately pay those charges without risking nonpayment.

200. As a direct and proximate result of Defendants' violation of Civil Code section 1947.12, Plaintiff Jennifer suffered damages, including overpayment, loss of money, fear of nonpayment consequences, stress, and other damages according to proof.

201. Plaintiff Jennifer is entitled to all remedies available under California law, including restitution, damages, injunctive and declaratory relief, attorneys' fees and costs where authorized, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**

Breach of Quiet Enjoyment / Nuisance - California Civil Code §§ 1927 and 3479

*(Against All Defendants)*

202. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

203. At all relevant times, Plaintiff Jennifer was the lawful tenant and occupant of the Subject Property.

204. California Civil Code section 1927 provides that a residential lease requires the landlord to secure the tenant's quiet possession of the premises during the tenancy. California Civil Code section 3479 further defines a

nuisance to include anything injurious to health, offensive to the senses, or obstructing the free use of property so as to interfere with the comfortable enjoyment of life or property.

205. Defendants owed Plaintiff Jennifer a duty to refrain from substantially interfering with her quiet possession, privacy, safety, and comfortable use and enjoyment of the Subject Property.

206. Defendants breached the covenant of quiet enjoyment and created or maintained a nuisance by repeatedly interfering with Plaintiff Jennifer's use and enjoyment of her home through unwanted ProCare inspection attempts, ignored cancellations, attempted entries, misleading maintenance communications, unwanted calls despite her email-only accommodation, and continued conduct after being placed on notice of Plaintiff Jennifer's disability-related harm and safety concerns.

207. This cause of action is supported by, among other events, the July 14, 2025 attempted ProCare visit without prior notice; the September 19, 2025 ProCare attempt after Plaintiff Jennifer canceled the appointment and posted notice; the October 17, 2025 attempted ProCare visit after counsel's cease-and-desist letter; and the May 18, 2026 incident where Matthew Hicks appeared after Plaintiff Jennifer canceled the appointment and revoked consent to be on the property.

208. Defendants' conduct substantially interfered with Plaintiff Jennifer's ability to safely and peacefully occupy the Subject Property, caused fear and distress, aggravated her disabilities, and deprived her of the ordinary comfort, privacy, and security of her home.

209. As a direct and proximate result of Defendants' breach of quiet enjoyment and nuisance, Plaintiff Jennifer suffered damages, including emotional distress, anxiety, physical symptoms, exacerbation of disabilities, loss of safety, interference with medical care, and loss of use and enjoyment of the Subject Property, according to proof.

210. Plaintiff Jennifer is entitled to damages, injunctive relief, declaratory relief, attorneys' fees and costs where authorized, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**

Negligent Supervision / Retention

*(Against Defendants 2018-4 IH Borrower LP, THR Property Management L.P., Invitation Homes Realty California, Inc., and DOES 1 through 50)*

211. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

212. At all relevant times, Defendant Matthew Hicks was employed by, contracted with, supervised by, retained by, controlled by, or acting as an agent or representative of Defendants in connection with maintenance, ProCare inspections, and attempted entries at the Subject Property.

213. Defendants owed Plaintiff Jennifer a duty to use reasonable care in hiring, supervising, retaining, assigning, and controlling employees, contractors, agents, and representatives sent to Plaintiff Jennifer's home.

214. Defendants knew or should have known that sending Matthew Hicks, or the individual Plaintiff Jennifer identified as matching the person connected to her prior sexual harassment and safety concerns, to Plaintiff Jennifer's home created a particular risk of harm to Plaintiff Jennifer.

215. This cause of action is supported by, among other things, the events of October 20, 2025, when Plaintiff Jennifer, through counsel, informed Defendants of the prior sexual harassment incident and her concern that the same individual, or someone strongly resembling him, was being sent to her home.

216. This cause of action is further supported by the events of October 22, 2025, when Defendants acknowledged Plaintiff Jennifer's safety concerns but dismissed or minimized the concern and failed to take adequate steps to prevent further contact.

217. This cause of action is further supported by the events of November 14, 2025, when Plaintiff Jennifer's counsel demanded that the individual connected to Plaintiff Jennifer's sexual harassment and safety concerns not be sent to her residence.

218. This cause of action is further supported by the events of November 17, 2025, when Defendants, through counsel, responded that refraining from sending the individual would delay repairs, without adequately addressing Plaintiff Jennifer's safety concerns or reasonable accommodation request.

219. Defendants' negligent supervision and retention is further supported by the events of May 18, 2026, when Matthew Hicks was again sent to Plaintiff Jennifer's home, despite prior notice of Plaintiff Jennifer's sexual harassment concerns, safety concerns, revoked consent, and disability-related need to avoid such contact.

220. Defendants failed to reasonably supervise, retain, restrict, reassign, or control Matthew Hicks and/or the individual connected to Plaintiff Jennifer's prior sexual harassment and safety concerns.

221. Defendants' failure to supervise, retain, restrict, reassign, or control Matthew Hicks was a substantial factor in causing harm to Plaintiff Jennifer, including fear, emotional distress, anxiety, panic attacks, exacerbation of disabilities, loss of safety, and interference with the use and enjoyment of her home.

222. As a direct and proximate result of Defendants' negligent supervision and retention, Plaintiff Jennifer has suffered and continues to suffer damages in an amount to be proven at trial.

223. Plaintiff Jennifer is entitled to damages, punitive damages where appropriate, attorneys' fees and costs where authorized, injunctive relief, and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**

Failure to Engage in a Good Faith Interactive Process Violation of the Fair Employment and Housing Act - Gov. Code § 12955 et seq.

(*Against All Defendants*)

224. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

225. At all relevant times, Plaintiff Jennifer was a person with disabilities within the meaning of the Fair Employment and Housing Act.

226. At all relevant times, Defendants were housing providers, landlords, property managers, agents, employees, contractors, representatives, and/or persons acting on behalf of housing providers in connection with the Subject Property.

227. Under California fair housing law, once Defendants were placed on notice of Plaintiff Jennifer's disability-related need for reasonable accommodations, Defendants were required to engage in a timely, good faith process to evaluate and address those accommodations.

228. Plaintiff Jennifer requested reasonable accommodations, including exemption from the ProCare inspection program, the ability to cancel or reschedule inspection or maintenance appointments due to her disabilities, and email-only communication.

229. Defendants were placed on notice of Plaintiff Jennifer's accommodation requests through multiple communications, including Plaintiff Jennifer's written requests on or about August 8, 2025, August 20, 2025, August 22, 2025, and August 26, 2025.

230. Plaintiff Jennifer's accommodation requests were further supported by her treating physician's written statement dated on or about August 29, 2025, which confirmed the medical necessity of the requested accommodations.

231. Defendants had actual knowledge of Plaintiff Jennifer's accommodation requests, including through the internal acknowledgment on or about September 2, 2025, and Defendant David Castaneda's acknowledgment on or about September 12, 2025.

232. Despite such notice, Defendants failed to timely and meaningfully engage in a good faith interactive process. This failure is supported by, among other things, Defendants' lack of substantive response after Plaintiff Jennifer's August 2025 accommodation requests and Defendant Castaneda's September 12, 2025 representation that Liz Arreguin would address the requests, followed by weeks without a timely substantive response.

233. Defendants' failure to engage in good faith is further supported by their October 22, 2025 response denying Plaintiff Jennifer's request for exemption from ProCare because Defendants considered the program "beneficial," without adequately addressing the medical necessity of the requested exemption.

234. Defendants' failure to engage in good faith is further supported by their November 5, 2025 response through counsel, again refusing to exempt Plaintiff Jennifer from ProCare and offering only alternatives that still required her continued participation in the inspection program.

235. Defendants' proposed alternatives were not the result of a meaningful good faith process because they failed to address Plaintiff Jennifer's specific disability-related limitations and the accommodations confirmed by her treating physician.

236. Defendants' failure to engage in a good faith interactive process caused Plaintiff Jennifer to suffer harm, including emotional distress, anxiety, physical symptoms, exacerbation of disabilities, loss of safety, interference with medical care, and loss of use and enjoyment of the Subject Property.

237. As a direct and proximate result of Defendants' conduct, Plaintiff Jennifer has suffered and continues to suffer damages in an amount to be proven at trial.

238. Plaintiff Jennifer is entitled to all remedies available under California law, including actual damages, emotional distress damages, punitive damages where appropriate, attorneys' fees and costs, and injunctive and declaratory relief.

**NINTH CAUSE OF ACTION**

Trespass

*(Against Defendants Matthew Hicks and DOES 1 through 50, and Against All Defendants Under Agency/Respondeat Superior Principles)*

239. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

240. At all relevant times, Plaintiff Jennifer was the lawful tenant and occupant of the Subject Property and had the right to possess, occupy, exclude others from, and peacefully enjoy the Subject Property.

241. Defendants, including their employees, agents, contractors, and representatives, had no right to enter or remain on the Subject Property without lawful authority, proper notice, consent, or another legally valid basis.

242. Defendants trespassed on the Subject Property by entering, attempting to enter, or causing others to enter or remain on the Subject Property after Plaintiff Jennifer canceled ProCare appointments, objected to entry, and expressly revoked consent.

243. This cause of action is supported by, among other things, the events of September 19, 2025, when Defendants proceeded with a ProCare visit after Plaintiff Jennifer canceled the appointment and posted notice; October 17, 2025, when Defendants again attempted a ProCare visit despite a posted notice stating they were not authorized to enter; and May 18, 2026, when Matthew Hicks appeared, read and photographed Plaintiff Jennifer's notice revoking consent, and then reentered the property to leave a "Sorry We Missed You" tag.

244. Defendants' conduct constituted an intentional, unauthorized entry and/or intrusion upon Plaintiff Jennifer's possessory interest in the Subject Property.

245. As a direct and proximate result of Defendants' trespass, Plaintiff Jennifer suffered damages, including fear, emotional distress, anxiety, loss of safety, interference with her use and enjoyment of the Subject Property, and other damages according to proof.

246. Plaintiff Jennifer is entitled to damages, punitive damages where appropriate, injunctive relief, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**

Invasion of Privacy / Intrusion Upon Seclusion

*(Against All Defendants)*

247. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

248. Plaintiff Jennifer had a reasonable expectation of privacy, safety, and seclusion in her home at the Subject Property.

249. Defendants intentionally intruded, attempted to intrude, or caused others to intrude upon Plaintiff Jennifer's privacy and seclusion by repeatedly attempting ProCare visits, ignoring cancellations and posted notices, photographing her door and notices, and continuing to send personnel to the Subject Property despite Plaintiff Jennifer's disability-related objections and safety concerns.

250. This cause of action is supported by, among other things, the September 19, 2025 attempted ProCare visit after cancellation and posted notice; the October 17, 2025 attempted visit after counsel's cease-and-desist letter; and the May 18, 2026 incident where Matthew Hicks read and photographed Plaintiff Jennifer's notice, remained outside her home, called her despite the email-only accommodation, and reentered the property to leave a door tag.

251. Defendants' conduct would be highly offensive to a reasonable person, particularly because it occurred at Plaintiff Jennifer's home after Defendants had notice of her disability-related accommodation needs and prior safety concerns.

252. As a direct and proximate result of Defendants' invasion of privacy, Plaintiff Jennifer suffered damages, including fear, anxiety, emotional distress, physical symptoms, loss of safety, and interference with the private use and enjoyment of her home.

253. Plaintiff Jennifer is entitled to damages, punitive damages where appropriate, injunctive relief, and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**

Unfair Business Practices - Violation of Business and Professions Code § 17200 et seq.

*(Against All Defendants)*

254. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

255. California Business and Professions Code section 17200 prohibits unlawful, unfair, and fraudulent business acts or practices.

256. Defendants engaged in unlawful, unfair, and/or fraudulent business practices by, among other things, failing to provide disability-related housing accommodations, failing to engage in a good faith interactive process, attempting unlawful entries, using misleading ProCare and "Post Move-in" communications, imposing and collecting disputed utility-related charges, and treating such charges as rent or additional rent.

257. This cause of action is supported by, among other things, Defendants' repeated refusal to exempt Plaintiff Jennifer from ProCare despite medical documentation; the September 19, 2025 and May 18, 2026 "Post Move-in" and "additional repairs" communications despite no pending repairs; the January 1, 2026 imposition of water, sewer, and Conservice-related charges; and the alleged rent increases exceeding AB 1482 limits beginning in February 2026.

258. Defendants' conduct was unlawful because it violated, among other laws, the Fair Housing Act, FEHA, Civil Code section 1954, Civil Code section 1947.12, and California landlord-tenant protections.

259. Defendants' conduct was unfair because it substantially interfered with Plaintiff Jennifer's tenancy, disability accommodations, privacy, safety, and ability to use and enjoy the Subject Property, while also forcing her to pay or risk nonpayment consequences for disputed charges.

260. Defendants' conduct was fraudulent and/or misleading because Defendants represented ProCare as a maintenance or post move-in issue and represented that additional repairs were required, even though Plaintiff Jennifer had lived at the Subject Property for approximately eleven to twelve years and alleges that no such repairs were requested, authorized, or pending.

261. As a direct and proximate result of Defendants' unfair business practices, Plaintiff Jennifer suffered injury in fact and lost money or property, including disputed fees, utility-related charges, overpayments, and other damages according to proof.

262. Plaintiff Jennifer seeks restitution, injunctive relief, declaratory relief, attorneys' fees and costs where authorized, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION

Declaratory and Injunctive Relief

(*Against All Defendants*)

263. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

264. An actual controversy exists between Plaintiff Jennifer and Defendants regarding Plaintiff Jennifer's rights to reasonable disability accommodations, freedom from unlawful entry, privacy, quiet enjoyment, and protection from continued ProCare inspections and related conduct at the Subject Property.

265. Plaintiff Jennifer contends that Defendants are required to provide reasonable accommodations, including exemption from ProCare inspections, email-only communication, and the ability to cancel or reschedule maintenance or inspection appointments due to disability.

266. Plaintiff Jennifer further contends that Defendants must cease scheduling or attempting ProCare visits, cease using false or misleading "Post Move-in" or "additional repairs" communications, comply with California entry laws, and refrain from sending Matthew Hicks or any individual connected to Plaintiff Jennifer's sexual harassment and safety concerns to the Subject Property.

267. Defendants dispute, deny, or have failed to honor Plaintiff Jennifer's rights, as shown by their continued ProCare scheduling, repeated attempted entries, failure to honor cancellations, disputed communications, and continued sending of Matthew Hicks to the Subject Property.

268. Judicial intervention is necessary because Defendants' conduct is ongoing and Plaintiff Jennifer has no adequate remedy at law to prevent future unlawful entries, disability accommodation violations, privacy intrusions, harassment, retaliation, and interference with her use and enjoyment of the Subject Property.

269. Plaintiff Jennifer seeks a judicial declaration of the parties' rights and obligations, including that Defendants must comply with Plaintiff Jennifer's reasonable disability accommodations and applicable housing, entry, privacy, and tenant protection laws.

270. Plaintiff Jennifer further seeks injunctive relief prohibiting Defendants from scheduling or attempting further ProCare inspections, entering or attempting to enter the Subject Property without lawful basis and proper notice, contacting Plaintiff Jennifer by telephone except as expressly authorized, sending Matthew Hicks or the individual connected to her safety concerns to the Subject Property, and imposing or collecting unlawful charges.

271. Plaintiff Jennifer is entitled to declaratory relief, injunctive relief, attorneys' fees and costs where authorized, and any other relief the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jennifer Anderson prays for judgment against Defendants, and each of them, as follows:

1. **For general damages** according to proof at trial;
2. **For special and consequential damages** according to proof, including but not limited to out-of-pocket expenses, disputed utility charges, administrative fees, overpayments, costs incurred as a result of Defendants' conduct, and other losses caused by Defendants' acts and omissions.
3. **For damages for emotional distress, anxiety, fear, panic attacks, physical symptoms, exacerbation of disabilities, loss of safety, inconvenience, loss of privacy, and loss of quiet use and enjoyment** of the Subject Property.
4. **For damages arising from Defendants' failure to provide reasonable accommodations**, failure to engage in a good faith interactive process, disability discrimination, disability-based harassment, and retaliation, according to proof;
5. **For damages arising from Defendants' unlawful entry**, attempted unlawful entry, trespass, invasion of privacy, intrusion upon seclusion, nuisance, and breach of quiet enjoyment, according to proof;
6. **For restitution, disgorgement, and/or reimbursement of all amounts wrongfully charged**, demanded, collected, or retained by Defendants, including but not limited to disputed utility-related charges, Conservice charges, administrative fees, service fees, and any rent or fee amounts charged in violation of California law;
7. **For statutory damages, civil penalties,** and all other statutory remedies available under applicable law, including but not limited to the Fair Housing Act, California Fair Employment and Housing Act, California Civil Code section 1947.12, Business and Professions Code section 17200 et seq., and any other applicable statute.
8. **For punitive and exemplary damages on all causes of action permitting such relief,** including but not limited to disability discrimination, retaliation, harassment, invasion of privacy, trespass, negligent supervision/retention, and any other claim for which punitive damages are authorized, in an amount sufficient to punish Defendants and deter similar conduct in the future;

9. **For declaratory relief,** including but not limited to a declaration that Defendants are required to provide Plaintiff Jennifer's reasonable disability-related accommodations, comply with applicable fair housing laws, comply with California entry laws, and cease the unlawful practices alleged herein;

10. **For preliminary and permanent injunctive relief** requiring Defendants to comply with Plaintiff Jennifer's reasonable accommodations, including exemption from ProCare inspections, email-only communication, and the ability to cancel or reschedule maintenance or inspection appointments due to disability;

11. **For preliminary and permanent injunctive relief** prohibiting Defendants from scheduling or attempting further ProCare inspections at the Subject Property, entering or attempting to enter the Subject Property without lawful basis and proper notice, contacting Plaintiff Jennifer by telephone except as expressly authorized, sending Matthew Hicks or any individual connected to Plaintiff Jennifer's sexual harassment or safety concerns to the Subject Property, and imposing or collecting unlawful charges;

12. **For reasonable attorney's fees** to the extent permitted by law, including but not limited to the Fair Housing Act, California Fair Employment and Housing Act, the written lease agreement, and any other applicable statutory or contractual basis;

13. **For costs of suit incurred herein;**

14. **For prejudgment and postjudgment interest** as permitted by law; and

15. **For such other and further relief as the Court deems just and proper.**

Date: August 19, 2026

/s/ Onica Cole

*Onica Cole*
*Attorney*

# Exhibit 1

invitation homes

# Summary of Lease Charges

This Summary of Lease Charges ("Summary") is hereby incorporated by reference into and made part of the attached Renewal Rental Agreement ("Lease"). Each reference in the Lease to any term of this Summary shall have the meaning as set forth in this Summary. In the event of a conflict between the terms of this Summary and the Lease, the terms of the Lease shall prevail. Any capitalized terms used herein and not otherwise defined shall have the meaning as set forth in the Lease.

**Residence Address:** 40169 Medford Rd, Temecula, CA 92591

**Lease Term:**
09/17/2024 to 09/16/2025 $ 3251.00

| MONTHLY RENTAL CHARGES | | DEPOSITS (Previously Paid) | |
|---|---|---|---|
| **Base Rent** | $ 3251.00 | **Refundable Security Deposit** | $ 2,200.00 |
| **Additional Rent (Animal Addendum)** | $ .00 | **Additional Refundable Security Deposit (Animal Addendum)** | $ 150.00 |
| **Pool Service Fee** | $ 0.00 | **TOTAL DEPOSITS PAID** | $ 2,350.00 |
| **Landscaping Service** | $ 0.00 | | |
| **Smart Home** | $ 0.00 | | |
| **Air Filter Service Fee** | $ 9.95 | | |
| **Internet Package Fee** | $ 85.00 | | |
| **TOTAL MONTHLY RENT** | $ 3,345.95 | | |



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

# RENEWAL RENTAL AGREEMENT

This **Renewal Rental Agreement** ("Lease") is entered into on 8/25/2024 **("Effective Date")** by and between 2018-4 IH Borrower LP, the owner of the Residence (**"Landlord"**); and

**Resident's Name:** Jennifer Anderson
**Primary Phone #:** 7605335246

**Resident's Name:**
**Primary Phone #:**

**Resident's Name:**
**Primary Phone #:**

**Resident's Name:**
**Primary Phone #:**

**Resident's Name:**
**Primary Phone #:**

**Resident's Name:**
**Primary Phone #:**

**Resident's Name:**
**Primary Phone #:**

**Resident's Name:**
**Primary Phone #:**

(collectively, **"Resident"** whether one or more).

1. **RENTAL PROPERTY.** Resident agrees to rent from Landlord and Landlord agrees to rent to Resident the real property and any other improvements at the address specified on the Summary page (collectively, the **"Residence"** or "**Premises**). Any current balance owed by Resident to Landlord shall not be canceled or extinguished by Landlord and Resident entering into this Lease and shall be a continuing obligation of Resident until paid in full.

2. **OCCUPANTS.** In addition to Resident, the following individuals will also reside at the Residence (**"Occupants"**): ______________________________

______________________________

**2.1.** Resident represents, warrants, and covenants that all persons who will reside at the Residence as Occupants are listed above. All Occupants eighteen (18) and older are subject to the same criminal and credit background approval required of Residents. No one else may occupy the Residence. Persons not listed above must not stay in the Residence for more than seven (7) consecutive days without Landlord's prior written consent, and no more than thirty (30) days in a calendar year. Any new resident or occupant will require the prior written acceptance and approval of Landlord. If an occupancy change is accepted and approved by Landlord during the Lease Term, a new lease or an amendment to this Lease shall be executed to memorialize such occupancy change as required by Landlord. All references in this Lease to **"Resident Party"** or **"Resident Parties"** shall include Resident, the Occupants, and any guests or invitees of Resident or the Occupants.

3. **LEASE TERM.** The term of this Lease (the **"Lease Term"**) shall commence on 09/17/2024 (the "**Commencement Date**") and end on 09/16/2025 at 5:00 p.m. local time where the Residence is located. Resident shall vacate the Residence immediately upon termination of the Lease unless: (a) Landlord and Resident have extended this Lease in writing or signed a new rental agreement, or (b) a month-to-month tenancy is created pursuant to the following paragraph.

**3.1. MONTH-TO-MONTH TENANCY.** The Lease Term shall become month-to-month if, upon expiration of the initial Lease Term, the Lease Term has not otherwise been terminated, extended, or renewed. Landlord may increase the monthly Rent by giving Resident written notice of such increase at



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

least thirty (30) days prior to the commencement of the rental period for which the adjustment will apply, or such notice period as required by Applicable Law. Resident may remain in possession of the Residence and the tenancy will then be on a month-to-month basis at the increased monthly Rent rate and subject to all of the terms and conditions of this Lease until either party terminates the tenancy in accordance with this Lease and Applicable Law. The term "**Applicable Law**" shall mean all laws, ordinances, directives, temporary orders, and rules and regulations enacted now or hereinafter by any governmental authority with jurisdiction over the Residence.

**3.2. NOTICE TO VACATE.** Prior to the expiration of the Lease Term, subject to Applicable Law, either party may terminate the Lease by providing at least sixty (60) days advance written notice (thirty (30) days for a month-to-month tenancy) to the other party. Rent shall be due and payable through the end of the notice period or the expiration of the Lease Term, whichever occurs later. Resident's failure to provide the full sixty (60) days' advance notice of intent to terminate the Lease (thirty (30) days for a month-to-month lease) will result in Resident being charged for the balance of the notice period in an amount equal to the daily pro rata rent, not to exceed two months' rent.

**4. RENT AND SECURITY DEPOSIT.**

**4.1. SECURITY DEPOSIT**. The amount set forth on the Summary as Security Deposit ("**Security Deposit**") was previously paid to Landlord pursuant to Resident's initial lease agreement and that same amount has been transferred and deposited with Landlord as security for Resident's payment and performance of the obligations under this Lease. Subject to Applicable Law, all or any portion of the Security Deposit may be used or retained by Landlord as reasonably necessary to: (a) clean, repair, and restore the Residence and any appliances, furniture, fixtures, equipment, and other property supplied by Landlord to its condition on the Commencement Date, excepting normal wear and tear; or (b) cure Resident's default in payment of any Rent, late charges, dishonored check charges, utility charges, or other charges which may be owed by Resident pursuant to this Lease. The retention of the Security Deposit shall not limit Landlord's right to proceed against Resident for claims above the amount of the Security Deposit. The Security Deposit shall not be used by Resident in lieu of payment of Rent, Late Charges, or other amounts owed. No interest shall be paid on the Security Deposit unless required by Applicable Law.

**4.2. RENT**. "Base Rent" shall mean the monthly rent amount as outlined on the Summary. Base Rent shall increase to $N/A______ beginning on N/A_______. "Rent" shall mean the total monthly rent as outlined on the Summary. Resident shall pay Rent in advance on the 1st day of each month without demand or offset and with no grace period.

**4.3. AB 1482.** If Civil Code §1946.2 or 1947.12 apply to this tenancy, California law limits the amount your rent can be increased. See Section 1947.12 of the Civil Code for more information. California law also provides that after all of the tenants have continuously and lawfully occupied the property for 12 months or more or at least one of the tenants has continuously and lawfully occupied the property for 24 months or more, a landlord must provide a statement of cause in any notice to terminate a tenancy. See Section 1946.2 of the Civil Code for more information.

**4.4. METHOD OF PAYMENTS.** The Security Deposit and all Rent shall be paid to Landlord or such other agent of Landlord as Landlord may designate by written notice to Resident. Rent payments will only be accepted from Resident or as required by Applicable Law. If Landlord agrees or is required by Applicable Law to accept payment of Rent from a third party, acceptance of such payment shall not



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

create a tenancy between Landlord and the third party. Subject to Applicable Law, monthly installments of Rent must be paid in U.S. Currency by one of the following payment methods:

**Electronic Payment:** Resident shall use the online resident portal to pay Rent via electronic payment at www.invitationhomes.com, following the instructions for current residents to Pay My Rent. If Resident elects to pay online by credit card instead of ACH transfer, a convenience fee or surcharge may be charged by the merchant service provider in an amount not to exceed the maximum amount permitted by Applicable Law. Landlord reserves the right to pass through such charge to Resident.

**Alternative Payment:** Subject to Applicable Law, Resident may pay Rent by personal check, cashier's check, or certified check made payable to Landlord (or such other person or entity as directed by Landlord) and delivered to Landlord at the address listed in Section 9. Resident may also pay Rent in cash by using a Walk in Payment System (WIPS) wherever WIPS is accepted.

**4.5. LATE CHARGES.** If the total Rent is not received by 11:59 p.m. on the third (3rd) day of the month, Resident agrees to pay a late charge in the amount of five percent (5%) of Rent or $95.00, whichever is less (the "**Late Charge**"). Resident acknowledges that late payment of Rent will cause Landlord to incur costs and expenses, including processing, enforcement and accounting expenses, and charges imposed on Landlord, the exact amounts of which are extremely difficult and impractical to determine. Resident agrees that the Late Charge represents a fair and reasonable estimate of the costs Landlord may incur by reason of late payment. The Late Charge, which shall be considered additional Rent, does not establish a grace period; Landlord may serve a 3-Day notice to pay or quit if Rent is not paid on its due date. If Landlord serves a written notice of non-payment of rent, Landlord may require that the payment called for by the notice be made by certified cashier's check, in person, at the office location designated by Landlord.

**4.6. NON-SUFFICIENT FUNDS.** In addition to any Late Charges, Resident also agrees to pay a non-sufficient funds fee ("NSF Charge") of $25.00 the first time a check or payment is not honored by Resident's bank or financial institution and a fee of $35.00 for each subsequent check or payment that is not honored by Resident's bank or financial institution, which NSF Charge will not exceed the maximum amount that may be charged pursuant to Applicable Law. Resident acknowledges that payment not honored will cause Landlord to incur costs and expenses, including processing, enforcement and accounting expenses, and charges imposed on Landlord, the exact amounts of which are extremely difficult and impractical to determine. Resident agrees that the NSF Charge represents a fair and reasonable estimate of the costs Landlord may incur by reason of Resident's payment not being honored. In the event that any payments of Rent during the Lease Term are returned due to non-sufficient funds, Resident may be "locked out" of the online payment system and shall be required to make such payments, together with any and all of Resident's outstanding balance, Late Charge, NSF Charge, and any other amounts due to Landlord hereunder, by certified cashier's check, in person, at the office location, as designated by Landlord in connection with this Lease. Only upon personal receipt by Landlord or Landlord's representative of such payment shall Resident be able to make subsequent electronic payments online.

Notwithstanding the foregoing, if any payments of Rent are returned due to non-sufficient funds during the Lease Term, Resident acknowledges and agrees that Landlord may, in its sole discretion, upon notice to Resident require Resident to make all subsequent payments required hereunder for a period of up to three (3) months by certified cashier's check in person at the office location, designated by Landlord.

Any Late Charge or NSF Charge will be deemed additional Rent and must be paid with the current



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

installment of Rent. Landlord's acceptance of any Late Charge or NSF Charge will not constitute a waiver as to any default of Resident. Landlord's right to collect a Late Charge or NSF Charge will not be deemed an extension of the date Rent is due or prevent Landlord from exercising any other rights and remedies under this Lease or Applicable Law.

**4.7. APPLICATION OF PAYMENTS.** Unless otherwise required by Applicable Law, payments received will be applied, without regard to their characterization or earmarking by Resident, as follows: (i) first to any arrears from previous month(s), (ii) then to Late Charges, legal and court costs, administrative fees, mailing costs, or any other miscellaneous charges owed, and (iii) the remainder will then be applied to the Rent for the current month.

**4.8. DISCLOSURE TO CREDIT BUREAUS.** Resident acknowledges that and consents to Landlord or Landlord's agent disclosing information about Resident and Resident's tenancy, including but not limited to the amount and timing of rent payments, good behavior, problematic behavior, and any debt outstanding to credit reporting agencies, which may then be used in a tenant record, credit report and credit score for the Resident and shared with other landlords and credit grantors. Resident further acknowledges that and consents to Landlord or Landlord's agent periodically making soft inquiries on Resident's credit profile throughout the term of the Lease. Such inquiries will have no impact on Resident's credit score and will not be used by Landlord as the sole reason for any adverse action taken against Resident including any decision not to offer Resident the opportunity to renew the Lease at the end of the term.

**5. ANIMALS.** Prior to Move-In, Resident must execute the attached Animal Addendum and abide by its terms for the duration of the Lease Term. Resident shall not bring or allow any animal onto the Residence property, even temporarily, at any time without Landlord's prior written approval unless otherwise permitted by Applicable Law.

If Resident keeps a dog or cat that is not considered a service, assist, or companion animal ("Pet") at the Residence, Resident must pay additional amounts set forth in the Animal Addendum and consistent with Appliable Law.

Service, assist, or companion animals for the assistance of a Resident or Resident Parties with a disability shall be permitted by Landlord upon Resident's advance request, provided that Landlord may request documentation or other reasonable evidence verifying disability and a disability-related need for the animal, in compliance with Applicable Law.

**6. MOVE-IN/MOVE-OUT.**

**6.1. MOVE-IN.** Resident has inspected the Residence, including all appliances, landscaping, fixtures, improvements, equipment, hardware, smoke detector(s) and carbon monoxide detector(s), if any, located at the Residence. Resident shall confirm (a) that the Residence and all such items are clean, in good working order, and fit for use under the Lease, and (b) that the size, number, and features of all rooms and any parking areas or garage at the Residence are approved for Resident's use. Resident must notify Landlord or Landlord's agent of any pre-existing defective conditions within 48 hours of Resident's move-in either in person, via email, or otherwise designated by Landlord. Otherwise, Resident accepts the Residence in the current "As-Is" condition and warrants that Resident has been given adequate opportunity to fully inspect the Residence and that Resident accepts the Residence, together with all furnishings, if applicable, as being in good condition. Only items included in Resident's notice to Landlord described above shall be accepted as defective, missing, or in need of remedial action. The absence of such notice shall be conclusive proof that there is no defective or hazardous



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

equipment or conditions existing as of the start of the tenancy. Resident agrees and understands such notice is not a request for repairs. Any required repairs will need to be submitted through a separate work order.

**6.2. MOVE-OUT.** Upon vacating the Residence, Resident shall remove all personal possessions and rubbish, steam clean all floors in the Residence, and leave the Residence in as good or better condition as the condition on the Commencement Date, excepting normal wear and tear. Upon move-out, if Resident chooses to have the carpets cleaned, such cleaning must be performed by a third-party professional carpet cleaning service reasonably acceptable to Landlord and receipt for such cleaning services must be provided to Landlord. Unless the carpet is cleaned in the manner provided herein, Landlord reserves the right to use a portion of the Security Deposit to professionally clean the carpets. Resident also shall return all keys and garage door openers, if applicable, or be liable for the replacement cost thereof, and shall provide Landlord with a written statement of forwarding address. Within the time required by Applicable Law, Landlord will provide Resident an itemized written statement of any amounts deducted and the reasons for the deductions from Resident's Security Deposit, along with a check for any balance of the Security Deposit due to Resident. Landlord may deliver the written statement and balance of the Security Deposit personally to Resident, or by mailing the statement and balance of the Security Deposit to Resident at Resident's forwarding address, or if that address is unknown, at Resident's last known address. The retention of the Security Deposit shall not limit Landlord's right to proceed against Resident for claims above the amount of the Security Deposit.

**6.3. Pre-Move-Out Inspection and Repairs:** (i) After giving or receiving notice of termination of a tenancy, or before the end of the Lease, Resident has the right to request that an inspection of the Residence take place prior to termination of the Lease; (ii) If Resident requests such an inspection, Resident will be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Lease; (iii) Any repairs or alterations made to the Residence as a result of this inspection (collectively, "Repairs") must be made at Resident's expense and only after obtaining the prior written approval of Landlord; (iv) Repairs may be performed by Resident or through others, who have adequate insurance and licenses and are approved by Landlord; (v) The work must comply with Applicable Law, including governmental permit, inspection, and approval requirements; (vi) Repairs must be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials; (vii) Resident must: (a) obtain receipts for Repairs performed by others; (b) prepare a written statement indicating the Repairs performed by Resident and the date of such Repairs; and (c) provide copies of receipts and statements to Landlord prior to termination. Resident's Right to Pre-Move-Out Inspection, as specified above, does not apply when the tenancy is terminated pursuant to California Code of Civil Procedure § 1161(2), (3) or (4).

**7. CONDITION OF RESIDENCE.** Landlord makes absolutely no warranties or representations about the neighborhood or the condition of the Residence, the improvements, utilities, electrical, plumbing, or appliances, except to the extent as required by Applicable Law. Landlord shall not be responsible for loss or damage caused by failure of any appliance (including loss of or damage to food or other perishables) in the event an appliance ceases to operate properly. Resident must satisfy himself or herself prior to move-in as to the neighborhood or area conditions, including schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered felons and other offenders, fire protection, other governmental services, availability, adequacy, and cost of any wired and/or wireless internet connections, other telecommunications or other technology services and installations, proximity to commercial, industrial, or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances,



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements, and preferences of Resident.

**8. USE.** Resident shall not use or permit the Residence to be used for any purpose other than as the principal and primary residence of Resident and any Occupants. Resident agrees that, subject to Applicable Law, the Residence will not be used for operation of a business or other commercial enterprise without Landlord's prior written consent, nor will Resident utilize the Residence for any purpose or in any manner which violates applicable state, federal or local law or the covenants, conditions, or rules of any applicable homeowner association. Notwithstanding the foregoing, subject to Applicable Law, Resident may operate a small daycare center at the Residence, provided that (i) Resident notifies Landlord in writing at least thirty (30) days in advance of its intent to operate such a business at the Residence; (ii) Resident is licensed by the State of California and provides a copy of such license in advance to Landlord; (iii) Resident complies with all Applicable Laws, and with all other provisions of this Lease; and (iv) Landlord may require Resident to increase its Security Deposit up to the maximum amount allowed by Applicable Law. Resident shall in no event use the Residence as any other type of business at any time without Landlord's express written permission. Resident is strictly prohibited from subletting all or any portion of the Premises.

**9. NOTICES.** Unless another method of delivery is permitted by Applicable Law, any notice to Landlord or Landlord's agent, including Property Manager identified below shall be in writing and delivered personally by hand, or by first class U.S. mail or express or overnight delivery to Landlord at the address below, which address is subject to change by written notice. Except as otherwise stated in this Lease, and subject to Applicable Law, a notice from Landlord to Resident may be delivered by email to the email address(es) on file.

**Landlord:**
2018-4 IH Borrower LP

801 N. Brand Blvd., Suite 1110, Glendale, CA 91203
(805) 372-2900

**Property Manager:**
THR Property Management L.P.
801 N. Brand Blvd., Suite 1110, Glendale, CA 91203
(805) 372-2900

The Property Manager identified above is authorized to manage the Residence and authorized to act for and on behalf of Landlord for service of process, prosecuting eviction actions, and for receiving notices and demands.

Notwithstanding anything in this section to the contrary, a Notice to Vacate pursuant to 3.2 Notice to Vacate, from Resident by email will be accepted by Landlord.

**10. UTILITIES.** Resident is responsible for payment of all utility charges incurred during the Lease Term unless prohibited by Applicable Law. Subject to Applicable Law, and except as expressly provided herein, Resident shall place all utilities, including all those specified in the attached Utilities Addendum, in Resident's name as of the Commencement Date, and shall pay all charges and related costs directly to the provider until Resident terminates such services. Resident is required to show proof of utility commencement prior to move-in. Resident's failure to provide such evidence shall be a default under this Lease, entitling Landlord to enforce all available remedies. Utilities that require proof are electricity, gas, water, sewer, and garbage services. In the event that Applicable Law requires Landlord to pay for any utility directly, Resident acknowledges and agrees that Resident shall be obligated to reimburse Landlord for any such amounts paid by Landlord to utility providers, which reimbursement shall be payable electronically as part of Resident's Rent payment, unless some other form of payment is



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

afforded to Resident in accordance with Applicable Law. If for any reason Resident fails to transfer or maintain all utilities and services in Resident's own name, Resident agrees to reimburse Landlord the full cost of Resident's utility usage and agrees to pay to Landlord an utility administrative fee in the amount described in the Utilities Addendum ("**Utility Admin Fee**") for each utility bill received by Landlord. Resident shall not allow electricity or other utilities to be disconnected or discontinued for any reason or by any means (including nonpayment of bill) until the end of the Lease Term or renewal period. If at any time any utility shall be turned off or discontinued due to nonpayment by Resident, Resident shall be in default under this Lease for the health and safety violation, and Landlord may, terminate Resident's occupancy of the Residence immediately and commence eviction and collection proceedings, subject to Applicable Law.

If any utilities are not separately metered or submetered, Resident shall pay Resident's proportional share, as reasonably determined and directed by Landlord in accordance with Applicable Laws. Resident shall obtain Landlord's prior written approval, which approval may be withheld in Landlord's sole and absolute discretion, prior to adding any telephone, cable, or data lines to the Residence. Resident shall cooperate with any conservation and recycling program adopted and implemented by Landlord, if any. Landlord does not represent or warrant that any utilities servicing the Residence will not be interrupted because of repairs or alterations to the Residence, fire or other casualty, acts of God, any labor controversy, or other events beyond the control of Landlord. Any such interruption shall never be deemed to be an eviction of Resident or a disturbance of Resident's use or occupancy of the Residence or render Landlord liable to Resident for damages. Notwithstanding anything contained in this Lease to the contrary, Landlord does not represent or warrant the availability of telephone service, internet service, satellite or cable television service, or any other service to the Residence, and no such services are guaranteed to be available to the Residence.

Notwithstanding anything to the contrary in this Section, Landlord may, at its option and in its sole discretion, elect to contract directly with the utility service providers providing utilities or services to the Residence, including, without limitation, water, garbage and refuse removal, sewer, natural gas, and electricity. In the event Landlord elects to contract for utilities directly with the utility or service providers, then Resident must reimburse Landlord for all charges incurred by Landlord along with the Utility Admin Fee and any set-up charges (all such charges being referred to in this Lease as the "Utility Charges") within fifteen (15) days of Landlord's request therefore accompanied by an invoice documenting such Utility Charges owed by Resident. The Utility Charges will be deemed additional "Rent" under this Lease so that Resident's failure to pay the Utility Charges when due or failure to place and continuously maintain utilities and services in Resident's name, if applicable, will constitute a default under this Lease.

**11. COMPLIANCE WITH RULES AND REGULATIONS.** As provided by Applicable Law, Landlord will have the right to establish and, from time to time, change, alter, and amend, and to enforce against Resident reasonable rules and regulations as may be deemed necessary or advisable for the proper and efficient operation, maintenance, and repair of the Residence. Resident will observe and comply with all reasonable and nondiscriminatory rules and regulations governing the Residence that are posted on the Residence, attached hereto and incorporated herein by this reference, or as may from time to time be delivered to Resident (the "Rules and Regulations"). Resident and any Resident Parties will observe and comply with the Rules and Regulations and with such amendments and additional Rules and Regulations as Landlord may adopt, effective ten (10) days after Landlord gives Resident written notice thereof, or as may be required by Applicable Law. A violation of the Rules and Regulations after such notice shall be a default under this Lease.

**12. PROHIBITED ACTIVITY.** In addition to any requirements established by the municipality or



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

county in which the Residence is located, Resident or any Resident Party, shall not (a) engage in criminal activity or any act intended to facilitate criminal activity on or near the Residence, (b) permit the Residence to be used for or to facilitate criminal activity regardless of whether the individual engaging in such activity is a member of the household or a guest; (c) engage in any drug-related activity, including but not limited to, growing, producing, manufacturing, cultivating, possessing with intent to manufacture, selling, using, storing, keeping, or distributing marijuana or any controlled substance (legal or illegal) or drug paraphernalia at or from the Residence or otherwise; (d) engage in any illegal activity, including but not limited to, prostitution, criminal street gang activity, threatening or intimidating assault, including the unlawful use or possession of firearms, on or near the Residence, or threaten the health, safety and/or welfare of Landlord, its agents, other Residents, or neighbors in any manner that constitutes waste or nuisance upon or about the Residence; or (e) disrupt or interfere with Landlord's business operations, or communicate with Landlord, Landlord's agents, or their employees in an unreasonable, discourteous, rude, or hostile manner. Resident understands and agrees that the use, possession, manufacturing or distribution of marijuana, whether medical or recreational, is strictly prohibited and constitutes a material and irreparable breach of this Lease. Resident agrees and authorizes Landlord to use any arrest record or police-generated reports referring to Resident as reliable direct evidence of Resident's conduct or violation of this section.

**VIOLATION OF ANY OF THE PROVISIONS OF THIS SECTION, OR OF ANY FEDERAL OR APPLICABLE LAWS, SHALL BE A SERIOUS, MATERIAL, AND IRREPARABLE VIOLATION OF THIS LEASE AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF THE TENANCY.**

## 13. MAINTENANCE.

**13.1. LANDLORD'S MAINTENANCE OBLIGATIONS.** Maintenance and repairs of items that significantly impact habitability of the Residence as determined by Landlord in its sole and absolute discretion, or by Applicable Law, shall be deemed "**Major Repairs.**" Landlord shall be responsible for Major Repairs, including repairs to heating or air conditioning systems, roofing, and mechanical, electrical, and defective plumbing systems.

Landlord may, at Landlord's sole discretion, hire contractors to perform maintenance or repairs at the Residence; however, no contractor shall be considered an employee of Landlord. Resident shall notify Landlord promptly if any contractor fails to perform requested maintenance or repairs. Notification to a contractor of any further maintenance or repair request does not constitute sufficient notice to Landlord, and Resident agrees to make all maintenance and repair requests directly to Landlord in writing.

**13.2. RESIDENT'S MAINTENANCE OBLIGATIONS.** Resident shall, at all times, use, operate, and safeguard the Residence, including any and all furnishings, improvements, equipment, hardware, appliances, landscaping, fixtures, and all mechanical, electrical, gas, and plumbing fixtures located at the Residence, and maintain, at Resident's own expense, the same in a clean and sanitary condition and perform all other maintenance obligations imposed upon Resident under this Lease. Resident shall be responsible for the performance of all maintenance and repairs that do not constitute a Major Repair and are not Landlord's obligation pursuant to Applicable Law. Resident's maintenance obligations shall include, without limitation, (a) following all maintenance recommendations of Landlord and any manufacturer recommendations for appliances, equipment, plumbing, and other fixtures and furnishings, (b) maintaining the Residence in a clean, sanitary condition, (c) keeping all drains clear and free of hair, obstructions, and any foreign matter and repair and maintenance of any related drain and sink backups or blockages, (d) promptly removing any standing water, excess moisture, or damp conditions at the Residence to prevent mold growth or other damage, (e) regularly changing and



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

cleaning all vents, filters, and fans located in the Residence (including the appliances and heating, ventilating, and any cooling systems), (f) replacing light bulbs, (g) checking and maintaining all smoke and carbon monoxide detectors and replacing batteries as needed, (h) properly ventilating kitchen and bathrooms, (i) routine insect and pest control, (j) maintenance of exterior landscaping as set forth in the Landscaping Addendum, (k) keeping sidewalks, driveways, and garages free from dirt and oil stains, (l) power washing the Premises as needed, up to ten feet high, (m) keeping gutters less than 10 ft. in height clean and free from debris, and (n) otherwise employing proper maintenance activities at the Residence in accordance with the terms of this Lease to maintain the Residence in a good condition of maintenance and repair. Resident shall immediately report to Landlord, in writing, conditions posing any problem, failure, malfunction, or damage at the Residence. Resident shall not disable or tamper with any smoke detectors or carbon monoxide detectors installed in the Residence and shall maintain all such detectors in good working order and immediately report to Landlord in writing if any detector becomes inoperable or nonfunctional. Resident shall take all reasonable and customary measures and shall comply with any emergency and temporary directives from law enforcement, to protect the Residence and Resident's personal property from damage from natural disasters (such as hurricanes, tornadoes, flooding, fires, and freezing) and shall follow any evacuation orders. The foregoing includes protecting pipes and other parts of the Residence during times of freezing temperature. Landlord may, from time to time, provide Resident with additional information or instructions regarding care of the Residence, including during times of disasters and severe weather, and Resident agrees to comply with such information or instructions.

Resident shall be responsible for any costs incurred by Landlord in inspecting the Residence and making repairs required due to Resident's failure to maintain the Residence as required under this Lease or due to damage that occurs while the Residence is in Resident's control and is not caused by weather, natural disaster, or Landlord. Resident shall also be responsible for any costs incurred in inspecting or repairing damage caused by Resident's failure to promptly report needed repairs. Resident's failure to maintain any item for which Resident is responsible will give Landlord the right to hire a vendor of its choosing to perform such maintenance and charge Resident to cover the cost of such maintenance. Resident shall be obligated to reimburse Landlord for all costs incurred by Landlord in performing such repairs as additional rent, including any costs associated with management of vendors and administration of work.

Resident must be physically present on the day of scheduled repair work to grant access to Landlord's vendors. Resident will be charged a $75.00 fee ("**Trip Fee**") if repairs or service must be rescheduled due to Resident's failure to be present or grant access on the scheduled date. All such charges shall be payable as additional rent. Resident acknowledges that not making the Residence available on the day of scheduled repairs will cause Landlord to incur costs and expenses, including costs related to the trip, processing, and administrative and accounting expenses the exact amounts of which are extremely difficult and impractical to determine. Resident agrees that the Trip Fee represents a fair and reasonable estimate of the costs Landlord may incur by reason of Resident not granting access to Landlord as described in this paragraph. If Landlord is required because of the actions or inactions of Resident or any Resident Party to inspect the Residence or perform repairs, Landlord shall have the right to charge for all costs of such inspection and repairs. Routine repairs and maintenance that may be necessary at the Residence shall not excuse Resident from the timely payment of Rent.

**14. ALTERATIONS.** Other than as specifically outlined herein, Resident will not make any alterations, modifications, or improvements in or about the Residence (collectively referred to as "**Alterations**") without the prior written consent of Landlord. Such Alterations include, but are not limited to: painting, wallpapering, finishing, coating, replacing, modifying, sampling, testing, analyzing, or evaluating any interior or exterior building materials or adding or changing locks at the Residence.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

In addition, Resident shall not install any fixtures in the exterior of the Residence (including above-ground pools), display any signs or exterior lights on the Residence (except temporary seasonal decorations), and no awnings or other projections shall be attached to the outside of the Residence without first obtaining the written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion. Resident shall be required to obtain all necessary permits required by Applicable Law before commencing work on a Landlord-approved Alteration. Any work performed on the Residence, whether by Resident or other parties, shall be considered an independent contractor or agent of Resident and not an employee or agent of Landlord. Resident further warrants that Resident will be responsible for any damage or injury resulting from such work and will defend, indemnify, and hold harmless Landlord and Landlord's agents for, from, and against all claims, losses, and damages, including mechanic's and other liens. Prior to commencing any Alterations, Resident shall provide Landlord with thirty (30) days' notice to allow Landlord to post any notices of non-responsibility or such other notices permitted by Applicable Law. At Landlord's sole and absolute discretion, any permitted Alterations of the Residence shall be removed by Resident at Resident's sole cost and expense and the Residence restored to its original condition prior to the end of the tenancy unless Landlord gives Resident written notice that all or any designated portion of said Alterations shall remain in the Residence, in which event all improvements to the Residence shall be the property of Landlord and shall remain attached to and be a part of the Residence when Resident vacates, subject to Applicable Law.

**15. PEST CONTROL.** Resident agrees to take all reasonable steps to maintain the cleanliness and proper housekeeping of the Residence, including, without limitation, ensuring the conditions at the Residence are not conducive to the presence, proliferation, or infestation of insects, bed bugs, rodents, or other pests. Resident is responsible for keeping the Residence clean and free of all pests and, at its sole cost and expense, shall be responsible for all pest control.

Resident agrees that, upon notification or reasonable belief of a pest infestation, Landlord and its agents shall have access at reasonable times, subject to the notice requirements under this Lease and Applicable Law, to inspect the Residence and Resident's furnishings, clothing, possessions, and any other personal property present in the Residence. Resident and any Resident Parties shall cooperate and not interfere with inspections or pest control treatments. Subject to Applicable Law, Landlord shall have no responsibility for any damage or injury to Resident or any other person or property at the Residence as a result of pests or any pest control treatment.

Landlord shall arrange for treatment of the Residence at no cost to Resident if a pest infestation is reported to Landlord in writing within thirty (30) days of the Commencement Date. Resident hereby accepts and assumes all responsibility for all pest control thereafter, including but not limited to bed bug infestations, subject to Applicable Law. Any pests, including insects and rodents, not reported to Landlord in writing within the first thirty (30) days will be presumed to have entered the Residence after the start of Resident's residency.

**16. ALARM SYSTEMS.** Resident may arrange for the installation of an alarm system (the "**Alarm System**") at the Residence, subject to the following: (a) Resident shall engage a reputable, licensed and bonded security company for the installation of the Alarm System and for the provision of the resulting security service; (b) Resident shall be solely responsible for the full cost of the Alarm System, including all installation, service, permit costs, and maintenance fees; (c) Resident shall reimburse Landlord, immediately upon demand, for any amounts expended by Landlord in connection with Resident's default under Resident's agreement with its Alarm System provider, provided however that Landlord shall not be a party to any such agreement and shall bear absolutely no liability thereunder; and (d) upon the expiration or earlier termination of this Lease, Resident shall



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

cause all components of any Alarm System to be removed, shall cancel the service, and shall restore the Residence to at least as good a condition as prior to the installation of the Alarm System.

**17. STORAGE.** Resident must store only personal property Resident owns and must not store property claimed by another or in which another has any right, title, or interest. Resident must not store any flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances. Basements are known to be prone to flooding and moisture; Resident is advised not to store any personal belongings in the basement. No personal property may be stored outside , but for patio furniture.

**18. DEFAULT.** Resident will be in default under this Lease if Resident (i) fails to pay Rent or other charges when due, or (ii) fails to perform any other obligation or duty of Resident under this Lease, which failure to pay or perform continues for three (3) days (unless a longer period is required by Applicable Laws) after the delivery of written notice to Resident of such default in the manner required by Applicable Law (an "Event of Default"). In no event shall a cure period be given for any material and irreparable defaults. Any notice required to be given for Resident to be in default hereunder will not be deemed to be in addition to any statutorily required notice if the notice given hereunder otherwise complies with the terms of the applicable statute. Resident understands and agrees that each of the obligations imposed by this Lease shall be regarded as material in nature, and violation of any such obligation shall entitle Landlord to exercise those remedies provided by Applicable Law, this Lease, or in any separate agreement between Landlord and Resident whether such document is incorporated herein or not.

**18.1.** Resident is hereby notified that a negative credit report reflecting on Resident's credit record may be submitted to a credit reporting agency if Resident fails to fulfill the terms of the Lease by failing to pay Rent on time.

**19. REMEDIES.** After the occurrence of an Event of Default, Landlord will have the right to the following remedies. These remedies are not exclusive; they are cumulative and in addition to any remedies allowed by Applicable Law or in equity.

**19.1.** The immediate option to terminate this Lease and all rights of Resident hereunder by giving Resident written notice of such intention to terminate, and pursuing applicable legal action, in which event Landlord may recover from Resident all of the following: (i) any unpaid Rent which had been earned at the time of such termination; plus (ii) the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss Resident proves reasonably could have been avoided; plus (iii) the amount by which the unpaid Rent for the balance of the term exceeds the amount of such rental loss that Resident proves reasonably could be avoided; plus (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Resident's failure to perform his or her obligations under this Lease, including, but not limited to: brokers' commissions; the costs of refurbishment, alterations, renovation, and repair of the Residence reasonably incurred for the sole purpose of reletting the Residence; and removal (including the repair of any damage caused by such removal) and storage (or disposal) of Resident's personal property, equipment, fixtures, alterations, and any other items which Resident is required under this Lease to remove but does not remove; plus (v) at Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted by Applicable Law; plus (vi) the amount of any concessions provided to Resident by Landlord in connection with this Lease at the time the parties entered into this Lease and/or at the time of Resident moving into the Residence.

**19.2.** In addition to the remedies specified above in this Section, if an Event of Default occurs,



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

Landlord has the remedy described in California Civil Code Section 1951.4 (Landlord may continue lease in effect after Resident's breach and abandonment and recover Rent as it becomes due, if Resident has the right to sublet or assign, subject only to reasonable limitations) and may continue the Lease in effect after Resident's default.

**19.3.** Landlord, at any time after Resident commits a default, may cure the default at Resident's cost. If Landlord, at any time, by reason of Resident's failure to cure a default within the required timeframe, pays any sum or does any act that requires the payment of any sum, the sum paid by Landlord shall be due immediately from Resident to Landlord and shall bear interest from the date the sum is paid by Landlord until Landlord is reimbursed by Resident, at the lesser of (a) ten percent (10%) per annum or (b) the maximum rate permitted by Applicable Law. The sum, together with interest, shall be considered additional Rent and paid along with the monthly Rent.

**20. ABANDONMENT.** Prior written notice, with provision of timely Rent payment, is required if Resident intends to be absent for an extended period. If the Residence appears to be unoccupied for fifteen (15) days while Rent is due and unpaid, or for such other time as specified by Applicable Law and Resident has not given Landlord written notice of Resident's intention to remain, then Landlord is authorized to deem the Residence abandoned, to take immediate possession of the Residence, and to store, dispose of, or otherwise handle Resident's personal property subject to Applicable Law. Resident herein gives Landlord specific authority, at Resident's expense, and without limitation of Landlord's other remedies, to dispose of abandoned personal property in any manner Landlord chooses that does not violate Applicable Law, with no recourse whatsoever on the part of Resident.

**21. OTHER TERMINATION.** This Lease may be subject to immediate termination for certain acts as provided by Applicable Law, including any act that jeopardizes the health, safety, or welfare of Landlord, any agent or employee of Landlord, or another Resident, or which involves imminent or actual severe personal injury or property damage.

**22. TENANT ESTOPPEL CERTIFICATES.** Upon Landlord's request, Resident shall execute and return a tenant estoppel certificate delivered to Resident within five (5) days after its receipt. Failure to comply with this requirement shall be deemed Resident's acknowledgment that the certificate is true and correct and may be relied upon by a lender or purchaser.

**23. ASSIGNMENT AND SUBLETTING.** Resident may not assign this Lease voluntarily or involuntarily nor sublet the whole or any portion of the Residence, which includes short-term rentals, without the prior written consent of Landlord. The failure to obtain such prior consent shall be deemed a material breach of this Lease. Subject to Applicable Law, any action or inaction or acceptance of any Rent or knowledge on the part of Landlord of the presence of a person other than Resident shall not be deemed to be a waiver of the requirement that Landlord's prior written consent must be obtained, nor shall it constitute a consent of any person as a "sub-tenant", approved occupant, or new tenant. Any proposed assignee, transferee or sublessee shall submit to Landlord an application and credit information for Landlord's approval and, if approved, sign a separate written agreement with Landlord and Resident to amend this Lease. Landlord's consent to any one assignment, transfer, or sublease shall not be construed as consent to any subsequent assignment, transfer, or sublease and shall not release Resident of Resident's obligations under this Lease. Landlord may assign this Lease at Landlord's sole and absolute discretion. Should Landlord sell, exchange, or assign this Lease or the Residence, as applicable (other than a conditional assignment as security for a loan), then Landlord, as transferor, will be relieved of all obligations on the part of Landlord accruing under this Lease from and after the date of such transfer.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**24. ACCESS.** Subject to Applicable Law, Resident shall allow Landlord and any agent or contractor of Landlord access to the Residence, at all reasonable times, for any lawful purpose, including but not limited to, to inspect the Residence, make necessary or requested repairs, perform routine maintenance, make alterations or improvements, or to show the Residence to prospective residents, purchasers, or mortgagees or to any other person having a legitimate interest therein. If practicable, Landlord shall give Resident reasonable notice prior to entering the Residence for routine situations requiring access. Landlord and Resident agree that 24-hour written notice will be reasonable and sufficient notice. No notice is required: (i) to enter in case of an emergency when immediate action is necessary in the opinion of Landlord or Landlord's agent for the protection of Resident or the Residence; (ii) if Resident is present and consents at the time of entry; or (iii) if Resident has abandoned or surrendered the Residence. Resident's failure or refusal to grant Landlord (or Landlord's representatives) access to the Residence as provided in this Section will be a default by Resident under this Lease. Written notice under this section may be provided by email, U.S. Mail, personal delivery, or by posting on, near, or under an entry door. Resident authorizes Landlord to place for sale or lease signs on the Residence without notice.

**25. LIABILITY.** To the full extent permitted by Applicable Law, (a) Landlord and Resident agree that Landlord will not be liable for any damages, injuries, or losses to any person or property related to or caused by any defective condition of the Residence, other residents or persons, theft, burglary, vandalism, or other crimes; (b) Landlord shall have no duty to furnish alarms of any kind, security guards, or additional locks, and latches and Resident shall not make any changes or additions to the existing locks for any reason without Landlord's prior written consent; and (c) Resident shall indemnify and hold Landlord and Landlord's agents, employees, lenders, and affiliates harmless from and against any and all claims, liabilities, damages, injuries, costs, or expenses that arise from or are related to Resident's or any Resident Party's use or occupancy of the Residence except to the extent solely caused by the intentional neglect or willful misconduct of Landlord, its agents, contractors, or employees.

Landlord's liability under this Lease will be limited to Landlord's unencumbered interest in the Residence. Neither Landlord nor any of its partners, members, officers, directors, agents, employees, shareholders, successors, assigns, or pledges, including without limitation, any management company or the individual signing this Lease on Landlord's behalf, will in any way be personally liable under this Lease.

**26. POSSESSION.** Except as provided by Applicable Law, if Landlord is unable to deliver possession of the Residence within seven (7) days of the Commencement Date stated above, then this Lease may be terminated at Landlord's option and all funds received from Resident will be returned. Except as provided by Applicable Law, Resident agrees to release and hold Landlord and its agents and representatives harmless from any further obligation or consequential damages related to any delay or inability to deliver possession of the Residence.

**27. SEVERABILITY.** In the event any term or provision of this Lease shall be invalid or unenforceable under Applicable Law, the remaining provisions shall continue to be valid and shall remain binding. In like manner, any obligations of either Landlord or Landlord's agent or of Resident which may become required by Applicable Law during the term of this Lease shall be binding as if included herein. All rights granted to Landlord or Landlord's agent by Resident shall be cumulative and in addition to any existing law and any new law which might become effective. Any exercise, or failure to exercise, by Landlord or Landlord's agent of any right shall not act as a waiver of any other rights.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**28. JOINT AND SEVERAL LIABILITY.** Each Resident signing this Lease is individually and jointly and severally liable for the full and complete performance of all obligations of Resident under this Lease, jointly with every other Resident, and individually, whether or not such Resident continues in possession.

**29. RESIDENT'S WARRANTIES.** Resident represents and warrants that all statements and information in Resident's rental application are true and accurate as of the date hereof. If any information or representation provided by Resident in the rental application is false, incorrect, or misleading, then Resident shall be deemed to have committed a material default under this Lease that Resident shall not be provided an opportunity to cure, and Resident shall be subject to eviction, damages and other remedies to Landlord as provided in this Lease and Applicable Law. Resident represents and warrants that Resident (a) shall comply with all requirements, obligations and conditions of any senior interest holder such as Landlord's lenders; (b) shall not disturb, annoy, or endanger other neighbors or use the Residence for unlawful purposes; (c) shall comply with all Applicable Laws.

**30. NO SMOKING.** No smoking of any substance (including but not limited to tobacco, marijuana, or e-cigarettes) is allowed inside the home or on any portion of the Residence. If smoking does occur at the Residence, (a) Resident shall be in breach of this Lease; (b) Resident shall be responsible for all damage caused by the smoking, including stains, burns, odors, and removal of debris; (c) Resident, guests, and all others may be required to leave the Residence; and (d) Resident acknowledges that in order to remove odor caused by smoking, Landlord may need to replace carpet and drapes and paint the entire home regardless of when these items were last cleaned, replaced, or repainted and such replacement, repainting, and cleaning will be performed at Resident's sole cost and expense.

**31. FIRE SPRINKLERS.** If the Residence contains fire sprinklers, Resident shall notify Landlord in writing if the sprinklers are not working properly or are missing any parts. Resident shall not place hangers or any other items on the fire sprinklers.

**32. HOMEOWNER ASSOCIATIONS AND MUNICIPALITIES.** Resident understands and agrees that this Lease may be subject to the prior approval of a homeowner association ("**HOA**") and, if such approval is not obtained, subject to Applicable Law, this Lease shall be null and void. Resident agrees to comply with all applicable declarations, covenants, conditions and restrictions, rules, regulations, and other lawful directives ("**HOA Governing Documents**") of any HOA to which the Residence is subject. Resident will cooperate with Landlord in performing all acts necessary to comply with the HOA Governing Documents or other Applicable Laws. Resident hereby represents and warrants to Landlord that Resident (a) has received, reviewed and will comply with all applicable HOA Governing Documents and other instruments of record; (b) shall provide prompt written notice to Landlord if Resident receives any notice of violation of any HOA Governing Documents or other Applicable Law; (c) shall reimburse Landlord for any fines or charges imposed by any HOA or municipality as a result of Resident's violation or failure to comply with any applicable HOA Governing Documents or other Applicable Law. Any such fines or charges shall be considered additional rent and be paid with Resident's next monthly Rent payment. Resident agrees that in the event that Resident fails to comply with any provision of any applicable HOA Governing Documents or other Applicable Law within five (5) days following notice from Landlord of such failure to comply, Landlord shall have the right, but not the obligation, to access any non-secured areas of the Residence to effect compliance, and upon such action by Landlord, Resident shall pay to Landlord the cost of such compliance as additional Rent with Resident's next monthly Rent payment. In Landlord's sole discretion and upon demand by Landlord, Resident shall also pay to Landlord as additional rent an administrative fee in the amount of $35.00 for each notice, violation, charge, or fine assessed due to Resident's failure to comply with any



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

HOA Governing Documents or Applicable Law ("**HOA Admin Fee**") to reimburse Landlord for administrative time and effort expended in complying with the particular violation on Resident's behalf. Resident further agrees to notify Landlord prior to reporting any violation to the HOA or to the municipality's code compliance department.

The Residence may be located within a community that includes common areas, resident amenities or facilities, and/or recreational facilities (collectively, "Amenities"). Resident's use of any Amenities is a privilege and license granted by Landlord, and not a contractual right except as otherwise provided for in this Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of this Lease and any HOA Governing Documents. Resident expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, related to Resident's and any Resident Parties' use of the Amenities. Resident shall hold Landlord harmless and release and waive any and all Claims that Resident may have against Landlord and that are in any way related to or arise from the use of any Amenities, including but not limited to, Resident's inability to use Amenities and any injury that may occur during use of the Amenities. Resident shall not be entitled to any reduction in Rent, in the event Resident is unable to use the Amenities for any reason. Resident shall indemnify and hold Landlord and Landlord's agents, employees, lenders, and affiliates harmless from and against any and all claims, liabilities, damages, injuries, costs, or expenses that arise from or are related to Resident's or any Resident Party's use of any Amenities.

**33. DAYS.** Except where stated otherwise in this Lease all references to days in this Lease shall be construed as calendar days and a day shall begin at 12:00 a.m. and end at 11:59 p.m. local time where the Residence is located.

**34. SUBORDINATION/MORTGAGEE PROTECTION.** This Lease is and shall be subordinate to any mortgages or encumbrances that are now or may hereafter be placed upon the Residence and to any advances to be made thereunder and all renewals, replacements, and extensions thereof. Resident shall not cause or permit anything to be done that violates any mortgage on the Residence. Resident agrees to sign any document reasonably requested by Landlord's lender in connection with a mortgage on the Residence, including a Subordination, Non-Disturbance and Attornment Agreement in a form satisfactory to Landlord's lender.

**35. FORCE MAJEURE.** Any delay or failure in the performance by Landlord hereunder shall be excused if and to the extent caused by the occurrence of any event that is beyond Landlord's control, such as fires, floods, earthquakes, wars, sabotage, terrorism, vandalism, governmental acts, injunctions, or labor strikes, acts of God, and any other occurrences that are unavoidable or unpreventable despite reasonable efforts to prevent, avoid, delay, or mitigate the effects thereof.

**36. DAMAGE TO THE RESIDENCE.** If, through no fault of Resident, the Residence is completely or partially damaged or destroyed by fire, earthquake, flood, accident, or other casualty that renders the Residence totally or partially uninhabitable, as determined by Landlord, either Landlord or Resident may terminate this Lease by giving the other written notice or as otherwise provided by Applicable Law. Rent will be abated as of the date the Residence become totally or partially uninhabitable. The abated amount will be the current monthly Rent prorated on a 30-day period. If this Lease is not terminated, Landlord shall promptly repair the damage, and monthly Rent shall be reduced based on the extent to which the damage interferes with Resident's reasonable use of the Residence. If damages are caused by Resident or any Resident Party, Resident shall be responsible for all costs and expenses of repairing such damages, only Landlord shall have the right of termination, and no reduction in Rent shall be made.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**37. LEAD-BASED PAINT.** The Residence may have been constructed prior to 1978. Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of lead-based paint and/or lead-based paint hazards in the dwelling. Residents must also receive a federally approved pamphlet on lead poisoning prevention. In accordance with federal law, Landlord has provided, and Resident acknowledges receipt of, the disclosures on the attached lead-based paint disclosure form. The most current version of the "Protect Your Family From Lead In Your Home" pamphlet provided by EPA can be obtained at any time by accessing the resident portal and/or from the EPA's website at https://www.epa.gov/sites/default/files/2020-04/documents/lead-in-your-home-portrait-color-2020-508.pdf

**38. ASBESTOS.** Asbestos is a generic term used to describe a group of naturally occurring, fibrous minerals. These minerals occur as bundles of strong, flexible fibers that are chemically inert, do not burn, and have good insulating properties. Because of these properties, it was commonly used before 1983 for insulation, fireproofing, and a wide variety of other building materials commonly referred to as asbestos-containing materials ("**ACM**"). Landlord has no knowledge that the Residence contains asbestos or ACM. In the event the Residence contains asbestos, disturbance or damage to certain interior surfaces may increase the potential exposure to this substance. Resident, occupants, and their guests must not take or permit any action which in any way damages or disturbs the ceiling in the Residence or alters or disturbs the heating and ventilation system serving the Residence, including without limitation, any ducting connected thereto. Resident must notify Landlord and its agents immediately in writing of any damage to or deterioration of the ceiling in the Residence or any portion thereof, including without limitation flaking, loose, cracking, hanging, or dislodged material, water leaks, or stains in the ceiling. There are both federal and state resources that can provide further information on asbestos and ACM. The U.S. EPA provides numerous details and references: http://www.epa.gov/asbestos.

**39. NOTICE REGARDING SEXUAL OFFENDERS.** Pursuant to Section 290.46 of the Cal. Penal Code, information about specified registered sex offenders is made available to the public via an Internet website maintained by the Department of Justice at *www.meganslaw.ca.gov*. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and zip code in which he or she resides. Neither Landlord nor brokers, if any, are required to check this website. If Resident wants further information, Resident should obtain information directly from this website.

**40. WATERBEDS.** No waterbeds or other liquid-filled furniture shall be brought onto or used in the Residence without Landlord's prior written consent, which consent shall be conditioned upon Resident's compliance with California Civil Code Section 1940.5.

**41. SIGNS.** Notwithstanding anything to the contrary in this Lease, Resident shall be permitted to display political signs at the Residence for a reasonable time subject to Resident's compliance with California Civil Code Section 1940.4 or any other Applicable Law.

**42. FLOOD HAZARD AREAS.** The Residence may be located in a special flood hazard area or an area of potential flooding. Resident may obtain information about hazards, including flood hazards, that may affect the property from the Internet website of the Office of Emergency Services. The MyHazards tool can be located at http://myhazards.caloes.ca.gov/. Landlord's insurance does not cover the loss of the Resident's personal possessions and it is recommended that Resident consider purchasing renter's insurance and flood insurance to insure his or her possessions from loss due to



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

fire, flood, or other risk of loss. Landlord is not required to provide additional information concerning the flood hazards to the Residence and the information provided pursuant to this section is deemed adequate to inform the Resident. The disclosures required by this section are subject to the requirements of Section 1632 of the Civil Code.

43. **SATELLITE DISHES.** If Resident provides Landlord with prior written notice, Resident may install one dish on the Residence, provided it does not exceed one (1) meter (3.3 feet) in diameter. Resident's installation must comply with reasonable safety standards and may not interfere with any cable, telephone, or electrical systems within or serving the Residence. Installation must be done by a qualified person, or company and the satellite dish cannot be installed or affixed to the roof of the Residence. Resident will have the sole responsibility for maintaining any satellite dish or antenna and all related equipment. Resident must pay for any damages and for the cost of repairs or repainting which may be reasonably necessary to restore the Residence to its condition prior to the installation of any satellite dish or related equipment. Resident agrees to indemnify, defend, protect, and hold harmless Landlord and Landlord's agents for, from, and against any liability, costs (including reasonable attorney's fees), or claims for personal injuries or property damage caused by or related to Resident's installation of a satellite dish. If Resident installs a satellite dish or antenna prior to satisfying the conditions set forth above, then Resident shall be deemed in default under the Lease.

44. **MILITARY SERVICE TERMINATION RIGHT.** In the event that Resident is, or hereafter becomes, a member of the United States Armed Forces on extended active duty and receives permanent change of station orders to depart from the area where the Residence is located (which for purposes of this Section means an area in excess of thirty-five (35) miles from the Residence), or is ordered into military housing, then in any of these events, or as otherwise allowed by Applicable Law, Resident may terminate this Lease upon giving not less than thirty (30) days' written notice to Landlord. Resident must also provide to Landlord a copy of the official orders or a letter signed by Resident's commanding officer, reflecting the change, which entitles Resident to the right to terminate this Lease early under this Section.

45. **NO ENCUMBRANCES PERMITTED.** Resident has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Resident, operation of law, or otherwise, to attach to or be placed upon the Residence. Landlord will have the right to post and keep posted on the Residence any notice which it deems necessary for protection from such liens. Resident covenants and agrees not to suffer or permit any mechanic's lien, municipal lien, or other lien to be placed or recorded against the Residence, and, in case of any such lien attaching or notice of any lien, Resident covenants and agrees to cause it to be immediately released and removed of record. Notwithstanding anything to the contrary set forth in this Lease, if any such lien is not released and removed on or before the date notice of such lien is delivered by Landlord to Resident, Resident will be deemed in default hereunder and Landlord, at its sole option, may immediately take all action necessary to release and remove such lien, without any duty to investigate the validity thereof, and all sums, costs, and expenses, including reasonable attorneys' fees and costs, incurred by Landlord in connection with such lien will be deemed Rent under this Lease and will immediately be due and payable by Resident.

46. **THIRD PARTY DISCLOSURE.** Unless required by law, Landlord shall not be obligated to provide any party with information with respect to this Lease or the Residence other than the undersigned Resident or such Resident's permitted assignee or sublessee pursuant to this Lease. Landlord may, at its discretion, provide information regarding this Lease to law enforcement or any government agency.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**47. COMMUNICATIONS.**

**47.1. Consent to Receive Communications.** Resident consents to receive electronic and other forms of communication including, but not limited to, phone calls, emails and text messages, including such communications via an automated dialing system or other automated technology, from Landlord and Landlord's agents and third-party service providers in order to convey information regarding the Residence, such as rent reminders, maintenance request information and other information related to the provision of the services described in this Lease and its Addenda, and including any new or existing ancillary services Landlord may provide during the Lease term. Resident understands that standard text messaging rates will apply to any messages received and agrees not to hold Landlord or its agents liable for any electronic messaging charges or fees generated by this service.

Resident Initial: M Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

Resident Initial: _____ Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

**47.2. Consent to Transfer of Personal Information.** Resident acknowledges and agrees that the provision of the services described in this Lease and its Addenda, including any new or existing ancillary services Landlord may provide during the Lease term, may require Landlord to transmit certain personal information of Resident to its third-party service providers and Resident hereby consents to the transfer of such personal information for this limited purpose. Resident further acknowledges and agrees that any of Resident's personal information transferred to Landlord's third-party service providers will be subject to the privacy policies and procedures implemented by such third-party service providers, which such policies may differ from those that have been implemented by Landlord.

Resident Initial: M Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

Resident Initial: _____ Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

**48. AGREEMENT TO MEDIATE.** Other than claims and/or disputes relating to evictions, Resident agrees, before filing any action, to mediate in good faith with Landlord any dispute and/or claim arising out of and/or relating to this Lease and/or the Residence. Mediation fees, if any, shall be divided equally among the parties who appear at the mediation. Resident understands, acknowledges, and agrees that such mediation is a condition precedent to filing any action by Resident in court, arbitration, and/or any other dispute resolution forum. Thus, if Resident commences any action against Landlord and/or any of Landlord's agents (whether in court, arbitration, and/or any other dispute resolution forum) without first attending and participating in good faith in the mediation referenced in this Section 48, then Resident's action shall be dismissed or stayed pending completion of this good faith mediation requirement, and Resident shall not be entitled to recover attorneys' fees and costs in such action, even if such fees and costs would otherwise be available to Resident in such action. For clarity, by failing to comply with the mediation requirement in this Section before filing any action, Resident waives its right to any attorneys' fees and costs (to the extent any right may exist) in the action even if Resident thereafter complies with this mediation requirement, and even for attorneys' fees and costs that may accrue following Resident's compliance with the mediation requirement set forth in this Section.

For clarity, and notwithstanding any other language in this Section 48, there is no obligation and/or requirement to mediate claims and/or disputes relating to evictions.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

Resident Initial: JA Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

Resident Initial: _____ Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

**49.** **<u>CLASS, COLLECTIVE, AND MASS ACTION WAIVER.</u>** Resident understands, acknowledges, and agrees that, by executing this Lease, Resident waives any right and/or ability to file, and/or participate as a representative and/or member of, any class, collective, mass, and/or similar action (collectively, for ease of reference, "Class Action") arising out of and/or in any way relating to this Lease and/or the Residence against Landlord and/or any of Landlord's agents in any forum. While Resident is not waiving any right(s) to pursue claims against Landlord and/or any of Landlord's agents in this Section of the Lease, Resident does hereby agree to file any such claim(s) in Resident's individual capacity, and Resident may not be a Class Action plaintiff, representative, and/or member, whether or not the class is putative, in any lawsuit against Landlord and/or any of Landlord's agents that arises out of and/or in any way relates to this Lease and/or the Residence. Accordingly, Resident expressly waives any right and/or ability to bring, represent, join, and/or otherwise maintain a Class Action against Landlord and/or any of Landlord's agents that arises out of and/or in any way relates to this Lease and/or the Residence.

**RESIDENT UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT, WITHOUT THE WAIVER CONTAINED IN THIS SECTION 49, RESIDENT MAY HAVE POSSESSED THE ABILITY TO BE A PARTY TO A CLASS ACTION AS DEFINED HEREIN. BY SIGNING THIS LEASE, RESIDENT UNDERSTANDS AND CHOOSES TO WAIVE SUCH RIGHT AND ABILITY AND CHOOSES TO HAVE ANY OF ITS CLAIMS DECIDED SOLELY ON AN INDIVIDUAL BASIS. THIS CLASS ACTION WAIVER SHALL SURVIVE THE TERMINATION AND/OR EXPIRATION OF THIS LEASE.**

Resident Initial: JA Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

Resident Initial: _____ Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

**50.** **<u>AGREEMENT TO SUBMIT TO ARBITRATION AND WAIVER OF ANY RIGHT TO A TRIAL BEFORE A JUDGE OR A JURY.</u>** All disputes arising out of and/or in any way relating to this Lease based on and/or related to mold in the Residence (no matter how styled, whether as breach of contract, tort, statutory, common law, or otherwise), and any supplemental and/or ancillary claims that are brought in conjunction with such mold-related claims, shall be submitted to binding, confidential arbitration before a single arbitrator, pursuant to the Federal Arbitration Act ("FAA") and conducted by the American Arbitration Association ("AAA") in accordance with the then-current and applicable rules of the AAA.

The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties, except that in all cases such arbitrator shall be an attorney admitted to practice in the state of the Residence. Nothing contained herein shall prevent a party from obtaining an injunction in the arbitration or in any court of competent jurisdiction. The final award of the arbitration shall be a reasoned award, and can be confirmed in any court with competent jurisdiction, but shall be treated as confidential and filed under seal.

The arbitration will be located, and the final hearing will take place, in the AAA office nearest the Residence, and within the same state. If there is no AAA office in the state of the Residence, then the arbitration will be located, and the final hearing will take place, in the AAA office nearest the Residence.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

Each party is responsible for and will bear their own fees and costs in and related to the arbitration. For clarity, each party is responsible for any administrative filing fee related to their filings and/or submissions in the arbitration, and each party is responsible for their share of AAA administrative and arbitrator fees and costs. AAA administrative and arbitrator fees and costs shall be divided equally per side in the arbitration—*i.e.*, per each side of the "v" regardless of whether there is more than one party on any side of the "v".

The final hearing in the arbitration shall be completed within 180 days of the appointment of the arbitrator in the arbitration, and the final award shall be issued within 30 days of the completion of the final hearing. Discovery in the arbitration will be limited as follows, per each side (*i.e.*, per each side of the "v" regardless of whether there is more than one party on any side of the "v"):

- 15 interrogatories;
- 15 requests for production of documents;
- 40 collective hours of fact depositions, with no one deposition to exceed 12 hours of running deposition time;
- 3 affirmative expert reports, and rebuttal expert reports corresponding to the number of affirmative expert reports.

**FOR CLARITY, AS PROVIDED FOR DIRECTLY ABOVE IN SECTION 49, RESIDENT AGREES TO FILE ANY CLAIM(S) AGAINST LANDLORD AND/OR ANY OF LANDLORD'S AGENTS IN THE ARBITRATION IN RESIDENT'S INDIVIDUAL CAPACITY. RESIDENT UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT IT IS WAIVING ANY RIGHT AND/OR ABILITY TO PARTICIPATE IN ANY ARBITRATION AS A REPRESENTATIVE AND/OR MEMBER OF ANY CLASS ACTION (AS DEFINED IN SECTION 49) AGAINST LANDLORD AND/OR ANY OF LANDLORD'S AGENTS.**

**RESIDENT ALSO UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT BY EXECUTING THIS LEASE AND AGREEING TO THIS SECTION 50, RESIDENT IS WAIVING ANY RIGHTS THAT IT MAY HAVE TO ELECT A TRIAL BY A JUDGE OR A JURY OF ANY ISSUE TRIABLE OF RIGHT BY A JUDGE OR A JURY, AND WAIVES ANY RIGHT TO TRIAL BY A JUDGE OR A JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE CLAIMS THAT ARE SUBJECT OF THIS SECTION 50. THIS WAIVER OF RIGHT TO TRIAL BY A JUDGE OR JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY RESIDENT AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY A JUDGE OR A JURY WOULD OTHERWISE ACCRUE. THIS WAIVER SHALL SURVIVE THE TERMINATION AND/OR EXPIRATION OF THIS LEASE.**

Resident Initial: Initial JL Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

Resident Initial: _____ Resident Initial: _____ Resident Initial: _____ Resident Initial: _____

**51. WAIVER.** No failure of Landlord to enforce any term of this Lease will be deemed a waiver of that term or of any other provision of this Lease, nor will any acceptance of a partial payment of Rent be deemed a waiver of Landlord's right to the full amount of Rent owed. Landlord's not enforcing or belatedly enforcing written notice requirements, rental due dates, liens, or other rights shall not be considered a waiver under any circumstances. Landlord's representatives (including personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose any obligations on Landlord unless in writing.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**52. WAIVER OF CLAIMS.** Except as provided otherwise by Applicable Law, by signing this Lease, Resident represents, warrants, and affirms that Resident does not have any present knowledge of any potential or existing claims against Landlord or any of its subsidiaries or affiliates, nor does Resident have any present intent to file any; including, but not limited to, claims for negligence, breach of contract, or any damage to personal property. **By signing this Lease, Resident hereby waives and releases Landlord from any such claims against Landlord, regardless of whether the claim is based on past or present acts or omissions, to the maximum extent permitted by Applicable Law.** Further, Resident expressly affirms that Resident is not aware of any mold in the Residence or any untreated condition in the Residence that may contribute to mold, such as water damage. Resident expressly affirms that Resident has exhibited no signs or symptoms of mold exposure and expressly waives and releases Landlord from any claims or causes of action related to mold exposure.

Nothing in this paragraph is intended to or does remove or limit Landlord's obligation to remedy future conditions at the Premises pursuant Applicable Law, but is a representation by Resident that no such conditions requiring repair or remedy presently exist. Further, nothing in this paragraph waives any provision, right of Resident, or duty of Landlord, that cannot be waived under Applicable Law.

**53. CONSENT.** Except as otherwise stated in this Lease, in all instances where Landlord's permission, consent or approval is required hereby, or where Landlord is entitled to use its discretion or exercise its judgment, Landlord shall be entitled to grant or withhold such consent, or approval, and to exercise its discretion, in Landlord's sole, absolute, and unfettered discretion.

**54. TIME OF THE ESSENCE.** Resident acknowledges and agrees that time is of the essence in all provisions of this Lease and all addenda hereto.

**55. GUARANTY.** If Resident is approved for occupancy of the Residence on condition of securing a guarantor for Resident's obligations under this Lease, Resident shall cause such guarantor to execute a separate guaranty agreement under which guarantor will guarantee the obligations of Resident for the Lease Term. Resident acknowledges and agrees that, if a guarantor is required, this Lease shall not be effective until Landlord has received a signed lease guaranty and has approved the guarantor thereunder.

**56. ATTORNEYS' FEES.** In accordance with Applicable Law, in any legal action brought by either party to enforce the terms of this Lease, the prevailing party is entitled costs incurred in connection with such action, including reasonable attorneys' fees, expenses, and other costs of collection; provided, however, that such amount shall not exceed One Thousand Dollars ($1,000).

**57. INTERPRETATION.** For purposes of this Lease: (a) the words "include," "includes," and "including" are deemed to be followed by the words "without limitation"; (b) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole; (c) words denoting the singular have a comparable meaning when used in the plural, and vice-versa; (d) words denoting any gender include all genders; and (e) any pronouns used herein shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons referred to may require. The attachments and addenda referred to herein are an integral part of this Agreement to the same extent as if they were set forth verbatim herein.

**58. COMPLETE AGREEMENT.** This Lease and the attachments and addenda referred to below represent the entire agreement between the parties, and that there are no other agreements between them or representations made by Landlord to Resident, including any oral agreements or representations outside of the written terms of this Lease. No amendment to or modification of this



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

Lease or any attachment or addenda hereto shall be valid unless written and executed by Landlord and Resident. Landlord and Resident agree that the transaction contemplated by this Lease or any related transaction between the parties may be conducted by electronic/digital signatures in accordance with the Uniform Electronic Transactions Act. Notwithstanding the foregoing, Resident may at any time request a physical (non-electronic) copy of this Lease.

**59. PRIVACY.** Resident's personal information collected in connection with this Lease or Resident's tenancy at the Residence will only be used in accordance with Landlord's privacy policy, as it is modified from time to time, and available at https://www.invitationhomes.com/privacy. Landlord's privacy policy is incorporated into this Lease by reference. By executing this Lease, Resident agrees to all of the terms and conditions contained in Landlord's privacy policy. Resident further authorizes Landlord and Property Manager to release information related to Resident and any other occupants of the Residence as may be required by Applicable Law or reasonably requested by governmental authorities or agencies.

**60. ⚠PROPOSITION 65 WARNING: BUILDING MATERIALS AT THE PREMISES CAN EXPOSE YOU TO CHEMICALS, INCLUDING FORMALDEHYDE IN SOME INSULATION, COMPOSITE-WOOD CABINETRY AND WALL AND FLOORING MATERIALS; CRYSTALLINE SILICA IN CERTAIN PAINTS AND PAINTED SURFACES; LEAD FROM IMPORTED PRE-1997 VINYL MINI-BLINDS, PLUMBING MATERIALS OR PAINT CHIPS IN OLDER PROPERTIES; ASBESTOS IN CEILING MATERIALS, IF DISTURBED, IN OLDER PROPERTIES; AND SOME PESTICIDES FOR INDOOR OR OUTDOOR USE THAT ARE ON THE PROP 65 LIST. FIREPLACES OR UNVENTED GAS SPACE HEATERS CAN EXPOSE YOU TO CARBON MONOXIDE. THESE CHEMICALS ARE KNOWN TO THE STATE OF CALIFORNIA TO CAUSE CANCER AND BIRTH DEFECTS OR OTHER REPRODUCTIVE HARM. FOR ADDITIONAL INFORMATION GO TO** www.P65Warnings.ca.gov.

**61. AGENCY AND LICENSEE DISCLOSURE.** Resident agrees and understands that Invitation Homes Realty California Inc. dba Invitation Homes is an affiliated entity of Landlord and any licensed real estate brokers or sales persons of Invitation Homes are not acting as Resident's agent in this transaction and are acting exclusively for Landlord's own benefit. Resident agrees to hold Landlord and Invitation Homes free from all liability regarding the Residence and transaction arising from any claim of agency.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**62. ATTACHMENTS AND ADDENDA TO THE LEASE.** Resident certifies that he/she has received a copy of this Lease and the following attachments and addenda, and understands that these attachments and addenda are incorporated into and form a part of this Lease:

1. [X] Rules and Regulations
2. [X] Utilities Addendum
3. [X] Lead-Based Paint and/or Lead-Based Hazards Disclosure
4. [X] Bed Bug Addendum
5. [X] Mold Addendum
6. [X] Insurance Addendum
7. [X] Landscape Maintenance Addendum
8. [X] Lease Buy-Out Addendum
9. [X] Disclosure Regarding Real Estate Agency Relationship
10. [X] Confirmation of Real Estate Agency Relationships
11. [X] Air Filter Service Addendum
12. [X] Smart Home Addendum
13. [X] Animal Addendum
13. [ ] Swimming Pool Addendum *(if applicable)*
15. [ ] Rent Concession Addendum *(if applicable)*
16. [x] Internet Package Addendum *(if applicable)*

The undersigned Residents further acknowledge receipt of the "**Protect Your Family From Lead In Your Home**" booklet provided by the USEPA and available on the EPA's website at: https://www.epa.gov/sites/default/files/2020-04/documents/lead-in-your-home-portrait-color-2020-508.pdf

THIS IS A LEGALLY BINDING CONTRACT. RESIDENT ACKNOWLEDGES THAT RESIDENT HAS HAD AN ADEQUATE OPPORTUNITY TO READ AND STUDY THIS LEASE AND TO CONSULT WITH LEGAL COUNSEL IF RESIDENT HAS SO DESIRED.

[Signatures on Following Page]



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**Resident specifically acknowledges that pursuant to Section 3.1, the Lease Term will automatically renew on a month-to-month basis unless (a) Resident or Landlord provides advance written notice of termination in compliance with Section 3.2, or (b) Landlord and Resident agree otherwise in writing.**

**RESIDENT:**

Signature: Signed by: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**Landlord agrees to rent the Residence on the above terms and conditions.**

**LANDLORD:**

2018-4 IH Borrower LP

By: Charles Young
Charles Young
Chief Operating Officer

DS
JA
Reviewed By





Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

## RULES AND REGULATIONS

1. **FURNITURE.** Resident will not bring any water-containing furniture into the Residence without Landlord's prior written consent and without first providing to Landlord written proof of insurance from a state-approved insurance company providing coverage for personal injury and/or property damage arising from the presence and/or use of such water-containing furniture.

2. **WALLS AND WOODWORK.** Resident shall be responsible for any damage caused by nails or adhesives of any kind and will restore the doors, woodwork, or walls of the Residence to the same condition as originally rented by Resident.

3. **LOCKS.** Resident will not change the locks on the doors of the Residence or install additional locks, chains, or other fasteners without the prior written consent of Landlord. Upon termination of the tenancy, all keys and garage door openers to the Residence must be returned to Landlord. If Resident fails to comply with this rule, Resident shall pay Landlord $75.00 for reimbursement of the cost of changing or re-keying the locks.

4. **FIRE RISK.** Resident will not use or store at the Residence any flammable liquids and fuels or other materials that are combustible or could increase the risk of fire. Resident shall not leave burning candles unattended, leave food cooking on the stove, or in the oven unattended.

5. **KEROSENE, SPACE OR PORTABLE HEATERS.** Resident will not store, install, or operate, in or about the Residence, any electric space or portable heaters or any heater fueled by kerosene, oil, or any other fluid. The use of any such heaters is strictly prohibited!

6. **FIREPLACES.** Wood may be burned in wood-burning fireplaces in the Residence only if approved in advance by Landlord in writing. No artificial substances, such as Duraflame® logs, are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold. Resident will comply with any "no burn days" declared by local government authorities.

7. **GRILLS AND BARBEQUES.** Grills, barbeques, and any other outdoor cooking or open flame devices shall only be used outside of the Residence on the ground level and shall be placed a minimum of ten (10) feet from any building or structure. Such devices shall not be used close to combustible materials, tall grass or weeds, on exterior walls or roofs, indoors, on balconies or patios, or in other locations vulnerable to fire. All coals or wood ash should be allowed to cool for 48 hours prior to disposal. Once coals or ash have cooled completely, they should be wrapped in aluminum foil and placed in a noncombustible trash bin. DO NOT PLACE HOT CHARCOAL IN A TRASH BIN!

8. **WINDOW SILLS.** Resident will not place anything on the outer edges of the sills of windows.

9. **STORAGE AND PLAY EQUIPMENT.** Resident will not install or erect any permanent or portable swimming or wading pools, playground equipment, trampolines, storage sheds, or other facilities anywhere at the Residence without Landlord's prior written consent.

10. **LOUD DISTURBANCES / QUIET ENJOYMENT OF RESIDENCE:** Resident will not disturb the peace and quiet enjoyment of any surrounding property by disruptive behavior on or near the Residence. Loud music or any other disturbance that can be heard two feet away from a closed door or ten feet away from an open window or door will not be tolerated at any time. The use of fireworks is strictly prohibited.

11. **GARBAGE AND RUBBISH.** Resident will place Resident's garbage and rubbish for disposal as directed by Landlord, any HOA, or municipality. Resident shall keep the entire Residence in a good state of preservation and cleanliness. Allowing trash and debris to accumulate is a material breach of this Lease. Resident is responsible for removal of trash and debris accumulating at the Residence; allowing trash and debris to accumulate is a material breach of this Lease. Resident agrees to pay, as additional



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

Rent, any reasonable fees and fines incurred due to Resident's failure to properly store containers or dispose of trash.

12. **CONDITION OF RESIDENCE.** Resident will keep balconies and patios free of all personal belongings and trash receptacles, except that Resident may maintain lawn furniture thereon, provided the same is maintained in a neat and orderly manner.

13. **DISPOSAL OF GREASE, ETC.** Resident will dispose of grease or other drain-blocking material or waste in a sealed container (e.g. glass jar) and throw it away as rubbish. Resident shall not dispose of grease or other drain-blocking material or waste in the plumbing, drains, or disposal systems at the Residence, and if Resident causes any such blockage, Resident shall reimburse Landlord for all resulting costs of repair or replacement.

14. **HEATING OF RESIDENCE.** Resident will keep the thermostat at the Residence to a minimum temperature of 55 degrees Fahrenheit during cold weather. Resident will not use the stove or other appliances for heating. Resident shall reimburse Landlord for all costs incurred by Landlord in repairing or replacing frozen pipes serving the Residence.

15. **MISCELLANEOUS.** Resident will keep any sidewalks, steps, and driveway clear of ice and snow. Landlord does not supply, repair, replace, or install storm doors, storm windows, screen doors, window screens or shades, fuses, light bulbs, batteries, furnace filters, laundry wash trays, janitor service, garbage collection, or any items or services not specifically listed as supplied in the Lease.

16. **SMOKE DETECTOR TESTING.** If Landlord has installed smoke detector(s) or carbon monoxide detector(s) in the Residence, it is Resident's responsibility to test them on a regular basis, keep them in good operating condition, and change batteries as necessary. Resident must immediately notify Landlord, in writing, of any problem, malfunction, or damage in either a smoke alarm or carbon monoxide detector. Resident shall also supply and maintain fire extinguisher(s).

17. **PARKING.** Parking is only permitted in the driveway, garage, or designated spaces of the Residence. The driveway, garage, and/or parking spaces are to be used for parking properly licensed and operable motor vehicles, except as otherwise prohibited by Applicable Law or homeowner's association. Vehicles leaking oil, gas, or other motor vehicle fluids must not be parked on the Residence. Mechanical work or storage of inoperable vehicles is not permitted on the Residence. Resident is responsible for making sure that all Resident Parties park in the appropriate parking areas. If any vehicles are parked in non-parking areas, such as grass, sidewalks, or in front of mailboxes, or in the neighbors' yards, or if there are inoperable vehicles parked at the Premises, then the vehicle may be towed at Resident's expense.

18. **ATTIC AND CRAWL SPACE.** Except solely for the purpose of replacing air filters or performing other Resident responsibilities outlined in the Lease, Resident will not access the attic or crawl space nor use the attic or crawl space for storage for any reason without Landlord's prior written consent.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

## UTILITIES ADDENDUM

This Utilities Addendum ("**Addendum**") dated 8/25/2024, is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents as ("**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease.

1. **UTILITY BILLING AGENT.** Landlord has contracted directly with a utility billing agent ("**Utility Billing Agent**") to provide utility administrative services, including, but not limited to, utility connections/disconnections and billing services. The Utility Billing Agent shall bill Resident the Utility Fees as defined hereunder, which Utility Fees are subject to change upon thirty (30) days' written notice from Landlord or Utility Billing Agent to Resident.

2. **GAS AND ELECTRIC CHARGES.** Resident must place all gas and electric utilities and services in Resident's name as of the Commencement Date. Resident will be required to show written proof that the utilities for electricity and gas services have been transferred and are in the name of Resident as of the Commencement Date. Resident must pay all costs for the conversion from existing gas and electric utilities' service providers. In the event that Resident fails to place service in Resident's name with the gas and electric providers as of the date of the Commencement Date (or allows the accounts to be placed in the name of the Landlord during the Lease Term), in addition to Landlord's ability to serve the notice and terminate the Lease as provided by law, the Utility Billing Agent may bill Resident for the estimate of Resident's gas and electric charges during that period plus an administrative fee of $25.00 per utility provider invoice. Notwithstanding anything to the contrary in this Section, should Applicable Law prohibit Resident from placing gas and/or electric utilities and services in Resident's name, the administrative fee shall not be charged.

3. **WATER, SEWER, STORMWATER, AND TRASH CHARGES.** Landlord shall contract directly with the water, sewer, stormwater, and trash utility service providers providing utilities or services to the Residence. The Utility Billing Agent shall invoice Resident and Resident shall pay monthly for the water, sewer, stormwater, and trash, and all other charges on the relevant provider bills ("**Monthly Utility Charges**") plus the Utility Admin Fee in the amount **of $8.35 per month.** Resident shall also pay a move-in fee or move-out fee, at Landlord's sole discretion, of $25.75. The fees being referred to in this and the preceding paragraph shall be considered the "Utility Fees" and shall be paid within fifteen (15) days of Resident's receipt of the invoice from the Utility Billing Agent.

Resident Initial: Initial M Resident Initial: ______ Resident Initial: ______ Resident Initial: ______

Resident Initial: ______ Resident Initial: ______ Resident Initial: ______ Resident Initial: ______

4. **GREEN ENERGY.** Resident agrees to cooperate with Landlord's efforts to improve energy efficiency at the Residence, including research and development related thereto. At Landlord's request, Resident shall use its best efforts to provide information related to Resident's energy consumption at the Residence.

5. The Monthly Utility Charges and Utility Fees will be deemed additional "Rent" under this Lease so that Resident's failure to pay the Monthly Utility Charges and Utility Fees when due or failure to place and continuously maintain utilities and services in Resident's name, if applicable, will constitute an Event of Default.

6. In the event of any conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**RESIDENT:**

Signature: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**LANDLORD:**

By: Charles Young
Charles Young
Chief Operating Officer



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

# PRE-1978 HOUSING RENTAL AND LEASES DISCLOSURE OF INFORMATION LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS

**Lead Warning Statement**

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

**Lessor's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check one below):

[ ] Known lead-based paint and/or lead-based paint hazards are present in the housing (explain):

______________________________________________

______________________________________________

[X] Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and Reports available to the Lessor (check one below):

[ ] Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based hazards in the housing (list documents below):

______________________________________________

______________________________________________

[X] Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Resident's Acknowledgment**

(c) The undersigned Residents acknowledge they have received copies of all information listed above.

(d) The undersigned Residents acknowledge they have received the pamphlet *Protect Your Family From Lead in Your Home.*

**Agent's Acknowledgment** (*initial*)

(e) CY______ Manager has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of its responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify to the best of their knowledge, that the information they have provided is true and accurate.

[Signatures on Following Page]



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**RESIDENT:**

Signature: Signed by: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**LANDLORD:**

2018-4 IH Borrower LP

By: Charles Young

Charles Young
Chief Operating Officer





Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

# BED BUG ADDENDUM

This bed bug addendum ("**Addendum**") dated 8/25/2024, is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents as ("**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease. This Addendum sets forth the agreement of Resident and Landlord for prevention of bed bugs at the Residence. As used herein, the terms "you" or "your" refer to all individuals listed as Resident under the Lease.

1. **PURPOSE**. This Addendum modifies the Lease and addresses situations related to bed bugs (*cimex lectularius*) which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

2. **INSPECTION.** You agree that you will inspect the dwelling within 48 hours after move-in/renewal and notify Landlord of any bed bugs or bed bug infestation. Landlord has no knowledge of any bed bug infestation or presence in the Residence.

3. **INFESTATIONS.** You agree that you have read the information in this Addendum about bed bugs and you agree that if you previously lived anywhere that had a bed bug infestation that all your personal property (including furniture, clothing, and other belongings) has been treated by a licensed pest control professional. You agree that such items are free of further infestation. If you disclose a previous experience of bed bug infestation, we can require documentation of the treatment and inspect your personal property and possessions to confirm the absence of bed bugs. You agree to provide documentation of any previous bed bug infestation which you may have experienced.

4. **ACCESS FOR INSPECTION AND PEST TREATMENT.** You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the method of treating the dwelling, building, and common areas for bed bugs. You are responsible for and must, at your own expense, have your own personal property, furniture, clothing, and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default of the Lease and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease. You agree not to treat the dwelling for a bed bug infestation on your own.

5. **NOTIFICATION**. You must promptly notify us:

- Of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture, or personal property.
- If you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

6. **COOPERATION.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing, and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease.

7. **RESPONSIBILITIES.** You may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease.

8. **TRANSFERS.** If we allow you to transfer to another property because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

## Information about Bed Bugs

**Bed bug Appearance.**
Bed bugs have six legs. Adult bed bugs have flat bodies about 1/4 of an inch in length. Their color can vary from red and brown to copper colored. Young bed bugs are very small. Their bodies are about 1/16 of an inch in length. They have almost no color. When a bed bug feeds, its body swells, may lengthen, and becomes bright red, sometimes making it appear to be a different insect. Bed bugs do not fly. They can either crawl or be carried from place to place on objects, people, or animals. Bed bugs can be hard to find and identify because they are tiny and try to stay hidden.

**Life Cycle and Reproduction.**
An average bed bug lives for about 10 months. Female bed bugs lay one to five eggs per day. Bed bugs grow to full adulthood in about 21 days. Bed bugs can survive for months without feeding.

**Bed bug Bites.**
Because bed bugs usually feed at night, most people are bitten in their sleep and do not realize they were bitten. A person's reaction to insect bites is an immune response and so varies from person to person. Sometimes the red welts caused by the bites will not be noticed until many days after a person was bitten, if at all.

**Common signs and symptoms of a possible bed bug infestation.**

- Small red to reddish brown fecal spots on mattresses, box springs, bed frames, mattresses, linens, upholstery, or walls.
- Molted bed bug skins, white, sticky eggs, or empty eggshells.
- Very heavily infested areas may have a characteristically sweet odor.
- Red, itchy bite marks, especially on the legs, arms, and other body parts exposed while sleeping. However, some people do not show bed bug lesions on their bodies even though bed bugs may have fed on them.

For more information, see the Internet websites of the United States Environmental Protection Agency and the National Pest Management Association.


Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**Bed Bugs Don't Discriminate.**
Bed bugs' increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs' presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

**Bed Bugs Don't Transmit Disease.**
There exists no scientific evidence that bed bugs carry disease. In fact, federal agencies tasked with addressing pests of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease-carrying pests. Claims associating bed bugs with disease are false.

**Preventing Bed Bug Encounters When Traveling.**
Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

**Bed Bug Do's and Don'ts.**

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture.
- **Do address bed bug sightings immediately.** Residents who suspect the presence of bed bugs in their property must immediately notify the Landlord.
- **Do not attempt to treat bed bug infestations.** Under no circumstances should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your property is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both the Landlord and their designated pest management company.

9. **Controlling Provisions.** In the event of any conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control.

[Signatures on Following Page]



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**RESIDENT:**

Signature: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**LANDLORD:**

2018-4 IH Borrower LP

By: Charles Young
Charles Young
Chief Operating Officer



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

# MOLD PREVENTION AND INFORMATION ADDENDUM

This Mold Information and Prevention Addendum ("**Addendum**") dated 8/25/2024 is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents as ("**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease. This Addendum sets forth the agreement of Resident and Landlord for the management of mold growth at the Residence.

1. **NATURE OF MOLD GROWTH.** Mold is a type of fungi which occurs naturally in the environment and is necessary for the natural decomposition of plant and other organic material. It spreads by means of sharing in microscopic spores borne on the wind and is found everywhere life can be supported. Most people are familiar with mold growth in the form of bread mold and mold that may grow on bathroom tile. Residential home construction is not, and cannot be, designed to exclude mold spores. If the growing conditions are right, mold can grow in the Residence. In order to grow, mold requires a food source. This might be supplied by items found in the home, such as fabric, carpet, or even wallpaper, or by building materials, such as drywall, wood, and insulation, to name a few. Also, mold growth requires a temperate climate. The best growth occurs at temperatures between 40ºF and 100ºF. Most importantly, mold growth requires moisture.

2. **MOISTURE AND MOLD GROWTH.** Moisture availability is the only mold growth factor that can be controlled in a residential setting. By minimizing moisture, Resident can reduce or eliminate mold growth. Moisture in the home can have many causes. Spills, leaks, overflows, condensation, and high humidity are common sources of home moisture. Good housekeeping and home maintenance practices are essential in the effort to prevent or eliminate mold growth. If moisture is allowed to remain on the growth medium, mold can develop within 24 to 48 hours. And if moisture sources are not removed or addressed, mold will continue to grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for persons with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken, as mold may be linked with adverse health effects in susceptible persons. While there are no specific mold cleanup levels or established numerical abatement standards for mold remediation, the most effective remedy for mold is to remove the source of excess water or continuing moisture intrusion.

3. **STEPS TO REDUCE MOLD GROWTH.** Mold growth depends largely on how Resident maintains the Residence. Resident shall act to prevent conditions which cause mold or moisture build-up, and minimize any effects that may be caused by mold growth, including the following:

   a. Before bringing items into the Residence, check for signs of mold on the items. For example, potted plants (roots and soil), furnishings, or stored clothing and bedding material, as well as many other household goods, could already contain mold growth.
   b. Regular vacuuming and cleaning will help reduce mold levels. Mild bleach solutions and most tile cleaners are effective in eliminating or preventing mold growth if used in accordance with the manufacturer's recommendations.
   c. Keep the humidity in the Residence low. Vent clothes dryers to the outdoors. Ventilate kitchens and bathrooms by opening the windows, by using exhaust fans, or by running the air conditioning to remove excess moisture in the air and to facilitate evaporation of water from wet surfaces.
   d. Promptly clean up spills, condensation, and other sources of moisture. Thoroughly dry any wet surfaces or material. Do not let water pool or stand in your home.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

e. Inspect for leaks on a regular basis. Look for discolorations or wet spots. Empty water from condensation pans (refrigerators and air conditioners). Take notice of musty odors and any visible signs of mold. Promptly notify Landlord of any visible or apparent leaks.
f. Should mold develop, thoroughly clean the affected area. First, test to see if the affected material or surface is color safe. Porous materials, such as fabric, upholstery, or carpet should be discarded. Should the mold growth be substantial, contact Landlord for further direction on the use of services from a qualified mold abatement professional.

4. **ADDITIONAL INFORMATION AND RESOURCES.** The U.S. EPA provides information and resources regarding excess water, moisture intrusion, and mold: http://www.epa.gov/mold/. The U.S. Centers for Disease Control and Prevention also provide details about mold growth and human health: http://www.cdc.gov/mold/.

5. **DUTIES OF RESIDENT.** Resident agrees to assume responsibility for following the recommendations set forth in this Addendum. It is the responsibility of Resident to reduce or eliminate the occurrence of mold growth in the home including but not limited to periodically running the heating, ventilation, and air conditioning (HVAC) system, changing air filters, and ensuring there is proper ventilation in the Residence. Resident's failure to take preventative actions may reduce or preclude Landlord's responsibility for water damage or water intrusion. If there is any water damage or water intrusion to the Residence, Resident shall take prompt action to prevent conditions which cause mold growth to develop. Resident shall immediately notify Landlord of water intrusion and allow Landlord the opportunity to inspect the problem. Failure to notify Landlord of water intrusion or water damage and/or the failure of Resident to allow Landlord access to the Residence for the purpose of inspection, evaluation, and/or failure to take the steps listed above to mitigate or eliminate the occurrence of mold growth, and/or failure to take corrective action shall be an affirmative defense to any claims by Resident arising from water damage or water intrusion.

6. **LIMITATIONS ON LANDLORD LIABILITY.** Resident acknowledges and agrees that Landlord shall not be liable for any claims with respect to the presence and/or existence of molds, mildew, and/or microscopic spores unless caused by the sole gross negligence or willful misconduct of Landlord. To the extent Landlord may be liable, if at all, Resident, on behalf of itself and any Resident Parties, hereby indemnifies Landlord and Landlord's officers, directors, partners, members, affiliates, successors, and assigns from and against any and all Claims for property damage, injury, or death resulting from the exposure to microscopic spores, mold, fungi, and/or mildew and from any loss of resale value due to the presence and/or existence of mold, mildew, and/or microscopic spores; provided, however, that in no event is Resident indemnifying Landlord as a result of the presence and/or existence of mold, mildew, and/or microscopic spores if caused by the sole gross negligence or willful misconduct of Landlord.

7. **CONTROLLING PROVISIONS.** In the event of any conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control.

[Signatures on Following Page]



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**RESIDENT:**

Signature: Signed by: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ______________

Signature:
Name: ______________

Signature:
Name: ______________

Signature:
Name: ______________

Signature:
Name: ______________

Signature:
Name: ______________

Signature:
Name: ______________

**LANDLORD:**

2018-4 IH Borrower LP

By: Charles Young

Charles Young
Chief Operating Officer



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

# INSURANCE ADDENDUM
## (Insurance Required by Resident)

This Insurance Addendum ("**Addendum**") dated 8/25/2024 is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents as ("**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease.

1. **NO LANDLORD LIABILITY.** Landlord shall not be liable for personal injury or for damage to or loss of Resident's personal property (furniture, jewelry, clothing, etc.) from fire, flood, water leaks, rain, hail, ice, snow, smoke, explosions, interruption of utilities, theft, acts of God, or any other event whatsoever except the gross negligence or willful misconduct of Landlord. Resident understands that Landlord's insurance for these risks does not cover Resident, any of Resident's personal property, or any family members, guests, or invitees or their personal property, and that Resident and its family members, guests, and invitees are not considered a co-insured of the Landlord.

2. **PERSONAL LIABILITY INSURANCE.** Resident agrees to maintain, at Resident's sole cost and expense, during the Lease Term and any subsequent renewal periods, a policy of personal liability insurance, which provides coverage to third parties in the amount not less than $100,000 per occurrence. Landlord shall be named as an interested party on such policy. Resident understands that such liability insurance does not protect against loss or damage to personal property or belongings.

3. **DOG BITE LIABILITY INSURANCE.** If Landlord has authorized Resident to keep a dog or dogs at the Residence under this Addendum, Resident shall obtain and maintain a personal liability policy that includes a minimum of $100,000 in dog bite liability coverage for all dogs at the Residence. If Resident's personal liability policy excludes coverage for any dog at the Residence, then Resident must obtain and maintain a separate, stand-alone dog bite liability insurance policy with at least $100,000 in liability coverage for the excluded dogs in a policy form reasonably satisfactory to Landlord. Resident's liability is not limited to the amount covered by such insurance policy. Prior to receiving possession of the Residence, Resident must provide proof of insurance and Landlord may demand proof of Resident's dog bite insurance policy at any time during the Lease Term. If Resident fails to provide proof of insurance prior to move-in, or fails to maintain insurance as required herein, Landlord may, but shall not be required to, obtain insurance on behalf of Resident (as Resident's agent), to the extent permitted by the laws of the jurisdiction in which the Residence is located, the cost of which (premium plus administrative charges) will be added to Resident's monthly Rent. Failure to provide adequate proof of insurance to Landlord, in Landlord's sole judgment, shall constitute a breach of the Lease.

4. **LOSSES AND DAMAGES TO PROPERTY.** Resident is solely responsible for any damage or loss to the personal property (furniture, jewelry, clothing, etc.) of Resident and its family members, guests, and invitees and their personal property from fire, flood, water leaks, rain, hail, ice, snow, smoke, explosions, interruption of utilities, theft, acts of God, or any other event whatsoever except the gross negligence or willful misconduct of Landlord, and for obtaining insurance against these risks.

5. **INSURANCE PROGRAM.** Resident acknowledges that Landlord has made available to Resident a program (the "**Program**") providing an opportunity to purchase policies of renter's insurance or personal liability insurance directly from Resident Shield. You may access this Program at ***www.residentshield.com*** or by calling **(800) 566-1186.** However, Resident is under no obligation



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

to purchase renter's insurance or personal liability insurance through this Program.

6. **GROUP INSURANCE.** To satisfy the personal liability insurance requirements of the Lease and this Addendum, Resident may, but is not obligated to, participate in a group insurance program that may be made available by Landlord from time to time ("**Group Insurance**"), the terms and conditions of which shall be provided to Resident separately. Resident shall pay, as additional rent, the amount of $10.00 per month for such Group Insurance for all periods that Resident is enrolled in Group Insurance. Resident's participation in Group Insurance and timely payment of the monthly Group Insurance charges shall constitute satisfactory evidence of insurance.

7. **PROOF OF INSURANCE; NOTICE OF LAPSE IN COVERAGE; NOTICE OF CANCELLATION OF COVERAGE; FAILURE TO INSURE.** Prior to receiving possession of the Residence, Resident must provide proof that Resident has obtained $100,000 personal liability coverage as described in Section 2. Resident shall also provide proof that it is maintaining this insurance from time to time thereafter upon Landlord's reasonable request. If Resident fails to provide proof of insurance prior to move-in, or fails to maintain insurance as required herein, Landlord may, but shall not be required to, obtain insurance on behalf of Resident (as Resident's agent), to the extent permitted by the laws of the jurisdiction in which the Residence is located, the cost of which plus a reasonable administrative charge in the amount of $5.50 per month will be due and payable along with Resident's monthly Rent. Notwithstanding the above, Resident's failure to provide proof of the required insurance will constitute an Event of Default under the Lease.

Proof of insurance, whether obtained through Resident Shield or another insurance carrier, agent or broker, must be forwarded via email to:

InvitationHomesIPM@yardi.com

Interested Party notifications (any notice of lapse in coverage or notice of cancellation of coverage) must be forwarded by U.S. Mail to:

Invitation Homes
PO Box 3687
Coppell, TX 75019

8. **CONTROLLING PROVISIONS.** In the event of any conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control.

[Signatures on Following Page]



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**RESIDENT:**

Signature: Signed by: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**LANDLORD:**

2018-4 IH Borrower LP

By: Charles Young
Charles Young
Chief Operating Officer



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

## LANDSCAPING ADDENDUM

This Landscaping Addendum ("**Addendum**") dated 8/25/2024 is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents as ("**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease.

Resident hereby agrees and acknowledges that Resident will maintain the yard area and related landscape located at the Residence during the Lease Term (collectively, "Landscape Maintenance"). The Landscape Maintenance shall be performed by Resident in strict conformance with and pursuant to the following standards:

1. **COMPLIANCE.** Resident must comply with all state laws, county, township, and municipal ordinances, as well as all homeowner's association rules and regulations with respect to Landscape Maintenance which shall control if in conflict with this Addendum.

2. **LAWN WATERING.** Resident must sufficiently water all lawn and grass areas as needed to keep the lawn green. To minimize evaporation and promote deeper saturation, the recommended watering time is early in the morning. Watering times and duration may need to be adjusted to accommodate different types of sprinklers and climates. Note: Any watering schedules may also need to be adjusted to comply with local watering restrictions.

3. **LAWN MAINTENANCE.** Resident is responsible for all mowing and edging. The lawn should be mowed weekly during the spring and summer and as needed in the fall and winter. Resident should edge around the driveway, sidewalks, and planter areas at the same time the lawn is mowed. All debris and grass clippings must be blown off or swept clean from the driveway and surrounding yard and placed in the trash or a green recycling/compost bin.

4. **PLANT WATERING AND MAINTENANCE.** Resident must sufficiently water all planted areas as needed to keep plants green and growing and remove weeds. Resident is responsible for regularly mulching of and maintaining pine straw for (as the case may be) flowerbeds and, if necessary, trees. To minimize evaporation and promote deeper saturation, the best watering time is early morning. Watering times and duration may need to be adjusted to accommodate different types of sprinklers, climates, and seasonal changes.

5. **IRRIGATION SYSTEMS.** Resident's Residence may be equipped with an automatic sprinkler system and timer that can be set to water at the appropriate time and frequency. Please be aware of warning signs that your sprinkler system might need adjustment. Inspect the lawn and plants bi-weekly for mildew or excessive yellow coloration. These can be signs that the system timer is incorrect or malfunctioning.

6. **BASIC MAINTENANCE.** Resident should check the irrigation system regularly to ensure that it is working properly. Resident is responsible for any costs related to maintenance, including those related to winterization, replacement of any damaged or broken sprinkler heads, mini sprayers, or drip lines and/or accessories associated with the irrigation system at the Residence with parts of "like kind". In colder climates, Resident shall be responsible for regular snow and ice removal.

7. **TREES, SHRUBS, AND HEDGES.** Resident must trim or prune all trees, branches, shrubs, and hedges that are under ten feet high as needed and necessary to prevent excessive or unkempt growth. For the portions of any trees, branches, shrubs and hedges that are higher than ten feet, Resident agrees to notify Landlord of excessive or unkempt growth, including if any trees and/or branches are leaning against the Residence or a fence. In the event the Residence is at the corner of intersecting streets, Resident must keep all hedges or shrubs trimmed to a height that does not



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

obstruct or obscure traffic visibility across the Residence. Any fallen tree branches or debris shall be removed by Resident in a timely manner.

8. **PERIODIC INSPECTIONS.** Landlord shall have the right to conduct exterior inspections of the Landscape Maintenance. Residents whose Landscape Maintenance is not consistent with the guidelines set forth in this Addendum will be in default of the Lease if maintenance is not remediated as set forth in the Lease.

9. **PROFESSIONAL LANDSCAPING SERVICES.** Notwithstanding anything to the contrary in the Lease or this Addendum, Landlord may provide or require professional landscaping services at the Residence, including but not limited to, maintenance of the garden, landscaping, trees, shrubs, and grass, weed control, and proper disposal of all clippings and waste (the "Landscaping Services") in the following circumstances and subject to the following terms and conditions:

a. Resident may request on or before the Commencement Date of the Lease, or during the Lease Term, that Landlord assume responsibility for Landscaping Services at the Residence. If Resident desires Landlord to assume responsibility for Landscaping Services during the Lease Term, Resident shall deliver such request in writing to Landlord. Landlord shall not be obligated to accept such request; if Landlord accepts such request, then Landlord's provision of Landscaping Services will begin the first day of the first full month following such written request and will continue until the expiration of the Lease Term.

b. If Resident, in Landlord's sole determination, fails to comply with its obligations under the Lease with respect to Landscaping Maintenance at the Residence, Landlord shall have the right (but not the obligation) to assume such obligations of Resident upon notice to Resident of such intent, for the remainder of the Lease Term.

c. If an HOA or a local municipality requires Resident or Landlord to maintain a professional lawn maintenance agreement, Resident shall obtain and maintain, at Resident's expense, a landscaping services contract for the entire duration of the Lease term. Resident shall provide Landlord with a copy of the landscaping services contract. Landlord, in Landlord's sole determination, may instead elect to contract directly for landscaping services and require Resident to reimburse Landlord as part of the Landscaping Fee.

10. **PAYMENT.** If Landlord assumes Resident's obligations with respect to Landscaping Services, Resident shall pay, at the time and place and in the same manner as Resident pays Rent and all other amounts due under the Lease, an additional monthly fee, as additional rent, in the amount set forth in the Summary (the "**Landscaping Fee**"). Resident's failure to timely pay the Landscaping Fee shall be considered a default under the Lease and shall entitle Landlord to all remedies available to Landlord thereunder.

11. **CONTROLLING PROVISIONS.** In the event of any conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control.

[Signatures on Following Page]



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

| **RESIDENT:** | | **LANDLORD:** |
|---|---|---|
| Signature: | Signed by: Jennifer Anderson | 2018-4 IH Borrower LP |
| Name: | Jennifer Anderson | |
| Signature: | | By: Charles Young |
| Name: | ____________________ | Charles Young |
| Signature: | | Chief Operating Officer |
| Name: | ____________________ | |
| Signature: | | |
| Name: | ____________________ | |
| Signature: | | |
| Name: | ____________________ | |
| Signature: | | |
| Name: | ____________________ | |
| Signature: | | |
| Name: | ____________________ | |
| Signature: | | |
| Name: | ____________________ | |



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

# LEASE BUY-OUT ADDENDUM

This Lease Buy-Out Addendum ("**Addendum**") dated 8/25/2024 is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents as ("**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease.

This Addendum sets forth the agreement of Resident and Landlord in the event that Resident decides to move out of the Residence at any time prior to the end of the Lease term as stated in the Lease.

1. **BUY-OUT OPTION.** After at least sixty (60) days of full compliance with the terms of this Lease, as long as Resident is not in default of the Lease either at the time Resident desires to terminate the Lease or when the Lease will be terminated, Resident shall have the option of terminating the Lease by complying with all of the following procedures:

   a. At least thirty (30) days prior to the date Resident desires to terminate the Lease, Resident shall provide written notice to Landlord ("Notice"), stating Resident's desire to exercise Resident's buy-out option and the date of proposed termination (the "Termination Date"); and

   b. With the Notice, Resident shall deliver to Landlord a payment, by electronic payment or cashier's check, in the amount of: (i) Rent due under the Lease through the Termination Date; (ii) a cancellation fee equal to two months' Rent; and (iii) repayment of move-in or special concessions received by Resident at the commencement of the Lease or during the term of the Lease, if any (such amount shall be collectively referred to herein as the "Buy-Out Payment"); and

   c. Resident shall also execute, no later than ten (10) days from the date of providing the Notice, a Termination of Lease Agreement (the "Termination Agreement") on Landlord's form and submit the Termination Agreement to Landlord; and

   d. Resident shall vacate the Residence on or before the Termination Date.

2. **NATURE OF BUY-OUT PAYMENT.** Resident acknowledges that: (i) the Buy-Out Payment is a buy-out fee which contemplates the various risks of the parties with respect to the early termination of the Lease, and in the event the Premises is re-rented, the Resident is not entitled to any return of part or all of the Buy-Out Payment; and (ii) this buy-out option may be exercised by Resident, in Resident's sole discretion. Notwithstanding the foregoing, in the event that Resident is in default of the Lease after Resident has executed the Termination Agreement, Landlord shall have the right, but not the obligation, to declare the Termination Agreement null and void and retain the Buy-Out Payment, subject to the terms of the Lease and applicable law.

3. **USE OF SECURITY DEPOSIT.** Resident and Landlord agree that the Security Deposit paid by Resident under the Lease may be used to pay for any portion of the Buy-out Payment, if such Buy-Out Payment remains unpaid on the Termination Date, in Landlord's sole discretion and in accordance with Applicable Law, but only after the Security Deposit is applied in accordance with the Lease.

4. **RATIFICATION OF LEASE TERMS.** Except as modified by this Addendum, all terms and provisions of the Lease are hereby ratified by the parties and remain in full force and effect.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**RESIDENT:**

Signature: Signed by: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**LANDLORD:**

2018-4 IH Borrower LP

By: Charles Young

Charles Young
Chief Operating Officer



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

# DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP

(As required by the Civil Code)

This form is being provided in connection with a transaction for a leasehold interest in a dwelling exceeding one year as per Civil Code section 2079.13(j) and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

## SELLER'S AGENT

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller. To the Buyer and the Seller:

(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.

An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## BUYER'S AGENT

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer. To the Buyer and the Seller:

(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.

An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## AGENT REPRESENTING BOTH SELLER AND BUYER

A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:

(a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
(b) Other duties to the Seller and the Buyer as stated above in their respective sections.

In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to,



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

**SELLER AND BUYER RESPONSIBILITIES**
Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as a dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role. The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional. If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.
Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change. Throughout your real property transaction, you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction.

This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).

[Signatures on Following Page]



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**RESIDENT:**

Signature: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**LANDLORD:**
2018-4 IH Borrower LP

By: Charles Young
Charles Young
Chief Operating Officer

Agent: INVITATION HOMES REALTY CALIFORNIA INC.
DRE Lic # 01950023

CIVIL CODE SECTIONS 2079.13 THROUGH 2079.24 (2079.16 APPEARS ON THE FRONT)

**2079.13** As used in Sections 2079.14 to 2079.24, inclusive, the following terms have the following meanings:

**(a)** "Agent" means a person acting under provisions of title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. **(b)** "Associate licensee" means a person who is licensed as a real estate broker or salesperson under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code and who is either licensed under a broker or has entered into a written contract with a broker to act as the broker's agent in connection with acts requiring a real estate license and to function under the broker's supervision in the capacity of an associate licensee. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (a) single family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of title 5, (3) a mobilehome, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29. (d) Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent which becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4)vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobilehome as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer, and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(m)** "Seller" means the transferor in a real property transaction, and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(n)** "Buyer's agent" means an agent who represents a buyer in a real property transaction.

**2079.14** A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and, shall obtain a signed acknowledgement of receipt from that seller and buyer, except as provided Section 2079.15, as follows: **(a)** The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

**2079.15** In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

**2079.16** Reproduced on Page 1 of this AD form.

**2079.17** **(a)** As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction exclusively as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.

CONFIRMATION the following agency relationships are confirmed for this transaction:
Seller's Brokerage Firm (DO NOT COMPLETE. SAMPLE ONLY)
License Number
Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller (dual agent).
Seller's Agent (DO NOT COMPLETE. SAMPLE ONLY)
License Number
Is (check one): the Seller's Agent, (salesperson or broker associate) ☐ the seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent).
Buyer's Brokerage Firm DO NOT COMPLETE SAMPLE ONLY
License Number
Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller (dual agent).
Buyer's Agent DO NOT COMPLETE SAMPLE ONLY
License Number
Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

**(d)**The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

**2079.18** (Repealed pursuant to AB-1289)

**2079.19** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

**2079.20** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

**2079.21** A dual agent shall not disclose to the buyer that the seller is willing to sell the property at a price less than the listing price, without the express written consent of the seller. A dual agent shall not disclose to the seller that the buyer is willing to pay a price greater than the offering price, without the express written consent of the buyer. This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

**2079.22** Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**2079.23** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

**2079.24** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

# CONFIRMATION OF REAL ESTATE AGENCY RELATIONSHIPS
## (As required by the Civil Code)

**Subject Property Address** 40169 Medford Rd, Temecula, CA 92591

**The following agency relationship(s) is/are hereby confirmed for this transaction:**

CONFIRMATION: The following agency relationships are confirmed for this transaction:

Seller's Brokerage Firm INVITATION HOMES REALTY CALIFORNIA INC.
License Number 01950023
Is the broker of (check one) x the seller/landlord; or □ both the buyer/tenant and seller/landlord (dual agent)
Seller's Agent Melissa Collins
License Number BRE#01449281

Is (check one) x the Seller/Landlord's Agent (salesperson or broker associate)
□ both the Buyer's/Tenant's and Seller's/Landlord's Agent (dual agent).
Buyer's Brokerage Firm ______
License Number ______

Is the broker of (check one) □ the buyer/tenant; or □ both the buyer/tenant and seller/landlord (dual agent)

Buyer's Agent ______
License Number ______

Is (check one) □ the Buyer/Tenant's Agent (salesperson or broker associate) □ both the Buyer's/Tenant's and Seller's/Landlord's Agent (dual agent).



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

# AIR FILTER SERVICE ADDENDUM

This Air Filter Service Addendum ("**Addendum**") dated 8/25/2024 is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents as ("**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease.

1. **DESCRIPTION OF AIR FILTER SERVICE.** Landlord will cause a vendor selected by Landlord to provide replacement air filters for the Residence on a quarterly basis **(collectively the "Air Filter Service").**

2. **AGREEMENT FOR AIR FILTER SERVICE.** From and after the Effective Date and for the Term hereof, Resident agrees that Resident is responsible for replacing the air filter(s) located at the Residence promptly upon receipt of the air filters through the Air Filter Service. Resident must notify Landlord of any issues regarding the Air Filter Service, including but not limited to, delay in delivery of air filters, incorrect sizes of air filters, and delivery of damaged air filters.

3. **LACK OF COMPLIANCE FEE.** In the event Resident fails to replace the air filter(s) at the Residence promptly upon receipt of the air filters provided through the Air Filter Service, Landlord shall charge Resident $25.00 lack of compliance fee **("Lack of Compliance Fee").** All such charges shall be payable as additional rent. Resident acknowledges that failing to replace the air filter(s) will cause Landlord to incur costs and expenses, including additional maintenance and accounting expenses, the exact amounts of which are extremely difficult and impractical to determine. Resident agrees that the Lack of Compliance Fee represents a fair and reasonable estimate of the costs Landlord may incur by reason of Resident failing to replace the air filter(s).

4. **TERM.** The term of this Addendum shall last from the Effective Date until the expiration of the Lease Term as it is described in the Lease **("Term").**

5. **PRICING AND PAYMENT.** Resident shall pay to Landlord, as additional rent, the air filter service fee in the amount set forth in the Summary paid on a monthly basis **("Air Filter Service Fee").** The terms of the Lease applicable to the monthly Rent, including, but not limited to, due dates and payment methods, shall apply to this Air Filter Service Fee.

6. **CANCELLATION.** Landlord reserves the right to cancel the Air Filter Service in its sole and absolute discretion. Resident will be responsible for the Air Filter Service Fee until the expiration of the Term or through the date of cancellation of the Air Filter Service, whichever is earlier.

7. **CONSENT TO RECEIVE ELECTRONIC COMMUNICATION.** Resident consents to receiving electronic and other forms of communication from Landlord regarding the Air Filter Service, the Air Filter Service Fee, or anything else related to Landlord's provision of the Air Filter Service.

8. **CONSENT TO TRANSFER OF PERSONAL INFORMATION.** Resident acknowledges and agrees that the provision of the Air Filter Service may require Landlord to transmit certain personal information of Resident to its third party service providers and hereby consents to the transfer of such personal information. Resident further acknowledges and agrees that any personal information transferred to Landlord's third party service providers will be subject to the privacy policies and procedures implemented by such third party service providers, which such policies and procedures may differ from those that have been implemented by Landlord.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

9. **CONSENT TO RECEIVE COMMUNICATIONS.** Resident hereby consents to receive phone calls, emails, and text messages via an automated dialing system or other automated technology from the Landlord and the Landlord's third party service provider related to the provision of the Air Filter Service. Resident may unsubscribe from such communications by sending an email to Hello@secondnature.com with the subject line "STOP" or by calling 1-888-423-1555. Resident may reply "STOP" to unsubscribe from text communication. Standard message and data rates may apply.

10. **NO LANDLORD LIABILITY.** Landlord shall not be liable to Resident for any claim whatsoever, including, but not limited to claims resulting from the failure or malfunction of the Air Filter Service.

11. **WARRANTY DISCLAIMER.** LANDLORD MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE. THE AIR FILTER SERVICE IS PROVIDED BY LANDLORD "AS IS" AND "AS AVAILABLE." RESIDENT ASSUMES ALL RISK FOR RESIDENT'S USE OF THE AIR FILTER SERVICE, INCLUDING WITHOUT LIMITATION, LOSS OR DAMAGE TO ANY PERSONAL PROPERTY AS A RESULT OF USING THE AIR FILTER SERVICE OR PERSONAL INJURY OR ANY OTHER HARM. IN NO EVENT DOES LANDLORD GUARANTEE THAT RESIDENT'S USE OF THE AIR FILTER SERVICE WILL BE UNINTERRUPTED OR ERROR FREE, OR THAT THE AIR FILTER'S SERVICE'S OPERATION WILL NOT NEGATIVELY AFFECT RESIDENT'S USE AND QUIET ENJOYMENT OF THE RESIDENCE. THIS SECTION 11 APPLIES TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW.

12. **LIMITATION OF LIABILITY.** IN NO EVENT WILL LANDLORD AND/OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE (i) FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES RELATED TO OR ARISING FROM RESIDENT'S USE, MISUSE, OR INABILITY TO USE THE AIR FILTER SERVICE, INCLUDING BUT NOT LIMITED TO, DAMAGES TO PERSONAL OR REAL PROPERTY OF ANY NATURE WHATSOEVER, PERSONAL OR BODILY INJURY, FOR ANY CLAIM RESULTING FROM RESIDENT'S NON-COMPLIANCE WITH OR BREACH OF THE TERMS HEREOF OR ANY OTHER STATE OR FEDERAL LAWS. IN NO EVENT SHALL LANDLORD'S AGGREGATE LIABILITY UNDER THIS ADDENDUM EXCEED THE TOTAL SUM OF MONIES PAID BY RESIDENT TO LANDLORD AS CONSIDERATION FOR USE OF THE AIR FILTER SERVICE DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY.

13. **INDEMNIFICATION.** RESIDENT AGREES, AT RESIDENT'S EXPENSE, TO INDEMNIFY, DEFEND AND HOLD HARMLESS LANDLORD, ITS LICENSORS, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS FROM AND AGAINST ALL DEMANDS, LIABILITIES, LOSSES, CLAIMS AND EXPENSES, INCLUDING ATTORNEY'S FEES, ARISING OUT OF (i) RESIDENT'S USE OF THE AIR FILTER SERVICE, (ii) THIRD PARTY CLAIMS, ACTIONS OR ALLEGATIONS OF INFRINGEMENT BASED ON INFORMATION, DATA OR CONTENT RESIDENT SUBMITTED IN CONNECTION WITH THE AIR FILTER SERVICE, (iii) ANY FRAUD OR MANIPULATION, OR OTHER BREACH OF THIS ADDENDUM, BY RESIDENT. LANDLORD RESERVES THE RIGHT, AT ITS OWN EXPENSE AND IN ITS SOLE DISCRETION, TO ASSUME THE EXCLUSIVE DEFENSE AND CONTROL OF ANY MATTER OTHERWISE SUBJECT TO INDEMNIFICATION BY RESIDENT.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

14. **CONTROLLING PROVISIONS.** In the event of any conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control with respect to the subject matter hereof.

[Signatures on Following Page]



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

**RESIDENT:**

Signature: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**LANDLORD:**

2018-4 IH Borrower LP

By: ____________________
Charles Young
Chief Operating Officer



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

## ANIMAL ADDENDUM

This Animal Addendum ("**Addendum**") dated 8/25/2024 is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents (collectively, "**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease. In the event the terms of this Addendum conflict with those of the Lease, the terms of the Addendum shall control to the extent of the conflict.

1. **ATTESTATION:** Resident attests to the following (mark one):

   a. Resident ☐ OWNS at least one dog and/or cat that is not considered a service, assist, or comfort animal ("Pet") and will keep a Pet at the Residence.

   b. Resident ☒ DOES NOT OWN a Pet that will be kept at the Residence.

2. **CONDITIONAL AUTHORIZATION.** Landlord hereby authorizes Resident to keep at the Residence the Pet(s) identified by Resident in this Addendum until the Lease expires or is terminated, whichever occurs first, subject to the terms and conditions of the Lease, including this Addendum. Landlord may revoke this authorization sooner if, in Landlord's judgment, Resident, Resident's Pet, Resident's guest or any Residence occupant violates the terms of this Addendum. Resident shall promptly remove from the Residence any offspring of any animal unless Landlord provides written authorization that such animal's offspring may remain at the Residence, and applicable additional Pet-related charges are paid with respect to such offspring. Resident must remove any animal, including Pets, previously permitted pursuant to this Addendum within 24 hours of written notification from Landlord that the animal, in Landlord's sole and absolute judgment, creates a nuisance or disturbance or is undesirable or dangerous. Resident's failure to remove an animal, after authorization is revoked shall be deemed a breach of the Lease and this Addendum, allowing Landlord to terminate Resident's tenancy.

3. **NUMBER OF PETS.** Resident may keep up to three (3) approved Pets at the Residence. The burden is on Resident to notify Landlord of any Pets and, upon receipt of Landlord's approval pursuant to this Addendum, to pay the applicable increases in the Security Deposit and monthly Rent. Landlord's approval is conditioned on Resident's continued compliance with the terms of the Lease and this Addendum.

4. **BREED RESTRICTIONS.** Unless specifically authorized in this Addendum, following dog breeds are not permitted at the Residence: American Pit Bull Terriers, Rottweilers, Staffordshire Terriers, or any dog that includes a percentage or mix of any of these breeds. Any canines other than domestic dogs are not permitted including, but not limited to, wolves, coyotes, dingoes, and jackals, along with any canine or wolf hybrids. For example, and not by limitation, a Husky-Wolf or Timber-Wolf mix is not permitted. Resident acknowledges that Landlord may, in its sole discretion, require Resident, at Resident's expense, to provide DNA test results or other proof, to Landlord's reasonable satisfaction, showing that a Pet kept at the Residence is not prohibited. Landlord reserves the right to modify or restrict certain animal breeds in its sole discretion at any time. Except as expressly set forth in this Addendum, Resident shall not keep or harbor at the Residence any animals of any kind including, but not limited to, dogs, cats, other mammals, birds, reptiles, and marine animals.

5. **NON-RESIDENT ANIMALS.** Pets and other animals of guests, visitors or any other non-resident are not authorized at the Residence, except as permitted by Applicable Law.

6. **ADDITIONAL PETS.** If Resident becomes an owner of one or more Pets during the Lease Term, Resident must notify Landlord, obtain Landlord's approval of the new Pet(s) prior to the Pet(s) entering the Residence and pay any additional security deposit or additional rent as required by Landlord. Failure to do so will result in Resident being assessed the non-compliance fees described below.



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

7. **ADDITIONAL SECURITY DEPOSIT.** Consistent with Applicable Law, and in consideration for Landlord's permission to keep a Pet at the Residence, Resident's Security Deposit will be increased in the amount of $325 per pet prior to any Landlord approved Pet(s) entering the Residence during the Lease Term.

8. **ADDITIONAL MONTHLY RENT.** Resident's monthly Rent, as stated in the Lease, will be increased by the amount set forth in the Summary. Except as otherwise required by Applicable Law, this Rent increase is due to Landlord pursuant to the Lease, is subject to all non-payment provisions of the Lease, and is not a deposit to repair damages caused by Pets. Additional rent amounts for Pets are subject to change and, if Resident is found to be out of compliance with the terms of this Addendum or adds an additional Pet, Resident will be charged the then-current rate for any newly added Pets.

9. **ANIMAL RULES.** Resident is responsible for the animal's actions and agrees to the following rules:

   a. Pets and service, assist, and companion animals must be housebroken. All other animals must be caged. Resident will immediately remove and clean up all animal waste at the Residence, including all interior and exterior areas of the home, as well as any common areas.

   b. Resident will safely secure or arrange for animal care when maintenance vendors or employees of Landlord need to enter the Residence.

   c. Resident will keep animals on a leash when not indoors or in a fenced backyard area.

   d. Resident will comply with all applicable statutes, ordinances, restrictions, homeowners' association rules, and other enforceable regulations regarding any animal.

   e. Resident agrees to treat all Pets, approved service, assist, and companion animals for fleas as preventative maintenance.

   f. Resident shall not allow animals to disturb neighbors or other residents.

   g. Resident shall provide adequate food, water, and veterinary care for all animals. Resident shall not leave food or water outside the Residence that would attract pests or other nuisances. Resident shall not leave any animal unattended at the Residence for an unreasonable period of time.

   h. Resident shall have all animals licensed and vaccinated, including but not limited to rabies vaccinations, as required by Applicable Law. Upon Landlord's request, Resident shall provide documentation evidencing compliance with Applicable Law.

   i. Fish tanks are limited to 20 gallons and predator fish, such as piranhas, are strictly prohibited.

10. **ADDITIONAL RULES.** Landlord may, from time to time and in its sole discretion, make reasonable updates to this Addendum and will notify Residents of any such updates.

11. **DOG BITE LIABILITY INSURANCE.** If Landlord has authorized Resident to keep a dog or dogs at the Residence under this Addendum, Resident shall obtain and maintain a personal liability policy that includes a minimum of $100,000 in dog bite liability coverage for all dogs at the Residence. If Resident's personal liability policy excludes coverage for any dog at the Residence, then Resident must obtain and maintain a separate, stand-alone dog bite liability insurance policy with at least $100,000 in liability coverage for each excluded dog in a policy form reasonably satisfactory to Landlord. Resident's liability is not limited to the amount covered by such insurance policy. Prior to receiving possession of the Residence, Resident must provide proof of insurance and Landlord may demand proof of Resident's dog bite insurance policy at any time during the Lease Term. If Resident fails to provide proof of insurance prior to move-in, or fails to maintain insurance as required herein, Landlord may, but shall not be required to, obtain insurance on behalf of Resident (as Resident's agent), to the extent permitted



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

by the laws of the jurisdiction in which the Residence is located, the cost of which (premium plus administrative charges), all as additional rent, will be added to Resident's monthly Rent. Failure to provide adequate proof of insurance to Landlord, in Landlord's sole judgment, shall constitute a breach of the Lease.

Proof of insurance, whether obtained through Resident Shield or another insurance carrier, agent or broker, must be forwarded via email to:

InvitationHomesIPM@yardi.com

Interested Party notifications (any notice of lapse in coverage or notice of cancellation of coverage) must be forwarded by U.S. Mail to:

Invitation Homes
PO Box 3687
Coppell, TX 75019

12. **SERVICE, ASSIST, AND COMPANION ANIMALS.** As permitted by Applicable Law, Landlord may require written verification of, or make other inquiries regarding, the disability-related need for a service, assist, or companion animal. Landlord will not charge a Pet Fee, Pet Rent or require additional insurance for any authorized service, assist, or companion animal. Except as provided by Applicable Law, all other provisions of this Addendum apply to service, assist, and companion animals.

13. **DESCRIPTION OF AUTHORIZED PETS.** Resident may keep only the Pets described below at the Residence. Resident may not substitute any other animals.

| | |
|---|---|
| Pet's name:<br>Type:<br>Breed:<br>Weight: | Pet's name:<br>Type:<br>Breed:<br>Weight: |
| Pet's name:<br>Type:<br>Breed:<br>Weight: | |

14. **REPRESENTATIONS.** Resident represents and warrants that none of the above Pets have any history or propensity for aggressive behavior or violent actions, including biting, scratching, chewing or otherwise. Resident represents to Landlord that the animals are housebroken or, if not, will be caged, and will be kept in good health and up to date on vaccinations. Resident agrees to provide proof of vaccinations and veterinarian records upon request by Landlord.

15. **LIABILITY NOT LIMITED.** The Pet Fee and Pet Rent under this Addendum do not limit any Resident's liability for any damage to the Residence including, but not limited to, property damage, replacements, personal injury and death, cleaning, deodorization, and flea extermination.

16. **DAMAGES AND INDEMNIFICATION.** Residents will be jointly and severally liable for the entire amount of any damages or injuries caused by any animals. Resident agrees to reimburse Landlord for any and all damages caused by an animal, whether such damage is to the Residence or to any common areas used in conjunction with the Residence, and Resident shall indemnify, protect, defend, and hold



Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

Landlord harmless for, from, and against all claims, costs, actions, fees, or liability of any kind arising out of the Resident's keeping of any animal at the Residence.

17. **WAIVER.** No failure of Landlord to enforce any term of this Addendum will be deemed a waiver of that term or of any other provision of this Addendum, nor will any acceptance of a partial payment be deemed a waiver of Landlord's right to the full amount owed. Landlord's not enforcing or belatedly enforcing any terms of this Addendum shall not considered a waiver under any circumstances. Landlord's representatives (including personnel, employees, and agents) have no authority to waive, amend, or terminate this Addendum or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose any obligations on Landlord unless in writing.

18. **CONTROLLING PROVISIONS.** In the event of any conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control.

**RESIDENT:**

Signature: Signed by: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**LANDLORD:**

2018-4 IH Borrower LP

By: Charles Young

Charles Young
Chief Operating Officer





Confidential and Proprietary – ©2023 Invitation Homes. All Rights Reserved.

invitation homes

## INTERNET PACKAGE ADDENDUM

This Internet Package Addendum ("**Addendum**") dated 8/25/2024 (**"Effective Date")** is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents as ("**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease.

1. **DESCRIPTION OF SERVICE.** Landlord has arranged for a third party service provider ("Telecommunication Provider") to make available certain services including high-speed internet and cable television including the infrastructure and systems to support such services ("Telecommunications") to Resident (collectively, "the Service").

2. **SERVICE.** From and after the Effective Date and until the expiration of the Lease Term as it is described in the Lease ("Term"), Landlord will make available the Service via the Hardware (as defined below) and Telecommunication Provider(s)' systems. **Resident must contact Landlord's vendor that manages administration of the Service, Onboard RS, Inc. ("Onboard") at onboardtoday.com/invitationhomes to setup an account in order to receive the Service.** Resident's use of the Service and any optional services or upgrades is subject to the standard terms and conditions of the Telecommunication Provider providing the Service, a copy of which is available in Attachment 1 to this Addendum. Resident acknowledges and understands that (a) Resident cannot change Telecommunication Providers, (b) Landlord does not provide end user support for the Service and Resident is to report any Service problems with the Service or additional services directly to the Onboard and (c) the Service comes with the Lease regardless of whether Resident intends to use the Service or not and that Resident will be responsible for the Internet Package Fee (as defined below) for Term.

3. **ACKNOWLEDGEMENT OF HARDWARE.** Resident acknowledges that Landlord has provided or, during the Term, may provide various hardware and other Telecommunications components necessary to the operation, maintenance and functioning of the Service, including, but not limited to an internet modem and router ("IH Hardware") and, at the request of Resident, up to two (2) high-definition receivers ("Resident Hardware"). Resident understands and agrees that Resident must contact Onboard in order to receive the high-definition receivers. Resident agrees to provide Landlord and its Telecommunication Provider with access to the Residence at such times as may be reasonably requested by Landlord or Telecommunication Provider for purposes of installing, maintaining or replacing the IH Hardware or Resident Hardware. Resident agrees to maintain and keep in good care and condition all IH Hardware and Resident Hardware. Resident may not: (a) remove any IH Hardware from the Residence; (b) tamper with IH Hardware or (c) interfere with the operation of any IH Hardware, Resident Hardware or any other Service functionality. Resident acknowledges that all IH Hardware is and shall remain, during and after the Term, the sole property of Landlord, and Resident shall have no ownership thereof or right thereto except in connection with Resident's use of the Residence during the Term. Resident shall be solely responsible for the full cost of the Hardware should Resident damage, uninstall or interfere with the Telecommunications system, including all installation, service, and maintenance fees. Resident agrees to promptly notify Onboard in the event the Service or any IH Hardware or Resident Hardware is not functioning in accordance with the advertised specifications. Resident shall reimburse Landlord, immediately upon demand as additional rent, for any amounts expended by Landlord in connection with Resident's breach of this Section 3. Resident's failure to so reimburse Landlord within five (5) days of such

demand shall constitute a default by Resident under the Lease, and Landlord shall thereafter be entitled to any and all remedies available to Landlord in connection with a Resident Default under the Lease. In the event Resident receives any Resident Hardware, Resident acknowledges and agrees that Resident is responsible for returning such Resident Hardware to Telecommunication Provider in accordance with the instructions of such Telecommunication Provider.

4. **OTHER HARDWARE.** Resident acknowledges and agrees that any additional telecommunication hardware or technology that Resident may obtain directly from a manufacturer, reseller or other third party ("Other Hardware") shall comprise part of the Telecommunications system at Resident's own risk, and that Resident shall be responsible for all costs associated with Other Hardware and Other Hardware's integration into, or access to, the Service. Other Hardware will be provided pursuant to the terms and conditions of the applicable manufacturer, reseller or other third party, and Landlord shall have no responsibility to Resident for the availability or performance of such Other Hardware.

5. **PRICING AND PAYMENT.** Resident shall pay to Landlord, as additional rent $85.00 ("Internet Package Fee"). The terms of the Lease applicable to the monthly Rent, including, but not limited to, due dates and payment methods, shall apply to this Internet Package Fee. Resident acknowledges and agrees that Landlord does not provide the Service directly but, rather, through Telecommunications Provider. As a result,. Resident will be required to contact Onboard directly to inquire about any service credits or to report service issues.

6. **OPTIONAL SERVICES AND UPGRADES.** Resident may contact Telecommunications Provider directly to purchase additional, upgraded services from Telecommunications Provider. Telecommunications Provider will bill Resident separately for any purchased additional services. Resident will not pay Landlord for any additional services.

7. **CONSENT TO RECEIVE ELECTRONIC COMMUNICATION.** Resident consents to receiving electronic and other forms of communication, including via texting, from Landlord and its authorized service providers regarding the Service, including Onboard, the Internet Package Fee, or anything else related to Landlord's provision of the Service.

8. **CONSENT TO TRANSFER OF PERSONAL INFORMATION.** Resident acknowledges and agrees that the provision of the Service may require Landlord to transmit certain personal information of Resident to its Telecommunications Providers and hereby consents to the transfer of such personal information. Resident further acknowledges and agrees that any personal information transferred to Telecommunications Providers will be subject to the privacy policies and procedures implemented by such Telecommunications Provider, which such policies and procedures may differ from those that have been implemented by Landlord.

9. **NO LANDLORD LIABILITY.** Landlord shall not be liable to Resident for any claim whatsoever, including, but not limited to claims resulting from the failure or malfunction of the Service, Hardware or the Telecommunications system, any inability to access the Residence or to use any other feature provided by the Service, or any invasion of privacy, intrusion upon seclusion or trespass claim related to the placement of the Hardware in the Residence.

10. **WARRANTY DISCLAIMER.** LANDLORD MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION, MERCHANTABILITY, FITNESS FOR A PARTICULAR USE OR THAT THE SERVICE WILL BE UNINTERRUPTED OR ERROR FREE, AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED BY

LANDLORD AND WAIVED BY RESIDENT TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW. THE SERVICE IS PROVIDED BY LANDLORD "AS IS" AND "AS AVAILABLE." RESIDENT ASSUMES ALL RISK FOR RESIDENT'S USE OF THE SERVICE, INCLUDING WITHOUT LIMITATION, INABILITY TO ACCESS THE RESIDENCE, LOSS OR DAMAGE TO ANY PERSONAL PROPERTY AS A RESULT OF USING THE SERVICE OR PERSONAL INJURY OR ANY OTHER HARM. IN NO EVENT DOES LANDLORD GUARANTEE THAT THE SERVICE OR ANY PORTION THEREOF, ARE ACCURATE, ERROR OR BUG FREE, THAT RESIDENT'S USE OF THE SERVICE WILL BE UNINTERRUPTED OR ERROR FREE, OR THAT THE SERVICE'S OPERATION WILL NOT NEGATIVELY AFFECT RESIDENT'S USE AND QUIET ENJOYMENT OF THE RESIDENCE. THIS SECTION APPLIES TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW.

RESIDENT ACKNOWLEDGES AND AGREES THAT (A) THE PEROFRMANCE OF INTERNET SERVICES MAY VARY FROM TIME TO TIME BASED ON OVERALL NETWORK USAGE, ENVIRONMENTAL CONDITIONS, DEVICE LIMIATIONS, AND OTHER FACTORS, AND THAT NO MINIMUM TRANSMISSION SPEED, UP-TIME OR AVAILABILITY IS GUARANTEED AT ANY TIME; (B) ACCESS TO THE INTERNET MAY NOT BE SECURE, MAY BE MONITORED BY THIRD PARTIES NOT UNDER LANDLORD'S OR TELECOMMUNICATION PROVIDER'S CONTROL, MAY PROVIDE RESIDENT WITH ACCESS TO CONTENT, MERCHANDISE AND SERVICES THAT ARE NOT CONTROLLED OR PROVIDED BY LANDLORD AND FOR WHICH THERE ARE CHARGES PAYBLE TO THIRD PARTIES, AND IS AT RESIDENT'S SOLE RISK; (C) LANDLORD SHALL NOT BE LIABLE IN ANY WAY IN CONNECTION WITH ANY USE OF THE INTERNET BY RESIDENT, INCLUDING FEES INCURRED BY RESIDENT FOR THIRD PARTY CONTENT, PRODUCTS OR SERVICES, OR CIRCUMSTNACES WHERE THE USE OR LOSS OF INTERNET SERVICES RESULTS IN CHARGES BY THIRD PARTIES, FILE OR DATA CORRUPTION OR LOSS, HARDWARE OR SOFTWARE DAMAGE OR LOSS (INCLUDING FROM VIRUSES AND OTHER MALEVOLENT ACTS OR THINGS), LOSS OF IOT CONNECTIVITY, USE OR FUCTIONALITY, ETC. AND LANDLORD HAS NO OBLIGATION TO RESOLVE DISPUTES WITH SUCH THIRD PARTIES OR OTHER VENDORS; (D) LANDLORD MAKES NO WARRANTY AS TO THE SECURITY OF USER COMMUNICATIONS VIA THE TELECOMMUNICATION SYSTEM OR THE SERVICE, OR THAT THIRD PARTIES WILL NOT GAIN UNAUTHORIZED ACCESS TO OR MONITOR RESIDENT COMMUNICATIONS; AND (E) LANDLORD MAKES NO WARRANTY THAT DATA OR FILES SENT BY OR TO RESIDENTS WILL BE TRANSMITTED IN A SECURE, ENCRYPTED OR UNCORRUPTED FORM OR WITHIN A REASONABLE PERIOD OF TIME.

RESIDENT ACKNOWLEDGES AND AGREES THAT IT HAS NOT RELIED ON LANDLORD FOR ANY PRIVACY OR SECURITY ADVICE, SECURITY MONITORING, SECURITY EVENT MITIGATION, OR THREAT IDENTIFICATION IN CONNECTION WITH THE SERVICE OR RESIDENT'S IOT APPLICATIONS OR DEVICES, OR OTHER APPLICATIONS OR DEVICES (WHETHER BY RESIDENT, RESIDENT PARTIES OR THIRD PARTIES), CONNECTED TO THE SYSTEM. RESIDENT IS RESPONSIBLE FOR AND ASSUMES ALL LIABILITY OF ANY LOSS OF INFORMATION, SECURITY BREACHES OR INCIDENTS AND TRANSMISSION OF MALICIOUS THINGS OVER OR RELATED TO THE SERVICE, USERS' IOT APPLICATIONS OR DEVICES AND ANY OTHER APPLICATIONS OR DEVICES CONNECT TO THE TELECOMMUNICATION SYSTEM.

11. **LIMITATION OF LIABILITY**. IN NO EVENT WILL LANDLORD AND/OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE (i) FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES RELATED TO OR ARISING FROM RESIDENT'S USE, MISUSE, OR INABILITY TO USE THE SERVICE, INCLUDING BUT NOT LIMITED TO, DAMAGES TO PERSONAL OR REAL PROPERTY OF ANY NATURE WHATSOEVER, PERSONAL OR BODILY INJURY, INCREASED ENERGY OR TELECOMMUNICATIONS EXPENSES, ANY DAMAGES RESULTING FROM UNAUTHORIZED ACCESS TO LANDLORD'S OR A

TELECOMMUNICATION PROVIDER'S SERVERS, SERVER UNAVAILABILITY, AND ANY PERSONAL INFORMATION STORED THEREIN, HOWEVER CAUSED UNDER ANY THEORY OF LIABILITY, INCLUDING BUT NOT LIMITED, TO CONTRACT OR TORT AND WHETHER OR NOT EITHER PARTY WAS OR SHOULD HAVE BEEN AWARE OR ADVISED OF THE POSSIBILITY OF SUCH DAMAGE; (ii) FOR ANY CLAIM ATTRIBUTABLE TO ERRORS, OMISSIONS, OR OTHER INACCURACIES IN THE SERVICE OR DESTRUCTIVE PROPERTIES OF THE SERVICE, AND (iii) FOR ANY CLAIM RESULTING FROM RESIDENT'S NON-COMPLIANCE WITH OR BREACH OF THE TERMS HEREOF OR ANY APPLICABLE TERMS OF SERVICE FOUND ONLINE OR ANY OTHER STATE OR FEDERAL LAWS. IN NO EVENT SHALL LANDLORD'S AGGREGATE LIABILITY UNDER THIS ADDENDUM EXCEED THE TOTAL SUM OF MONIES PAID BY RESIDENT TO LANDLORD AS CONSIDERATION FOR USE OF THE SERVICE DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY.

12. **INDEMNIFICATION.** RESIDENT AGREES, AT RESIDENT'S EXPENSE, TO INDEMNIFY, DEFEND AND HOLD HARMLESS LANDLORD, ITS LICENSORS, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS FROM AND AGAINST ALL DEMANDS, LIABILITIES, LOSSES, CLAIMS AND EXPENSES, INCLUDING ATTORNEY'S FEES, ARISING OUT OF (i) RESIDENT'S USE OF THE SERVICE, (ii) THIRD PARTY CLAIMS, ACTIONS OR ALLEGATIONS OF INFRINGEMENT BASED ON INFORMATION, DATA OR CONTENT RESIDENT SUBMITTED IN CONNECTION WITH THE SERVICE, (iii) ANY FRAUD OR MANIPULATION, OR OTHER BREACH OF THIS ADDENDUM, BY RESIDENT, (iv) THIRD PARTY CLAIMS, ACTIONS OR ALLEGATIONS BROUGHT AGAINST LANDLORD ARISING OUT OF RESIDENT'S USE OF THE SERVICE, OR (v) FOR ANY CLAIM WHATSOEVER RESULTING FROM RESIDENT'S OR RESIDENT'S AFFILIATES', EMPLOYEES', CONTRACTORS' OR AGENTS' BREACH OF THE CHILDREN'S ONLINE PRIVACY PROTECTION ACT OR ANY OTHER STATE OR FEDERAL PRIVACY OR INFORMATION SECURITY LAWS. LANDLORD RESERVES THE RIGHT, AT ITS OWN EXPENSE AND IN ITS SOLE DISCRETION, TO ASSUME THE EXCLUSIVE DEFENSE AND CONTROL OF ANY MATTER OTHERWISE SUBJECT TO INDEMNIFICATION BY RESIDENT.

13. **CONTROLLING PROVISIONS.** In the event of any conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control with respect to the subject matter hereof.

**RESIDENT:**

Signature: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ______________________

Signature:
Name: ______________________

Signature:
Name: ______________________

Signature:
Name: ______________________

Signature:
Name: ______________________

Signature:
Name: ______________________

Signature:
Name: ______________________

**LANDLORD:**

2018-4 IH Borrower LP

By: ______________________
Charles Young
Chief Operating Officer

**ATTACHMENT 1**
**to**
**TELECOMMUNICATIONS ADDENDUM**

Below are the terms and conditions of certain Telecommunication Providers applicable to the Service. Resident acknowledges and agrees that the applicable terms and conditions must be followed and adhered to at all times and that it is Resident's responsibility to routinely review the applicable terms and conditions of the Telecommunication Provider that provides Service to the Residence.

| Telecommunication Provider | Terms and Conditions |
|---|---|
| Spectrum | Terms applicable to internet services: https://www.spectrum.com/policies/residential-terms.html<br><br>Privacy policy portion applicable to internet services: https://www.spectrum.com/policies/spectrum-customer-privacy-policy.html<br><br>General terms of service: https://www.spectrum.com/policies/residential-general-terms-and-conditions-of-service |

invitation homes

## SMART HOME ADDENDUM

This Smart Home Addendum ("**Addendum**") dated 8/25/2024 is part of that certain lease dated 8/25/2024 (the "**Lease**"), by and between 2018-4 IH Borrower LP ("**Landlord**") and the undersigned residents as ("**Resident**"). Capitalized terms not defined in this Addendum shall have the same meaning as in the Lease.

1. **DESCRIPTION OF SERVICE.** The Smart Home System ("System") gives Resident remote and keyless access capability, remote HVAC control and remote monitoring capabilities via the online dashboard and mobile application (collectively, "the Service").

2. **DECLINED SERVICE.** Resident hereby declines for Landlord to make available the Service via the Hardware (defined below) and System. Resident acknowledges that Resident will not have remote and keyless access capability, HVAC temperature scheduling, and remote HVAC control and monitoring capabilities.

3. **ACKNOWLEDGEMENT OF HARDWARE.** Although Resident has elected to decline the Service, Resident acknowledges that Landlord has installed and/or, during the term of the Lease, may install various hardware and other System components necessary to the operation, maintenance and functioning of System, including, but not limited to an electronic lock system, digital thermostat, network connectivity hub, leak sensor and other wiring and fixtures (collectively, "the Hardware"). Resident agrees to provide Landlord and its third party service providers with access to the Residence at such times as may be reasonably requested by Landlord or such third party service providers for purposes of installing, maintaining or replacing the Hardware. Resident agrees to maintain and keep in good care and condition all Hardware. Resident may not: (a) remove any Hardware; (b) disconnect any Hardware from any power source; or (c) interfere with the operation of any Hardware or any other System functionality. Resident acknowledges that all Hardware is and shall remain, during and after the term of the Lease, the sole property of Landlord, and Resident shall have no ownership thereof or right thereto except in connection with Resident's use of the Residence during the term of the Lease. Resident shall be solely responsible for the full cost of the Hardware should Resident damage, uninstall or interfere with the System, including all installation, service, and maintenance fees. Resident agrees to promptly notify Landlord in the event any Hardware is not properly functioning. Resident shall reimburse Landlord, immediately upon demand, for any amounts expended by Landlord in connection with Resident's breach of this Section 3. Resident's failure to so reimburse Landlord within five (5) days of such demand shall constitute a default by Resident under the Lease, and Landlord shall thereafter be entitled to any and all remedies available to Landlord in connection with a Resident Default under the Lease.

4. **NO LANDLORD LIABILITY.** Landlord shall not be liable to Resident for any claim whatsoever, including, but not limited to claims resulting from the failure or malfunction of the Hardware or the System, any inability to access the Residence or to use any other feature provided by the Service, or any invasion of privacy, intrusion upon seclusion or trespass claim related to the placement of the Hardware in the Residence or the monitoring, capture, storage and/or accidental dissemination of personal information or other data that may be stored by the System.

5. **CONTROLLING PROVISIONS.** In the event of any conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control with respect to the subject matter hereof.

[Signatures on Following Page]

invitation homes

**RESIDENT:**

Signature: Jennifer Anderson
Name: Jennifer Anderson

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

Signature:
Name: ____________________

**LANDLORD:**
2018-4 IH Borrower LP

By: Charles Young

Charles Young
Chief Operating Officer

Electronically FILED by Superior Court of California, County of Riverside on 08/19/2026 02:40 PM
Case Number CVME2611301 0000178871662 - Jason B. Galkin, Executive Officer/Clerk of the Court By Judith Soriano, Clerk

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY STATE BAR NUMBER: 198383
NAME: Onica Cole
FIRM NAME: CONSUMER PROTECTION NETWORK-LA
STREET ADDRESS: 205 S Broadway, Suite: 802
CITY: Los Angeles STATE: CA ZIP CODE: 90012
TELEPHONE NO.: (213)285-4321 FAX NO.:
EMAIL ADDRESS: onica.cole@ConsumerProtectionNetworkLA.com
ATTORNEY FOR (name): Plaintiff Jennifer Anderson

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
STREET ADDRESS: 30755-D Auld Road
MAILING ADDRESS: 30755-D Auld Road
CITY AND ZIP CODE: Murrieta, CA 92563
BRANCH NAME: Southwest Justice Center

CASE NAME:
Jennifer Anderson vs. 2018-4 IH BORROWER LP, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: CVME2611301 |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $35,000) [ ] Limited (Amount demanded is $35,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Asbestos**
- [ ] Asbestos (04)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/Unfair business practice (07)
- [X] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Employment Development Department (EDD)**
- [ ] EDD decision review (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.404)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Comprehensive groundwater adjudication (47)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. Is this case complex under rule 3.400 of the California Rules of Court? ☐ Yes ☒ No

   If the case is complex, mark the factors requiring exceptional judicial management:

   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*:

   a. ☒ monetary
   b. ☒ nonmonetary; declaratory or injunctive relief
   c. ☒ punitive

4. Number of causes of action *(specify)*: 12

5. Is this case a class action suit? ☐ Yes ☒ No

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 19, 2026

Onica Cole
(TYPE OR PRINT NAME)

▶ /s/ Onica Cole
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 of the California Rules of Court or a complex case, this cover sheet will be used for statistical purposes only.

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on pages 1 and 2. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 of the California Rules of Court is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $35,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**SEE PAGE 3 FOR INFORMATION PURPOSES ONLY.**

## CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/ Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Asbestos**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/Wrongful Death

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Product Liability *(not asbestos or toxic/ environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice–Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collections Case–Seller Plaintiff
- Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord-tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition re Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Employment Development Department (EDD)**
- EDD Decision Review (48) *(if the case involves an Employment Development Department decision, check this item instead of Wrongful Termination or Other Employment)*

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Comprehensive Groundwater Adjudication (47)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister-State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only Injunctive Relief Only *(non-harassment)*
  - Mechanic's Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| Jennifer Anderson vs. 2018-4 IH BORROWER LP, et al. | |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| Other Personal Injury/ Property Damage/ Wrongful Death | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Jennifer Anderson vs. 2018-4 IH BORROWER LP, et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| Other Personal Injury/ Property Damage/ Wrongful Death | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☑ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| Employment | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| Contract | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Jennifer Anderson vs. 2018-4 IH BORROWER LP, et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>Number of Parcels ______ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Jennifer Anderson vs. 2018-4 IH BORROWER LP, et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| Provisionally Complex Litigation (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| Enforcement of Judgment | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| Miscellaneous Civil Complaints | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| Miscellaneous Civil Petitions | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Jennifer Anderson vs. 2018-4 IH BORROWER LP, et al. | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON: ☑ 1. ☑ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | | | ADDRESS: 40169 Medford Road, Temecula, CA 92591 |
|---|---|---|---|
| CITY: Temecula | STATE: CA | ZIP CODE: 92591 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Southwest Justice Center District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: 08/19/2026

/s/ Onica Cole

(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

Menifee Justice Center
27401 Menifee Center Drive, Menifee, CA 92584
www.riverside.courts.ca.gov

**Case Number:** CVME2611301

**Case Name:** ANDERSON vs 2018-4 IH BORROWER LP

ONICA COLE
205 SOUTH BROADWAY SUITE 802
Los Angeles, CA 90012

## NOTICE OF CASE MANAGEMENT CONFERENCE

The Case Management Conference is scheduled as follows:

| Hearing Date | Hearing Time | Department |
|---|---|---|
| 03/30/2027 | 8:30 AM | Department M302 |
| Location of Hearing: **27401 Menifee Center Drive, Menifee, CA 92584** | | |

No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case. CRC, Rule 3.725.

The plaintiff/cross-complainant shall serve a copy of this notice on all defendants/cross-defendants who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP Section 170.6 shall be filed in accordance with that section.

**Remote Appearance at Hearing:** The court **strongly encourages** parties and counsel to appear remotely for non-evidentiary hearings in civil cases. Pursuant to local rule 3132, persons intending to appear remotely shall notify all opposing parties of their intention to appear remotely before the hearing. Notice may be given informally, including by telephone, email, or text message. To appear remotely, on the day of the hearing, either use your computer, mobile device, or dial (833) 568-8864 (toll free) or (669) 254-5252, when prompted enter:

Meeting ID: 161 672 7660 #
Access Code: Press the # key (no number after the #)

Please MUTE your phone until your case is called, and it is your turn to speak. It is important to note that you must call twenty (20) minutes prior to the scheduled hearing time to check in or there may be a delay in your case being heard.

Interpreter services are available upon request. If you need an interpreter, please complete and submit the online Interpreter Request Form (https://riverside.courts.ca.gov/Divisions/InterpreterInfo/ri-in007.pdf) or contact the clerk's office and verbally request an interpreter. All requests must be made in advance with as much notice as possible, and prior to the hearing date in order to secure an interpreter.

Assistive listening systems, computer-assisted real time captioning, or sign language interpreter services are available upon request if at least 5 days notice is provided. Contact the Office of the ADA Coordinator by calling (951) 777-3023 or TDD (951) 777-3769 between 8:00 am and 4:30 pm or by emailing ADA@riverside.courts.ca.gov to request an accommodation. A *Request for Accommodations by Persons With Disabilities and Order* (form MC-410) must be submitted when requesting an accommodation. (Civil Code section 54.8.)

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

Menifee Justice Center
27401 Menifee Center Drive, Menifee, CA 92584
www.riverside.courts.ca.gov

**Case Number:** CVME2611301

**Case Name:** ANDERSON vs 2018-4 IH BORROWER LP

JENNIFER ANDERSON

## NOTICE OF CASE MANAGEMENT CONFERENCE

The Case Management Conference is scheduled as follows:

| Hearing Date | Hearing Time | Department |
|---|---|---|
| **03/30/2027** | **8:30 AM** | **Department M302** |
| Location of Hearing: **27401 Menifee Center Drive, Menifee, CA 92584** | | |

No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case. CRC, Rule 3.725.

The plaintiff/cross-complainant shall serve a copy of this notice on all defendants/cross-defendants who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP Section 170.6 shall be filed in accordance with that section.

**Remote Appearance at Hearing:** The court **strongly encourages** parties and counsel to appear remotely for non-evidentiary hearings in civil cases. Pursuant to local rule 3132, persons intending to appear remotely shall notify all opposing parties of their intention to appear remotely before the hearing. Notice may be given informally, including by telephone, email, or text message. To appear remotely, on the day of the hearing, either use your computer, mobile device, or dial (833) 568-8864 (toll free) or (669) 254-5252, when prompted enter:

Meeting ID: 161 672 7660 #
Access Code: Press the # key (no number after the #)

Please MUTE your phone until your case is called, and it is your turn to speak. It is important to note that you must call twenty (20) minutes prior to the scheduled hearing time to check in or there may be a delay in your case being heard.

Interpreter services are available upon request. If you need an interpreter, please complete and submit the online Interpreter Request Form (https://riverside.courts.ca.gov/Divisions/InterpreterInfo/ri-in007.pdf) or contact the clerk's office and verbally request an interpreter. All requests must be made in advance with as much notice as possible, and prior to the hearing date in order to secure an interpreter.

Assistive listening systems, computer-assisted real time captioning, or sign language interpreter services are available upon request if at least 5 days notice is provided. Contact the Office of the ADA Coordinator by calling (951) 777-3023 or TDD (951) 777-3769 between 8:00 am and 4:30 pm or by emailing ADA@riverside.courts.ca.gov to request an accommodation. A *Request for Accommodations by Persons With Disabilities and Order* (form MC-410) must be submitted when requesting an accommodation. (Civil Code section 54.8.)

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

Menifee Justice Center
27401 Menifee Center Drive, Menifee, CA 92584
www.riverside.courts.ca.gov

**Case Number:** CVME2611301

**Case Name:** ANDERSON vs 2018-4 IH BORROWER LP

2018-4 IH BORROWER LP

## NOTICE OF CASE MANAGEMENT CONFERENCE

The Case Management Conference is scheduled as follows:

| Hearing Date | Hearing Time | Department |
|---|---|---|
| **03/30/2027** | **8:30 AM** | **Department M302** |
| Location of Hearing: **27401 Menifee Center Drive, Menifee, CA 92584** | | |

No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case. CRC, Rule 3.725.

The plaintiff/cross-complainant shall serve a copy of this notice on all defendants/cross-defendants who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP Section 170.6 shall be filed in accordance with that section.

**Remote Appearance at Hearing:** The court **strongly encourages** parties and counsel to appear remotely for non-evidentiary hearings in civil cases. Pursuant to local rule 3132, persons intending to appear remotely shall notify all opposing parties of their intention to appear remotely before the hearing. Notice may be given informally, including by telephone, email, or text message. To appear remotely, on the day of the hearing, either use your computer, mobile device, or dial (833) 568-8864 (toll free) or (669) 254-5252, when prompted enter:

Meeting ID: 161 672 7660 #
Access Code: Press the # key (no number after the #)

Please MUTE your phone until your case is called, and it is your turn to speak. It is important to note that you must call twenty (20) minutes prior to the scheduled hearing time to check in or there may be a delay in your case being heard.

| | |
|---|---|
| | Interpreter services are available upon request. If you need an interpreter, please complete and submit the online Interpreter Request Form (https://riverside.courts.ca.gov/Divisions/InterpreterInfo/ri-in007.pdf) or contact the clerk's office and verbally request an interpreter. All requests must be made in advance with as much notice as possible, and prior to the hearing date in order to secure an interpreter. |
| | Assistive listening systems, computer-assisted real time captioning, or sign language interpreter services are available upon request if at least 5 days notice is provided. Contact the Office of the ADA Coordinator by calling (951) 777-3023 or TDD (951) 777-3769 between 8:00 am and 4:30 pm or by emailing ADA@riverside.courts.ca.gov to request an accommodation. A *Request for Accommodations by Persons With Disabilities and Order* (form MC-410) must be submitted when requesting an accommodation. (Civil Code section 54.8.) |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

Menifee Justice Center
27401 Menifee Center Drive, Menifee, CA 92584
www.riverside.courts.ca.gov

**Case Number:** CVME2611301

**Case Name:** ANDERSON vs 2018-4 IH BORROWER LP

THR PROPERTY MANAGEMENT L.P.

## NOTICE OF CASE MANAGEMENT CONFERENCE

The Case Management Conference is scheduled as follows:

| Hearing Date | Hearing Time | Department |
|---|---|---|
| **03/30/2027** | **8:30 AM** | **Department M302** |
| Location of Hearing: **27401 Menifee Center Drive, Menifee, CA 92584** | | |

No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case. CRC, Rule 3.725.

The plaintiff/cross-complainant shall serve a copy of this notice on all defendants/cross-defendants who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP Section 170.6 shall be filed in accordance with that section.

**Remote Appearance at Hearing:** The court **strongly encourages** parties and counsel to appear remotely for non-evidentiary hearings in civil cases. Pursuant to local rule 3132, persons intending to appear remotely shall notify all opposing parties of their intention to appear remotely before the hearing. Notice may be given informally, including by telephone, email, or text message. To appear remotely, on the day of the hearing, either use your computer, mobile device, or dial (833) 568-8864 (toll free) or (669) 254-5252, when prompted enter:

Meeting ID: 161 672 7660 #
Access Code: Press the # key (no number after the #)

Please MUTE your phone until your case is called, and it is your turn to speak. It is important to note that you must call twenty (20) minutes prior to the scheduled hearing time to check in or there may be a delay in your case being heard.

| | |
|---|---|
| | Interpreter services are available upon request. If you need an interpreter, please complete and submit the online Interpreter Request Form (https://riverside.courts.ca.gov/Divisions/InterpreterInfo/ri-in007.pdf) or contact the clerk's office and verbally request an interpreter. All requests must be made in advance with as much notice as possible, and prior to the hearing date in order to secure an interpreter. |
| | Assistive listening systems, computer-assisted real time captioning, or sign language interpreter services are available upon request if at least 5 days notice is provided. Contact the Office of the ADA Coordinator by calling (951) 777-3023 or TDD (951) 777-3769 between 8:00 am and 4:30 pm or by emailing ADA@riverside.courts.ca.gov to request an accommodation. A *Request for Accommodations by Persons With Disabilities and Order* (form MC-410) must be submitted when requesting an accommodation. (Civil Code section 54.8.) |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

Menifee Justice Center
27401 Menifee Center Drive, Menifee, CA 92584
www.riverside.courts.ca.gov

**Case Number:** CVME2611301

**Case Name:** ANDERSON vs 2018-4 IH BORROWER LP

INVITATION HOMES REALTY CALIFORNIA, INC.

## NOTICE OF CASE MANAGEMENT CONFERENCE

The Case Management Conference is scheduled as follows:

| Hearing Date | Hearing Time | Department |
|---|---|---|
| **03/30/2027** | **8:30 AM** | **Department M302** |
| Location of Hearing: **27401 Menifee Center Drive, Menifee, CA 92584** | | |

No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case. CRC, Rule 3.725.

The plaintiff/cross-complainant shall serve a copy of this notice on all defendants/cross-defendants who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP Section 170.6 shall be filed in accordance with that section.

**Remote Appearance at Hearing:** The court **strongly encourages** parties and counsel to appear remotely for non-evidentiary hearings in civil cases. Pursuant to local rule 3132, persons intending to appear remotely shall notify all opposing parties of their intention to appear remotely before the hearing. Notice may be given informally, including by telephone, email, or text message. To appear remotely, on the day of the hearing, either use your computer, mobile device, or dial (833) 568-8864 (toll free) or (669) 254-5252, when prompted enter:

Meeting ID: 161 672 7660 #
Access Code: Press the # key (no number after the #)

Please MUTE your phone until your case is called, and it is your turn to speak. It is important to note that you must call twenty (20) minutes prior to the scheduled hearing time to check in or there may be a delay in your case being heard.

Interpreter services are available upon request. If you need an interpreter, please complete and submit the online Interpreter Request Form (https://riverside.courts.ca.gov/Divisions/InterpreterInfo/ri-in007.pdf) or contact the clerk's office and verbally request an interpreter. All requests must be made in advance with as much notice as possible, and prior to the hearing date in order to secure an interpreter.

Assistive listening systems, computer-assisted real time captioning, or sign language interpreter services are available upon request if at least 5 days notice is provided. Contact the Office of the ADA Coordinator by calling (951) 777-3023 or TDD (951) 777-3769 between 8:00 am and 4:30 pm or by emailing ADA@riverside.courts.ca.gov to request an accommodation. A *Request for Accommodations by Persons With Disabilities and Order* (form MC-410) must be submitted when requesting an accommodation. (Civil Code section 54.8.)

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

Menifee Justice Center
27401 Menifee Center Drive, Menifee, CA 92584
www.riverside.courts.ca.gov

**Case Number:** CVME2611301

**Case Name:** ANDERSON vs 2018-4 IH BORROWER LP

CONSERVICE, LLC

## NOTICE OF CASE MANAGEMENT CONFERENCE

The Case Management Conference is scheduled as follows:

| Hearing Date | Hearing Time | Department |
|---|---|---|
| **03/30/2027** | **8:30 AM** | **Department M302** |
| Location of Hearing: **27401 Menifee Center Drive, Menifee, CA 92584** | | |

No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case. CRC, Rule 3.725.

The plaintiff/cross-complainant shall serve a copy of this notice on all defendants/cross-defendants who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP Section 170.6 shall be filed in accordance with that section.

**Remote Appearance at Hearing:** The court **strongly encourages** parties and counsel to appear remotely for non-evidentiary hearings in civil cases. Pursuant to local rule 3132, persons intending to appear remotely shall notify all opposing parties of their intention to appear remotely before the hearing. Notice may be given informally, including by telephone, email, or text message. To appear remotely, on the day of the hearing, either use your computer, mobile device, or dial (833) 568-8864 (toll free) or (669) 254-5252, when prompted enter:

Meeting ID: 161 672 7660 #
Access Code: Press the # key (no number after the #)

Please MUTE your phone until your case is called, and it is your turn to speak. It is important to note that you must call twenty (20) minutes prior to the scheduled hearing time to check in or there may be a delay in your case being heard.

Interpreter services are available upon request. If you need an interpreter, please complete and submit the online Interpreter Request Form (https://riverside.courts.ca.gov/Divisions/InterpreterInfo/ri-in007.pdf) or contact the clerk's office and verbally request an interpreter. All requests must be made in advance with as much notice as possible, and prior to the hearing date in order to secure an interpreter.

Assistive listening systems, computer-assisted real time captioning, or sign language interpreter services are available upon request if at least 5 days notice is provided. Contact the Office of the ADA Coordinator by calling (951) 777-3023 or TDD (951) 777-3769 between 8:00 am and 4:30 pm or by emailing ADA@riverside.courts.ca.gov to request an accommodation. A *Request for Accommodations by Persons With Disabilities and Order* (form MC-410) must be submitted when requesting an accommodation. (Civil Code section 54.8.)

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

Menifee Justice Center
27401 Menifee Center Drive, Menifee, CA 92584
www.riverside.courts.ca.gov

**Case Number:** CVME2611301

**Case Name:** ANDERSON vs 2018-4 IH BORROWER LP

MATTHEW HICKS

## NOTICE OF CASE MANAGEMENT CONFERENCE

The Case Management Conference is scheduled as follows:

| Hearing Date | Hearing Time | Department |
|---|---|---|
| **03/30/2027** | **8:30 AM** | **Department M302** |
| Location of Hearing: **27401 Menifee Center Drive, Menifee, CA 92584** | | |

No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case. CRC, Rule 3.725.

The plaintiff/cross-complainant shall serve a copy of this notice on all defendants/cross-defendants who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP Section 170.6 shall be filed in accordance with that section.

**Remote Appearance at Hearing:** The court **strongly encourages** parties and counsel to appear remotely for non-evidentiary hearings in civil cases. Pursuant to local rule 3132, persons intending to appear remotely shall notify all opposing parties of their intention to appear remotely before the hearing. Notice may be given informally, including by telephone, email, or text message. To appear remotely, on the day of the hearing, either use your computer, mobile device, or dial (833) 568-8864 (toll free) or (669) 254-5252, when prompted enter:

Meeting ID: 161 672 7660 #
Access Code: Press the # key (no number after the #)

Please MUTE your phone until your case is called, and it is your turn to speak. It is important to note that you must call twenty (20) minutes prior to the scheduled hearing time to check in or there may be a delay in your case being heard.

| | |
|---|---|
| | Interpreter services are available upon request. If you need an interpreter, please complete and submit the online Interpreter Request Form (https://riverside.courts.ca.gov/Divisions/InterpreterInfo/ri-in007.pdf) or contact the clerk's office and verbally request an interpreter. All requests must be made in advance with as much notice as possible, and prior to the hearing date in order to secure an interpreter. |
| | Assistive listening systems, computer-assisted real time captioning, or sign language interpreter services are available upon request if at least 5 days notice is provided. Contact the Office of the ADA Coordinator by calling (951) 777-3023 or TDD (951) 777-3769 between 8:00 am and 4:30 pm or by emailing ADA@riverside.courts.ca.gov to request an accommodation. A *Request for Accommodations by Persons With Disabilities and Order* (form MC-410) must be submitted when requesting an accommodation. (Civil Code section 54.8.) |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

Menifee Justice Center
27401 Menifee Center Drive, Menifee, CA 92584
www.riverside.courts.ca.gov

**Case Number:** CVME2611301

**Case Name:** ANDERSON vs 2018-4 IH BORROWER LP

FELICIA HOUSTON

## NOTICE OF CASE MANAGEMENT CONFERENCE

The Case Management Conference is scheduled as follows:

| Hearing Date | Hearing Time | Department |
|---|---|---|
| **03/30/2027** | **8:30 AM** | **Department M302** |
| Location of Hearing: **27401 Menifee Center Drive, Menifee, CA 92584** | | |

No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case. CRC, Rule 3.725.

The plaintiff/cross-complainant shall serve a copy of this notice on all defendants/cross-defendants who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP Section 170.6 shall be filed in accordance with that section.

**Remote Appearance at Hearing:** The court **strongly encourages** parties and counsel to appear remotely for non-evidentiary hearings in civil cases. Pursuant to local rule 3132, persons intending to appear remotely shall notify all opposing parties of their intention to appear remotely before the hearing. Notice may be given informally, including by telephone, email, or text message. To appear remotely, on the day of the hearing, either use your computer, mobile device, or dial (833) 568-8864 (toll free) or (669) 254-5252, when prompted enter:

Meeting ID: 161 672 7660 #
Access Code: Press the # key (no number after the #)

Please MUTE your phone until your case is called, and it is your turn to speak. It is important to note that you must call twenty (20) minutes prior to the scheduled hearing time to check in or there may be a delay in your case being heard.

Interpreter services are available upon request. If you need an interpreter, please complete and submit the online Interpreter Request Form (https://riverside.courts.ca.gov/Divisions/InterpreterInfo/ri-in007.pdf) or contact the clerk's office and verbally request an interpreter. All requests must be made in advance with as much notice as possible, and prior to the hearing date in order to secure an interpreter.

Assistive listening systems, computer-assisted real time captioning, or sign language interpreter services are available upon request if at least 5 days notice is provided. Contact the Office of the ADA Coordinator by calling (951) 777-3023 or TDD (951) 777-3769 between 8:00 am and 4:30 pm or by emailing ADA@riverside.courts.ca.gov to request an accommodation. A *Request for Accommodations by Persons With Disabilities and Order* (form MC-410) must be submitted when requesting an accommodation. (Civil Code section 54.8.)

Notice has been printed for the following Firm/Attorneys or Parties: CVME2611301

COLE, ONICA
205 SOUTH BROADWAY SUITE 802
Los Angeles, CA 90012

2018-4 IH BORROWER LP

INVITATION HOMES REALTY CALIFORNIA, INC.

HICKS, MATTHEW

ANDERSON, JENNIFER

THR PROPERTY MANAGEMENT L.P.

CONSERVICE, LLC

HOUSTON, FELICIA

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
www.riverside.courts.ca.gov
**Self-represented parties:** https://www.riverside.courts.ca.gov/SelfHelp/self-help.php

**ALTERNATIVE DISPUTE RESOLUTION (ADR) –**
***INFORMATION PACKAGE***

***** THE PLAINTIFF MUST SERVE THIS INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT. *****

**What is ADR?**
Alternative Dispute Resolution (ADR) is a way of solving legal disputes without going to trial. The main types are mediation, arbitration, and settlement conferences.

**Advantages of ADR:**
- Faster: ADR can be done in a 1-day session within months after filing the complaint.
- Less expensive: Parties can save court costs and attorneys' and witness fees.
- More control: Parties choose their ADR process and provider.
- Less stressful: ADR is done informally in private offices, not public courtrooms.

**Disadvantages of ADR:**
- No public trial: Parties do not get a decision by a judge or jury.
- Costs: Parties may have to pay for both ADR and litigation.

**Main Types of ADR:**

**Mediation:** In mediation, the mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to create a settlement agreement that is acceptable to everyone. If the parties do not wish to settle the case, they go to trial.

Mediation may be appropriate when the parties:
- want to work out a solution but need help from a neutral person; or
- have communication problems or strong emotions that interfere with resolution; or
- have a continuing business or personal relationship.

Mediation is not appropriate when the parties:
- want their public "day in court" or a judicial determination on points of law or fact;
- lack equal bargaining power or have a history of physical/emotional abuse.

**Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration the arbitrator's decision is final; there is no right to trial. In "non-binding" arbitration, any party can request a trial after the arbitrator's decision. The court's mandatory Judicial Arbitration program is non-binding.



Adopted for Mandatory Use
Riverside Superior Court
RI-ADR001-INFO [Rev. 06/10/21]

Arbitration may be appropriate when the parties:
- want to avoid trial, but still want a neutral person to decide the outcome of the case.

Arbitration is not appropriate when the parties:
- do not want to risk going through both arbitration and trial (Judicial Arbitration)
- do not want to give up their right to trial (binding arbitration)

**Settlement Conferences:** Settlement conferences are similar to mediation, but the settlement officer usually tries to negotiate an agreement by giving strong opinions about the strengths and weaknesses of the case, its monetary value, and the probable outcome at trial. Settlement conferences often involve attorneys more than the parties and often take place close to the trial date.

## RIVERSIDE COUNTY SUPERIOR COURT ADR REQUIREMENTS

ADR Information and forms are posted on the ADR website:
https://www.riverside.courts.ca.gov/Divisions/ADR/ADR.php

**General Policy:**
Parties in most general civil cases are expected to participate in an ADR process before requesting a trial date and to participate in a settlement conference before trial. (Local Rule 3200)

**Court-Ordered ADR:**
Certain cases valued at under $50,000 may be ordered to judicial arbitration or mediation. This order is usually made at the Case Management Conference. See the "Court-Ordered Mediation Information Sheet" on the ADR website for more information.

**Private ADR (for cases not ordered to arbitration or mediation):**
Parties schedule and pay for their ADR process without Court involvement. Parties may schedule private ADR at any time; there is no need to wait until the Case Management Conference. See the "Private Mediation Information Sheet" on the ADR website for more information.

**BEFORE THE CASE MANAGEMENT CONFERENCE (CMC), ALL PARTIES MUST:**
1. Discuss ADR with all parties at least 30 days before the CMC. Discuss:
   - Your preferences for mediation or arbitration.
   - Your schedule for discovery (getting the information you need) to make good decisions about settling the case at mediation or presenting your case at an arbitration.
2. File the attached "Stipulation for ADR" along with the Case Management Statement, if all parties can agree.
3. Be prepared to tell the judge your preference for mediation or arbitration and the date when you could complete it.

(Local Rule 3218)

**RIVERSIDE COUNTY ADR PROVIDERS INCLUDE:**
- The Court's Civil Mediation Panel (available for both Court-Ordered Mediation and Private Mediation). See https://adr.riverside.courts.ca.gov/Home/CivilMedPanel or ask for the list in the civil clerk's office, attorney window.
- Riverside County ADR providers funded by DRPA (Dispute Resolution Program Act):
  Dispute Resolution Service (DRS) Riverside County Bar Association: (951) 682-1015
  Dispute Resolution Center, Community Action Partnership (CAP): (951) 955-4900
  Chapman University School of Law Mediation Clinic (services only available at the court)



Adopted for Mandatory Use
Riverside Superior Court
RI-ADR001-INFO [Rev. 06/10/21]

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

☐ **BLYTHE** 265 N. Broadway, Blythe, CA 92225
☐ **CORONA** 505 S. Buena Vista, Rm. 201, Corona, CA 92882
☐ **MORENO VALLEY** 13800 Heacock St. #D201, Moreno Valley, CA 92553
☐ **MURRIETA** 30755-D Auld Rd., Murrieta, CA 92563
☐ **PALM SPRINGS** 3255 Tahquitz Canyon Way, Palm Springs, CA 92262
☐ **RIVERSIDE** 4050 Main St., Riverside, CA 92501

**RI-ADR001**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (*Name, State Bar Number and Address*)<br><br>TELEPHONE NO: FAX NO. (*Optional*):<br>E-MAIL ADDRESS (*Optional*):<br>ATTORNEY FOR (*Name*): | *FOR COURT USE ONLY* |
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | CASE NUMBER:<br><br>CASE MANAGEMENT CONFERENCE DATE(S): |

## STIPULATION FOR ALTERNATIVE DISPUTE RESOLUTION (ADR)
(CRC 3.2221; Local Rule, Title 3, Division 2)

**Court-Ordered ADR:**
Eligibility for Court-Ordered Mediation or Judicial Arbitration will be determined at the Case Management Conference. If eligible, the parties agree to participate in:

☐ Mediation ☐ Judicial Arbitration (non-binding)

**Private ADR:**
If the case is not eligible for Court-Ordered Mediation or Judicial Arbitration, the parties agree to participate in the following ADR process, which they will arrange and pay for without court involvement:

☐ Mediation ☐ Judicial Arbitration (non-binding)
☐ Binding Arbitration ☐ Other (describe): ______________________

Proposed date to complete ADR: ______________

**SUBMIT THIS FORM ALONG WITH THE CASE MANAGEMENT STATEMENT.**

| | | |
|---|---|---|
| (PRINT NAME OF PARTY OR ATTORNEY)<br>☐ Plaintiff ☐ Defendant | (SIGNATURE OF PARTY OR ATTORNEY) | (DATE) |
| (PRINT NAME OF PARTY OR ATTORNEY)<br>☐ Plaintiff ☐ Defendant | (SIGNATURE OF PARTY OR ATTORNEY) | (DATE) |
| (PRINT NAME OF PARTY OR ATTORNEY)<br>☐ Plaintiff ☐ Defendant | (SIGNATURE OF PARTY OR ATTORNEY) | (DATE) |
| (PRINT NAME OF PARTY OR ATTORNEY)<br>☐ Plaintiff ☐ Defendant | (SIGNATURE OF PARTY OR ATTORNEY) | (DATE) |